UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 02-10890 NG

ROBERTA WERNER, EXECUTRIX OF
THE ESTATE OF LOUIS GRECO,
ROBERTA WERNER, ADMINISTRATRIX
OF THE ESTATE OF LOUIS GRECO, JR.,
and ROBERTA WERNER,
INDIVIDUALLY,

     Plaintiffs,

vs.

UNITED STATES OF AMERICA, H.
PAUL RICO, DENNIS CONDON,, FRANK
L. WALSH, UNKNOWN AGENTS OF THE
UNITED STATES OF AMERICA, and
UNKNOWN STATE LAW
ENFORCEMENT OFFICERS,

     Defendants.

**AMENDED COMPLAINT OF PLAINTIFF ROBERTA WERNER,
INDIVIDUALLY AND IN HER CAPACITIES AS EXECUTRIX OF THE
ESTATE OF LOUIS GRECO AND ADMINISTRATRIX OF THE
ESTATE OF LOUIS GRECO, JR.**

INTRODUCTION

1.　　This Complaint stems from the wrongful conviction of Louis Greco for the

murder of Edward Deegan in 1967.  Greco's conviction for this murder by the Commonwealth of

Massachusetts was the proximate result of the intentional, wrongful acts of the Federal Bureau of

Investigation ("FBI"), defendant FBI agents H. Paul Rico ("Rico"), and Dennis Condon

("Condon") as well as defendant Frank L. Walsh ("Walsh"), who was a law enforcement officer

of the City of Boston, Massachusetts at the time of his wrongful acts alleged herein.

2.      As is more fully described below, in the course of their investigation of New England organized crime, Rico, Condon and other unknown FBI agents developed a witness to the Deegan murder, Joseph Barboza a.k.a. Joseph Baron ("Barboza") and turned him over to the Suffolk County District Attorney's Office ("Suffolk D.A.") in order to enable that Office to obtain indictments against and convictions of Greco and the others who were subsequently convicted of the Deegan murder. They did this even though they knew that Barboza's testimony concerning the purported involvement of Greco in the murder was fabricated. Moreover, Rico, Condon and other FBI agents failed to turn over to the Suffolk D.A. information that they had received from informants concerning the actual perpetrators of the murder, which information was exculpatory with respect to Greco and others convicted of the murder.

3.      Walsh (along with Rico, Condon and others) was a member of the joint state/federal task force that investigated the Deegan murder, and he participated in the suborning of Barboza's perjury and the concealment of exculpatory evidence from the Suffolk D.A.

### PARTIES

4.      Plaintiff Roberta Werner is an individual residing in Boynton Beach, Florida. Plaintiff also brings this suit in her capacities as Executrix of the Estate of Louis Greco and Administratrix of the Estate of Louis Greco, Jr., the deceased son of Werner and Greco.

5.      The United States of America ("United States") is a defendant in this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, et seq., with respect to plaintiff's claims arising from the tortious acts and/or omissions of employees and agents of the Federal Bureau of Investigation ("FBI"), an agency of the United States. Under the law of the Commonwealth of Massachusetts, said acts or omissions constitute the common law torts of malicious prosecution, intentional infliction of emotional distress, loss of consortium, parental

loss of consortium and conspiracy. Because the employees of the FBI were acting in their official capacity as employees of the United States at the time of their wrongful acts alleged herein, pursuant to the FTCA, the United States is the appropriate defendant with respect to these common law claims.

6.     Defendant H. Paul Rico ("Rico") is an individual who resides in Florida. During all times relevant to this Complaint, Rico was employed as a Special Agent of the FBI and was acting in his official capacity within the scope of his office of employment and under color of Federal law. Rico is sued individually as a defendant in plaintiff Roberta Werner, as Executrix of the Estate of Louis Greco's claims under <u>Bivens v. Six Unknown Agents of Federal Bureau of Narcotics,</u> 403 U.S. 388 (1971) (hereinafter "<u>Bivens</u>").

7.     Defendant Dennis M. Condon ("Condon") is an individual who resides in Waltham, Massachusetts. During all times relevant to this Complaint, Condon was employed as a Special Agent of the FBI and was acting in his official capacity within the scope of his office of employment and under color of Federal law. Condon is sued individually as a defendant in plaintiff's claims under <u>Bivens</u>.

8.     Defendant Frank Walsh ("Walsh") is an individual who resides in Roslindale, Massachusetts. During all times relevant to this Complaint, Walsh was employed as an officer of the Police Department of the City of Boston, Massachusetts and was acting in his official capacity within the scope of his office of employment and under color of the law of the Commonwealth of Massachusetts and/or the City of Boston, Massachusetts. Walsh is sued individually as a defendant in plaintiff Robert Werner, as Executrix of the Estate of Louis Greco's claims under 42 U.S.C. § 1983.

9.     Defendant Unknown Agents of the United States are as of yet unidentified

employees of the FBI and/or other agencies of the United States who materially assisted and

participated in the tortious conduct and Constitutional violations alleged herein.  At all times

relevant hereto, these Unknown Agents were acting in their official capacities within the scope of

their offices of employment and under color of Federal law.

10.    Defendant Unknown State Law Enforcement Officers are as of yet unidentified

employees of the Commonwealth of Massachusetts and/or a political subdivision thereof who

materially assisted and participated in the tortious conduct and Constitutional violations alleged

herein.  At all time relevant hereto, these Unknown State Officers were acting in their official

capacities within the scope of their offices of employment and under color of the law of the

Commonwealth of Massachusetts and/or a political subdivision thereof.

JURISDICTION AND VENUE

11.    Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over

plaintiff's claims against the United States under the FTCA based upon the fact that those claims

arise under the laws of the United States within the meaning of Section 1331, and pursuant to 28

U.S.C. § 1346 based upon the fact that the United States is a defendant.

12.    Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over

plaintiff's Bivens claims against Rico and Condon based upon the fact that those claims are for

violation of rights guaranteed by the Constitution of the United States.

13.    Pursuant to 28 U.S.C. §§ 1331, 1343 this Court has subject matter jurisdiction

over plaintiff's claims under 42 U.S.C. § 1983 against Walsh based upon the fact that those

claims are for violation of rights guaranteed by the Constitution of the United States and arise

under the laws of the United States.

14.    Venue of plaintiff's claims against the United States is proper in this Court

4

because the acts or omissions giving rise to plaintiff's claims against the United States occurred within this judicial district within the meaning of 28 U.S.C. § 1402(2)(b).

15.     Venue of plaintiff's claims against the individual defendants under <u>Bivens</u> and 42 U.S.C. § 1331 is proper in this Court because a substantial part of the events or omissions giving rise to plaintiff's claims against these defendants occurred in this judicial district within the meaning of 28 U.S.C. § 1391.

16.     In July 2001, plaintiff Roberta Werner, individually and in her capacity as the Executrix of the Estate of Louis Greco and Administratrix of the Estate of Louis Greco, Jr. presented notice of her claims against the United States set forth herein to the appropriate Federal Agency pursuant to 28 U.S.C. § 2675.

17.     Plaintiff Robert Werner's individual and representative claims referenced in the preceding paragraph were denied on October 3, 2002.

BACKGROUND FACTS

A.      <u>The Deegan Murder</u>

18.     Louis Greco ("Greco"), Roy French ("French"), Joseph Salvati ("Salvati"), Henry Tameleo ("Tameleo"), Ronald Cassesso ("Cassesso") and Peter Joseph Limone ("Limone") were convicted in 1968 in the Superior Court for Suffolk County, Massachusetts for the murder of Edward "Teddy" Deegan ("Deegan") on March 12, 1965.

19.     Greco was originally sentenced to death, but the sentence was vacated, and he was then sentenced to life imprisonment. Greco spent twenty-eight years in prison and died while he was still incarcerated in 1995.

20.     Deegan was in fact killed by Vincent James Flemmi ("Jimmy Flemmi"), Joseph Barboza a.k.a. Joseph Baron ("Barboza"), French, Cassesso, and Joseph Romeo Martin

5

("Martin"), who were all involved in organized crime activities. Greco, Limone and Tameleo were innocent of and were wrongfully convicted and incarcerated for the murder of Deegan.

B.    The Plaintiff

21.    Plaintiff Roberta Werner ("Werner") is the former wife of Greco. She was married to Greco from 1957 until 1970. She is a plaintiff in her individual capacity as well as in her capacity as Executrix of the Estate of Louis Greco and Administratrix of the Estate of Louis Greco, Jr. Louis Greco, Jr. was the son of Werner and Greco, and he died in 1997.

C.    The FBI's Informant Information Exculpatory to Greco

22.    At all times relevant hereto, Rico and Condon were partners and worked out of the Boston, Massachusetts Office of the FBI. At all times relevant hereto, Rico and Condon were assigned responsibility for investigating organized crime in New England and developing prosecutable cases against alleged organized crime figures.

23.    At all times relevant hereto, Walsh was a City of Boston, Massachusetts police officer. Walsh, Rico, and Condon were members of the joint federal/state task force that investigated the Deegan murder which was believed to be, and in fact was, an organized crime "hit."

24.    The FBI had been aware for some time prior to the murder of Deegan that Jimmy Flemmi intended to kill Deegan. Specifically, an October 19, 1964 Memorandum authored by Rico states that an informant had reported that Jimmy Flemmi had stated that he "wants to kill Deegan and wanted the informant to go with him on the 'hit.'" The FBI had also received information in 1964 that Flemmi had stated that "all he wants to do now is kill people" and that he desired to become the number one "hit man" in the area.

25.    Jimmy Flemmi was the brother of Steven "the Rifleman" Flemmi. He died of a

6

drug overdose in 1979.

26.     A Memorandum from the Boston Office of the FBI to the Director of the FBI

dated March 10, 1965 stated that an informant had advised the Boston Office that on March 9,

1965 Jimmy Flemmi and Barboza contacted Raymond Patriarca ("Patriarca") to explain to

Patriarca that they were having a problem with Deegan and to get the "o.k." to kill him.

Patriarca was reputed, and believed by the FBI, to be an organized crime boss.

27.     On March 10, 1965, another informant reported to Rico that he had been told by

Jimmy Flemmi that Patriarca had authorized the murder of Deegan and that a "dry run" had

already been made.  This is evidenced by a March 15, 1965 Memorandum authored by Rico.

28.     On March 13, 1965, the day after Deegan was killed, the same informant who

provided the information in the preceding paragraph informed Rico that Jimmy Flemmi had told

him that Flemmi, Barboza, French, Cassesso and Martin had been involved in Deegan's murder.

This is evidenced by an April 15, 1965 Memorandum authored by Rico.

29.     One of the weapons used to kill Deegan was a .45 caliber handgun.  On March 23,

1965, the FBI received information from an informant that Barboza claimed to have shot Deegan

with the .45 caliber gun.  The FBI gave this information a "very good" rating.  This is evidenced

by an April 6, 1965 FBI Memorandum.

30.     The foregoing information and the documents referenced in paragraphs 24, and

26-29 above were not disclosed by the FBI until 2000.  This is true even though at all times

relevant hereto the FBI (including without limitation Rico and Condon) believed that Flemmi

was involved in the Deegan murder.  At the same time, however, Rico and Condon developed

and turned over to the Suffolk D.A. a witness, Barboza, who they knew intended to commit

perjury by testifying that Flemmi was not involved in the murder and by implicating Greco,

7

among other innocent persons, in the murder.

      D.      <u>The FBI's Development of Barboza as a Witness</u>

      31.      Rico and Condon began their efforts to develop Barboza as a witness with respect to the Deegan murder and other organized crime murders in about March 1967.

      32.      Rico and Condon convinced Barboza to become a witness in the trial concerning the Deegan murder (the "Deegan murder trial") and other organized crime trials by providing him false information through an informant in order to cause him to fear for his life. Specifically, a Memorandum dated April 14, 1967 authored by Rico evidences that Rico and Condon instructed an informant to tell Jimmy Flemmi, who was then at the Walpole House of Correction along with Barboza, that the "Italian element," and specifically organized crime boss Jerry Angiulo ("Angiulo"), was attempting to use connections at the Suffolk D.A. to "bury" Barboza. Rico and Condon hoped that Flemmi would relay this information to Barboza, which Flemmi in fact did. Rico and Condon knew that Barboza would be particularly susceptible to this type of coercion because he was of Portuguese descent and, as a result, he had never been fully accepted by the so-called "Italian element" of organized crime.

      33.      Condon testified at the Deegan murder trial that he believed Barboza's testimony to be "pure" and that he had done everything in his power to ensure that. At no point during his testimony did he disclose the foregoing influence used on Barboza to induce him to testify.

      34.      Shortly after Rico and Condon began their efforts to develop Barboza as a witness in the Deegan murder case and before Rico and Condon turned him over to the Suffolk D.A., Barboza told them that under no circumstances would he implicate Jimmy Flemmi in a murder. This is evidenced by a Memorandum dated March 8, 1967 authored by Condon and Rico. Nonetheless, Rico and Condon continued to develop Barboza as a witness to testify at the

Deegan murder trial even though they both believed that Flemmi was involved in the murder.

35.     Furthermore, Barboza told Rico and Condon that he left the scene prior to the actual murder of Deegan and that Greco shot Deegan with the .45 caliber gun.  These claims were contradicted by the information that the FBI had from the informant referenced in paragraph 29, above.

36.     Rico has since admitted that at the time he believed that Jimmy Flemmi was involved in the Deegan murder.  In about 2000, Rico testified before a Committee of the United States House of Representatives that based upon the information that he had from informants at the time it seemed "logical" to him that Jimmy Flemmi was involved in the Deegan murder.

37.     Prior to Barboza's testimony before the grand jury for the Deegan murder case, Rico, Condon and Walsh took a statement from him on September 12, 1967 concerning the Deegan murder in which Barboza failed to implicate Jimmy Flemmi.  In addition, Barboza claimed that Greco shot Deegan with the .45 caliber gun.  As such, Rico and Condon knew that Barboza would commit perjury before the grand jury.  The document containing this statement was not disclosed to counsel for the defense prior to the trial and, in fact, it was not disclosed until 2000.

38.     Prior to Barboza's grand jury testimony, Rico and Walsh took at least one statement from Barboza (in addition to the September 12, 1967 statement referenced above) in which Barboza contradicted himself in several material respects concerning his claim that Greco was involved in the Deegan murder.  For example, in the statement that Barboza gave to Rico and Walsh (among others) on September 12, 1967, Barboza stated that on the night of the murder Greco left the Ebbtide Restaurant with the .45 caliber handgun in his possession; that Greco was wearing a brown topcoat, about medium color when he went into the alley with the others to kill

9

Deegan; and that after the murder Greco returned to the Ebbtide Restaurant and informed

Barboza that he was one of the persons who shot Deegan.

39.     In a statement to Rico and Walsh (among others) one month later on October 16,

1967, Barboza stated that on the night of the murder Greco did not come into the Ebbtide

Restaurant at all; that he did not remember what Greco was wearing; and he made no mention of

seeing Greco at the Ebbtide Restaurant afterwards or of any admission by Greco that Greco had

shot Deegan.  Upon information and belief, prior to the time that Rico and Condon turned

Barboza over to the Suffolk D.A., Condon had knowledge of these glaring inconsistencies in

Barboza's statements.

40.     The written documents memorializing Barboza's verbal statements to law

enforcement officers, including Rico, Condon and Walsh, and containing the material

inconsistencies mentioned in the preceding two paragraphs concerning his testimony that Greco

was involved in the Deegan murder, were not disclosed until 2000.

41.     Notwithstanding their lack of probable cause to believe that Greco was involved

in the Deegan murder and knowing that Barboza would nonetheless perjuriously implicate Greco

in the murder, Rico and Condon provided Barboza to the Suffolk D.A. to enable the Suffolk D.A.

to obtain an indictment and conviction of Greco for the Deegan murder.  The indictment and

conviction of Greco would not have been possible without Barboza as a witness against him.

42.     Rico and Condon did not inform the Suffolk D.A. of the foregoing information

showing that they knew that Barboza had fabricated material parts of his testimony concerning

the Deegan murder in general and, in particular, his testimony that Greco was involved in the

murder and actually shot Deegan.

43.     Barboza testified before the grand jury with respect to the Deegan murder on

October 25, 1967. The indictment against Greco was handed down after his testimony on that same day.

E.      The Defendants' Wrongful Post-Indictment Actions

44.     When Greco learned that he had been indicted in Massachusetts for the Deegan murder, he was in Florida. He turned himself in to the Miami Police Department. He was administered a polygraph examination by the Miami Police Department Polygraph Unit during which he denied that he had been involved in the Deegan murder. The polygraph examiner concluded that this response was truthful. (Greco would again successfully pass polygraph examinations on this issue in 1978 and 1983).

45.     Despite Greco's request at the time, upon information and belief, the FBI did not administer a polygraph test to Barboza before turning him over to the Suffolk D.A. as a witness to the Deegan murder.

46.     When Deegan was killed, Anthony Stathopoulos was with him. Prior to the trial, Rico, Condon and Walsh arranged for Barboza, who was in federal custody, and Stathopoulos, who was in the protective custody of the Commonwealth of Massachusetts, to meet in order to assure that their testimony at trial would not be contradictory. At the time they arranged this meeting, Rico and Condon were aware that Stathopoulos claimed to have seen only Cassesso and Martin at the murder scene at the time of the murder and admitted that "he did not see the others involved." After this meeting, Stathopoulos claimed for the first time that the man with the gun looked like Greco.

47.     The written report memorializing the statements that Stathopoulos gave to law enforcement officers in which he claimed that the only persons he saw were Cassesso and Martin was not disclosed until 2000. At the trial, the Commonwealth denied that any such written report

existed.

48.     Prior to encouraging Stathopoulos to commit perjury by arranging for him to meet with Barboza, the only information that Rico, Condon and Walsh had that Greco was involved in the murder came from Barboza, who they knew was not telling the truth. As such, at no time did the FBI, Rico, Condon or Walsh have probable cause to believe that Greco had been involved in the Deegan murder.

49.     After the indictment of Greco for the Deegan murder, the FBI, Rico, and Condon assisted the Suffolk D.A. in connection with the prosecution of Greco by, among other acts, preparing Barboza for his testimony at trial.

50.     Prior to the trial, Walsh interviewed a witness in Florida who was able to provide alibi testimony for Greco. This witness, Barbara Dones Brown, babysat for Greco's children when Greco was in Florida. She provided Walsh with a calender evidencing that she had babysat for Greco's children on the night of the Deegan murder. Walsh falsely claimed that no such calender existed.

51.     The prosecution of Greco for the murder of Deegan was the direct result of the investigation by Rico and Condon and their development of Barboza as a witness, a fact which was confirmed by the then Suffolk County District Attorney, Garrett H. Byrne, after the guilty verdict was returned against Greco and the others convicted of the murder.

52.     Upon information and belief, the FBI suborned Barboza's perjury because at the time of the murder it was attempting to develop Flemmi as an informant, and it did not want Flemmi's involvement in the Deegan murder to be disclosed. Indeed, a Memorandum from the Boston Office of the FBI to the Director of the FBI dated March 9, 1965 (three days before Deegan was killed) stated that Jimmy Flemmi was being designated as a target in the FBI's "Top

12

Echelon Criminal Informant" program.

53.     Upon information and belief, another reason why the FBI, Rico and Condon suborned Barboza's perjury is that they assumed that, because Greco was of Italian ancestry, he was involved in organized crime and that he had committed other crimes.

54.     The malice alleged in the preceding paragraph is evidenced by Rico's testimony before Congress that he did not feel any remorse for his part in the wrongful conviction of Salvati for the Deegan murder because he does not "know everything that Joseph Salvati has done in his lifetime" or "that he is completely innocent of everything." Salvati was released from prison in 1997 after spending approximately 29 years in prison for his conviction of the Deegan murder.

F.     Greco's Counsel's Diligent Search For The Exculpatory Documents

55.     Requests for discovery of exculpatory information were made by the defense attorneys prior to the trial, during the trial and after Greco's conviction.

56.     Despite these requests by the defense attorneys, the exculpatory documents referenced in paragraphs 24, 26-29, 32, 34, 40 and 47 and the information contained therein were not disclosed or produced at the time of the trial and were not disclosed until December, 2000.

G.     Post-conviction Matters Involving Barboza

57.     In about 1970, while he was in the custody of the Commonwealth of Massachusetts for parole violations, Barboza recanted his testimony in the Deegan murder trial against Greco, Limone, and Tameleo in statements that he made to attorney F. Lee Bailey, among other individuals. Barboza, however, subsequently denied these recantations after he was visited by federal officials.

13

58.     In about 2000, Bailey testified before a Committee of the United States House of Representatives about a conversation he had with Barboza in about 1970.  According to Bailey, Barboza told Bailey that when Rico and Condon questioned him about the Deegan murder (and other murders), he told Rico and Condon directly that he would falsely implicate persons whom the FBI wanted to be convicted of the murder if the FBI permitted him to falsely implicate other persons whom he wanted incarcerated.

59.     Barboza implicated Greco in the Deegan murder because of a personal grudge that he had against Greco, and he implicated Limone and Tameleo because the FBI wanted to convict them as they were reputed, and believed by the FBI, to be the "right hand men" of crime bosses Patriarca and Angiulo.

60.     In 1971, Barboza was living in California under the name of Joseph Bentley as a participant in the federal witness protection program.  At that time, he shot and killed Clayton Wilson and was prosecuted for the capital crime of first-degree murder.

61.     In 1972, Barboza wrote to Condon seeking his assistance with the charge pending against him in the Wilson murder case.  Condon and Rico traveled to Santa Rosa, California to intercede on Barboza's behalf with the local authorities responsible for his prosecution.  As a result of their efforts, Barboza was permitted to plead guilty to second-degree murder and was sentenced to only five years imprisonment.

62.     The actions taken by Condon and Rico on behalf of Barboza in connection with the Wilson murder were to ensure his continuing silence in connection with his false testimony in the Deegan murder trial and in order to keep Greco, among others, wrongfully incarcerated for Deegan's murder.

63.     In 1976, Barboza was machine gunned to death in San Francisco, California.

14

H.    Limone's Exoneration and Greco's Exoneration by Proxy

64.    Limone remained incarcerated for his conviction of the Deegan murder until

January 5, 2001 when he was released on bail based upon the disclosure of the information and

documents referenced in paragraphs 24, 26-29, 32, 34, 40 and 47 above.  On January 5, 2001, the

Suffolk Superior Court (Hinkle, J.) vacated his conviction and ordered a new trial.  The court

found that the newly disclosed FBI documents cast substantial doubt on the credibility of

Barboza's testimony at the Deegan murder trial and that, had the documents been disclosed to the

defense, the jury would likely have reached a different result (i.e., an acquittal).  The

Commonwealth of Massachusetts had joined in Limone's request for a new trial.

65.    On January 30, 2001, the Suffolk D.A. announced that it would not prosecute the

case further and Limone was discharged.  The written nolle prosequi which the Suffolk D.A.

filed with the Suffolk Superior Court stated that evidence newly discovered as of December 19,

2000, consisting of the FBI information and documents referenced in paragraphs 24, 26-29, 32,

34, 40 and 47, had undermined the credibility of Barboza.  The nolle prosequi further stated that

the Commonwealth had conducted a thorough review of the facts and the alleged evidence

against Limone and concluded "that it does not now have a good faith basis – legally or ethically

– to proceed with any further prosecution of the defendant."  As such, the criminal proceedings at

issue were terminated in Limone's favor.

66.    The information and documents referenced in paragraphs 24, 26-29, 32, 34, 40

and 47 that the FBI and the Suffolk D.A. finally disclosed in 2000 are even more exculpatory of

Greco than they are of Limone.  Accordingly, if Greco had been alive when these documents

were disclosed his conviction would have been overturned in the same manner that Limone's

was.

15

67.     The vacating of Limone's conviction for the Deegan murder and the nolle prosequi filed by the Suffolk D.A. constitute a reversal by proxy of Greco's conviction.

68.     Defendants deprived Greco of the opportunity to overturn his conviction prior to his death by fraudulently concealing the exculpatory information and documents referenced in paragraphs 24, 26-29, 32, 34, 40 and 47 above until after his death in prison.

I.      Facts Concerning Emotional Distress Claims

      1.     Louis Greco's Emotional Distress Claims

            a.     A decorated war hero

69.     Greco was fifty-one years old when he was incarcerated. He spent the rest of his life in prison, until he died in 1995 at the age of seventy-eight. During his incarceration, Greco suffered from several illnesses including colon cancer, diabetes, and heart disease.

70.     Greco was a decorated World War II veteran. He served in the United States Army and fought in the battle to reclaim Bataan and liberate the Phillippines. Greco suffered a crippling and permanent injury in Bataan that ailed him until his death. He received a severe shrapnel wound in the ankle during the battle and nevertheless he carried a wounded soldier to safety after he was injured. He was awarded the Philippine Liberation Ribbon, two Bronze Stars, the Purple Heart, the World War II Victory Medal, the Good Conduct Medal, Combat Infantryman's Badge and the Asiatic-Pacific Theater Ribbon with three Battle Stars. Greco was honorably discharged from the army in 1946.

71.     Greco was a family man and a social person. His incarceration marked the end of his days as a father to his two young sons and as a husband to his wife. Greco was unable to be a father figure in his sons' crucial developmental years, and was denied the friendship and love of his wife, family, and friends.

16

b.    Originally sentenced to death row

72.    Greco spent the first four of his prison years on death row in Walpole. Consistent

with prison regulations for prisoners of his status, he was allowed only one shower per week, and

was allotted extremely limited exercise time. The rest of the time, apart from visits, Greco was

locked in his suffocatingly tiny cell.

73.    He was allowed one visit per week from his wife Roberta. Greco lived for those

visits. Roberta's visiting time was strictly designated to take place on Thursday mornings from

9:00 a.m. to 10:00 a.m., and it was required that a prison guard escort her to the visiting room

and remain present throughout the visit. Conjugal visits were not allowed.

74.    Although Roberta arrived early every single week, there was never a guard

available to escort her to the visiting room. Greco would routinely have to wait twenty to forty

minutes to see Roberta, and the visits would be curtailed because they had begun late.

75.    The actual visits took place in a room that contained a structure resembling a glass

cage with a wire fence all around the glass. Greco was kept inside the cage, and Roberta was not

allowed inside. She would communicate with him from outside the cage, with a prison guard

ever-present in the room.

76.    The delay in his wife's visits, the shortened time due to the late starts, and the

atmosphere of the visiting room frustrated Greco and caused him mental anguish. He imagined

that she was cheating on him because he was locked away and had little communication with her.

As a result, the small amounts of time they did spend together were extremely strained, and

eventually became unbearable.

77.    Consequently, during his time in Walpole, Greco began urging Roberta to divorce

him and to "get on with" her life. Roberta did not want to do this, but finally, he convinced her

17

to do so. She later remarried.

c.      Furloughs in Shirley

78.      Greco was eventually moved to MCI Norfolk and then to a prison in Shirley,
Massachusetts. He was allowed to go out on furloughs because he was a well liked, polite,
"model prisoner." Generally, on a furlough, Greco was allowed to spend a day and a night with
his family.

79.      Because Roberta had remarried by the time Greco was eligible for furloughs,
Greco would have to spend his visits with Roberta, her new husband, and his children. The visits
were often difficult because he no longer had a traditional place in his own family.
Notwithstanding the awkwardness, Greco cherished the time that he was able to spend with
Roberta and his children and the tiny amount of near-normalcy that the furloughs afforded him.

80.      A few years after he began taking furloughs, the parole board voted to eliminate
Greco's access to furloughs. The furloughs were not stopped because of anything having to do
with Greco, who remained a model prisoner at all times. Rather, they were stopped as a result of
the negative publicity the Massachusetts furlough program received during the 1988 campaign
for President of the United States.

81.      The termination of the furloughs was a crippling blow to both Greco and his
family. He was mentally tortured by having a small window of freedom and normalcy for a
time, and then having this stripped away. Roberta Werner and her sons, Louis Greco Jr., and
Edward Greco, were similarly anguished by the furlough termination.

d.      Greco's severe medical problems and eventual death

82.      In his later years, Greco developed serious diabetes-related problems. He required
medical treatment and a special diet. Neither was provided adequately in prison.

18

83.     Greco's health rapidly deteriorated as a result.  He was placed in a wheelchair, and soon afterwards, one of his legs was amputated.   The physical and mental pain of his disability were too difficult for him to bear.  Greco died in prison shortly after his leg was amputated.

    2.    <u>Roberta Werner's Emotional Distress Claims</u>

84.     Roberta was approximately 31 years old when Greco was incarcerated, and she had been married to him for ten years.  She was left to raise her two young sons alone and was deprived of the companionship, love and support of her husband.

85.     In the beginning of Greco's incarceration, Roberta, too, lived for the Thursday morning visits.  Although she always reached the prison at 8:30 am and the designated visiting time was 9:00 am, Roberta was chronically delayed in seeing Greco due to the lack of available escorting guards.

86.     In addition to the difficulties caused by the late starts, the visitation process routinely resulted in extreme humiliation and degradation for Roberta.  Even though she was diligent in removing all metallic items from her person, the metal detector was frequently triggered when she walked through it.  When this happened, Roberta was always immediately strip searched by the female guards.

87.     As part of the search, Roberta was told to take off all of her clothes - including her undergarments.  She was then forced to squat on the ground until the guards were satisfied that she had not hidden anything "inside."  Roberta was embarrassed and disgusted by this procedure.

88.     Upon information and belief, the strip searches were a routine procedure of the Massachusetts Department of Corrections.

89.     Roberta determined, at one point, that the metal detector might be triggered by

bobby pins she needed to keep her long, thick hair in place, so she cut off her hair in an attempt to alleviate the situation.

90.     The combination of the late starts of the visits, Greco's frustration towards her as a result, her nervousness regarding the impending strip searches and the humiliation she felt when they actually occurred, caused Roberta extreme mental distress.

91.     Furthermore, she was deeply distressed when Greco pressured her to divorce him on the basis that he could no longer withstand the pain of their situation and that she should get on with her life.

92.     In addition, Roberta's social life was destroyed as a result of her husband's incarceration.  She felt everyone she knew was staring at her saying, "There goes the wife of a murderer."  She felt she was stared at as though she were dirty, or guilty of wrongdoing.  Her female friends, with whom she enjoyed socializing and playing bridge, telephoned to tell her that their husbands had forbid them from being in contact with her for their own safety.

93.     Roberta and her sons were financially depleted from the trial expenses.  Although she was previously a homemaker and never wanted for any material things, Roberta was forced to start working.  She had great difficulty attaining a job, because as soon as she disclosed her name was Roberta Greco, the potential employer ended the interview on the spot indicating that they did not want to employ her because of who her husband was.

94.     Even though Roberta was eventually hired as a waitress, her family was always financially infirm after Greco was incarcerated.  When her sons were of age to take their drivers' licence exams, she explained to each of them that they could not get a licence because there was no point, as they would never be able to afford a car.

95.     Neither of her sons ever got their drivers' licences, even though her son Louis, Jr.

lived to age forty and her son Edward is now forty-five.

      3.      <u>Louis Greco, Jr.'s Emotional Distress Claims</u>

      96.     Greco and Roberta's older son, Louis Greco, Jr., (Louis) was born on Jan 25, 1955. He was thirteen years old when his father went to prison.

      97.     Louis was extremely disturbed by his father's conviction and incarceration. For years, he wanted to change his name so that others would not immediately recognize him as the son of the Greco who went to prison for murder.

      98.     Louis was subjected to years of visiting Greco in prison and watching his father deteriorate before his eyes.

      99.     When he visited the prison in Greco's later years and saw that Greco's leg had been amputated, Louis was mentally devastated.

      100.    Louis was extremely depressed and deeply grieved when his father died in prison.

      101.    After Greco's death, Louis took his own life by drinking a bottle of Drano. His mother was made aware that in taking his own life, her son bled from every orifice in his body, and that there were no organs to donate.

COUNT I
(Malicious Prosecution Pursuant to FTCA –
Estate of Louis Greco v. United States)

      102.    Plaintiffs incorporate by reference herein the allegations set forth in paragraphs 1-101, above as if they were set forth fully here.

      103.    The FBI, Rico, Condon and other Unknown Agents of the United States developed Barboza as a witness in the Deegan murder case and provided him to the Suffolk D.A. for the purpose of securing an indictment and conviction of Greco for the Deegan murder even though they knew that Barboza's testimony about Greco's purported involvement in the murder

21

was false.

104.    In addition, the FBI, Rico, Condon and other Unknown Agents of the United States failed to disclose to the Suffolk D.A. information and documents in their possession regarding the Deegan murder that was exculpatory with respect to Greco.

105.    Defendants' provision of fabricated evidence to, and withholding of exculpatory evidence from, the Suffolk D.A. constitutes initiation of the prosecution of Greco for the Deegan murder and satisfies that element of a malicious prosecution claim under Massachusetts law.

106.    As set forth above, at no point did the FBI, Rico, Condon and the other Unknown Agents of the United States have probable cause to believe that Greco had been involved in the Deegan murder.

107.    In initiating the prosecution of Greco for the Deegan murder without probable cause, the FBI, Rico, Condon and the Unknown Agents of the United States acted with malice.

108.    The prosecution of Greco for the Deegan murder was terminated in favor of Greco by proxy at the time that the Suffolk D.A. filed the nolle prosequi in 2001.

109.    The foregoing actions of the FBI, Rico, Condon and the Unknown Agents of the United States constitute the tort of malicious prosecution under Massachusetts law.

110.    As a result of defendants' malicious prosecution, plaintiff Roberta Werner, as Executrix of the Estate of Louis Greco, has suffered damages, including without limitation loss of liberty, damage to reputation and pain and suffering.

111.    Defendants committed the above acts and omissions while acting in their official capacities and within the scope of their offices or employment with the United States. Accordingly, pursuant to 28 U.S.C. § 2679, the United States is the appropriate defendant in plaintiff's malicious prosecution claim.

112.    As a result of the foregoing acts and omissions of its employees while acting in

their official capacities, if the United States were a private person it would be held liable under

Massachusetts law to plaintiff Roberta Werner, as Executrix of the Estate of Louis Greco for the

tort of malicious prosecution.

COUNT II

(Intentional Infliction of Emotional Distress Pursuant
to the FTCA – Roberta Werner, Individually and the Estates of
Greco and Louis Greco, Jr. v. United States)

113.    Plaintiff incorporates by reference herein the allegations set forth in paragraphs 1-

112, above as if they were set forth fully here.

114.    As a proximate result of the initiation of the prosecution of Greco for the Deegan

murder without probable cause and with malice by the FBI, Rico, Condon and the Unknown

Agents of the United States, Greco was convicted and imprisoned for twenty-eight years until his

death.

115.    The acts and omissions of the FBI, Rico, Condon and the Unknown Agents of the

United States in initiating the prosecution of Greco for the Deegan murder without probable

cause and with malice were extreme and outrageous, beyond all possible bounds of decency and

utterly intolerable in a civilized community.

116.    The FBI, Rico, Condon, and the Unknown Agents of the United States knew or

should have known that their initiation of the prosecution of Greco for the Deegan murder

without probable cause and with malice and the imprisonment of Greco which proximately

resulted from their actions was likely to cause Louis Greco, Louis Greco, Jr. and Roberta Werner

severe emotional distress.

117.    The aforementioned acts and omissions of the FBI, Rico, Condon and the

23

Unknown Agents of the United States did in fact proximately cause Louis Greco, Louis Greco, Jr. and Roberta Werner to suffer severe emotional distress of a nature that no reasonable person could be expected to endure as described above.

118.   The foregoing actions of the FBI, Rico, Condon and the Unknown Agents of the United States constitute the tort of intentional infliction of emotional distress under Massachusetts law.

119.   As a result of defendants' intentional infliction of emotional distress, plaintiff has suffered damages, including without limitation the pain and suffering of Louis Greco, Louis Greco, Jr. and Roberta Werner.

120.   Defendants committed the above acts and omissions while acting in their official capacities and within the scope of their offices or employment with the United States. Accordingly, pursuant to 28 U.S.C. § 2679, the United States is the appropriate defendant in plaintiff's intentional infliction of emotional distress claims.

121.   As a result of the foregoing acts and omissions of its employees while acting in their official capacities, if the United States were a private person it would be held liable under Massachusetts law to plaintiff for the tort of intentional infliction of emotional distress.

COUNT III
(Loss of Consortium – Roberta Werner, Individually and the<br>Estate of Louis Greco v. United States)

122.   Plaintiff incorporates by reference herein the allegations set forth in paragraphs 1-121, above as if they were set forth fully here.

123.   As a proximate result of the initiation of the prosecution of Greco for the Deegan murder without probable cause and with malice by the FBI, Rico, Condon and the Unknown Agents of the United States, Greco was convicted and imprisoned for twenty-eight years until his

24

death.

124.    In addition, the initiation of the prosecution of Greco for the Deegan murder without probable cause and with malice by the FBI, Rico, Condon and the Unknown Agents of the United States and his conviction as a result thereof proximately caused plaintiff Roberta Werner and Greco to suffer the loss of the society, affection, companionship and relations with each other during the time that Greco was imprisoned and she remained married to him.

125.    The FBI, Rico, Condon and the Unknown Agents of the United States knew or should have known that their initiation of the prosecution of Greco for the Deegan murder without probable cause and with malice and the imprisonment of Greco which proximately resulted from their actions was likely to cause Robert Werner and Greco to suffer the loss of the society, affection, companionship and relations with each other during the time that he was imprisoned and she remained married to him.

126.    The foregoing actions of the FBI, Rico, Condon, and the Unknown Agents of the United States constitute the tort of loss of consortium under Massachusetts law.

127.    As a result of defendants' commission of the tort of loss of consortium, Roberta Werner, Individually and in her capacity as Executrix of the Estate of Louis Greco, has suffered damages, including without limitation pain and suffering of Greco and Robert Werner.

128.    Defendants committed the above acts and omissions while acting in their official capacities and within the scope of their offices or employment with the United States. Accordingly, pursuant to 28 U.S.C. § 2679, the United States is the appropriate defendant in plaintiff's loss of consortium claims.

129.    As a result of the foregoing acts and omissions of its employees while acting in their official capacities, if the United States were a private person it would be held liable under

Massachusetts law to plaintiff for the tort of loss of consortium.

COUNT IV

(Loss of Parental Consortium – Estate of Louis Greco, Jr. v. United States)

130.   Plaintiff incorporates by reference herein the allegations set forth in paragraphs 1-129, above as if they were set forth fully here.

131.   As a proximate result of the initiation of the prosecution of Greco for the Deegan murder without probable cause and with malice by the FBI, Rico, Condon and the Unknown Agents of the United States, Greco was convicted and imprisoned for twenty-eight years until his death.

132.   In addition, the initiation of the prosecution of Greco for the Deegan murder without probable cause and with malice by the FBI, Rico, Condon and the Unknown Agents of the United States and his conviction as a result thereof proximately caused Louis Greco, Jr. to suffer the loss of the society, affection, and nurturing of his father during the time that he was imprisoned and Louis Greco, Jr. was a minor.

133.   Prior to the time that Greco was wrongfully imprisoned for the murder of Deegan, Greco had a loving and caring relationship with his son, Louis Greco, Jr., and Louis Greco, Jr. depended on Greco for society, affection, and nurturing.  As such, Louis Greco, Jr.'s dependency on Greco was not entirely economic.

134.   The FBI, Rico, Condon and the Unknown Agents of the United States knew or should have known that their initiation of the prosecution of Greco for the Deegan murder without probable cause and with malice and the imprisonment of Greco which proximately resulted from their actions was likely to cause Louis Greco, Jr. to suffer the loss of the society, affection, and nurturing of his father during the time that his father was imprisoned and Louis

26

Greco, Jr. was a minor.

135.    The foregoing actions of the FBI, Rico, Condon and the Unknown Agents of the
United States constitute the tort of loss of parental consortium under Massachusetts law.

136.    As a result of defendants' commission of the tort of parental loss of consortium,
plaintiff Roberta Werner, in her capacity as Administratrix of the Estate of Louis Greco, Jr. has
suffered damages, including without limitation the pain and suffering of Louis Greco, Jr.

137.    Defendants committed the above acts and omissions while acting in their official
capacities and within the scope of their offices or employment with the United States.
Accordingly, pursuant to 28 U.S.C. § 2679, the United States is the appropriate defendant in
plaintiff's loss of parental consortium claim.

138.    As a result of the foregoing acts and omissions of its employees while acting in
their official capacities, if the United States were a private person it would be held liable under
Massachusetts law to plaintiff for the tort of loss of parental consortium.

COUNT V
(Civil Conspiracy – Roberta Werner, Individually, and the
Estates of Greco and Louis Greco, Jr. v. the United States)

139.    Plaintiff incorporates by reference herein the allegations set forth in paragraphs 1-
138, above as if they were set forth fully here.

140.    Defendants the FBI, Rico and Condon either agreed and/or tacitly agreed to
commit the torts against plaintiff alleged in Counts I-IV above and, as such, they committed the
tort of civil conspiracy.

141.    As a result of defendants' commission of the tort of civil conspiracy, plaintiff has
suffered damages, including without limitation Greco's loss of liberty and damage to his
reputation as well as all pain and suffering on the part of Greco, Louis Greco, Jr. and Roberta

27

Werner.

142.    Defendants committed the above acts and omissions while acting in their official capacities and within the scope of their offices or employment with the United States. Accordingly, pursuant to 28 U.S.C. § 2679, the United States is the appropriate defendant in plaintiff's conspiracy claims.

143.    As a result of the foregoing acts and omissions of its employees while acting in their official capacities, if the United States were a private person it would be held liable under Massachusetts law to plaintiffs Roberta Werner, Individually, and as Executrix and Administratrix for the tort of civil conspiracy.

COUNT VI
(<u>Bivens</u> Cause of Action – Estate of
Greco v. Rico and Condon)

144.    Plaintiff incorporates by reference herein the allegations set forth in paragraphs 1-143, above as if they were set forth fully here.

145.    The acts and omissions of Rico and Condon alleged herein were committed by them while acting under color of federal law.

146.    The acts and omissions of Rico and Condon alleged herein deprived Greco of rights that he is guaranteed by the Constitution of the United States, including without limitation, his liberty, procedural and substantive due process, equal protection of the laws, freedom from cruel and unusual punishment, the right to petition the United States for redress, and the right to a fair trial.

147.    As a result of the deprivation of Greco's Constitutional rights by the FBI, Rico and Condon, plaintiff Roberta Werner, as Executrix of the Estate of Louis Greco has suffered damages, including without limitation Greco's loss of liberty, damage to his reputation as well as

28

his pain and suffering.

148.    Pursuant to <u>Bivens v. Six Unknown Agents of Federal Bureau of Narcotics</u>, 403

U.S. 388 (1971), Rico and Condon are liable to plaintiff for the damages alleged in the preceding

paragraph.

<u>COUNT VII</u>
(Violation of 42 U.S.C. § 1983 – Estate of Greco v. Walsh)

149.    Plaintiff incorporates by reference herein the allegations set forth in paragraphs 1-

148, above as if they were set forth fully here.

150.    The acts and omissions of Walsh alleged herein were committed by him while he

was acting under color of the law of the Commonwealth of Massachusetts.

151.    The acts and omissions of Walsh alleged herein deprived Greco of rights that he is

guaranteed by the Constitution of the United States, including without limitation, his liberty,

procedural and substantive due process, equal protection of the laws, freedom from cruel and

unusual punishment, the right to petition the United States for redress, and the right to a fair trial.

152.    As a result of the deprivation of Greco's Constitutional rights by Walsh, plaintiff

Roberta Werner, as Executrix of the Estate of Louis Greco has suffered damages, including

without limitation Greco's loss of liberty, damage to his reputation as well as all pain and

suffering.

153.    Pursuant to 42 U.S.C. § 1983 defendant Walsh is liable to plaintiff for the

damages alleged in the preceding paragraph.

WHEREFORE, plaintiff Roberta Werner, Individually, as Executrix of the Estate of

Louis Greco and Administratrix of the Estate of Louis Greco, Jr. respectfully prays that this

Court:

a.    award damages in favor of plaintiff Roberta Werner, as Executrix of the Estate of

29

Louis Greco and against the United States on Counts I-III and V-VII of the Complaint in the amount of plaintiff's damages proved at trial;

b.      award damages in favor of plaintiff Roberta Werner, Individually, on Counts II, III and V of the Compliant in the amount of plaintiff's damages proved at trial;

c.      award damages in favor of plaintiff Roberta Werner, as Administratrix of the Estate of Louis Greco, Jr. on Counts II, IV and V of the Compliant in the amount of plaintiff's damages proved at trial;

d.      award plaintiff punitive damages;

e.      award plaintiff her costs of prosecuting this matter including reasonable attorneys' fees and expenses; and

f.      enter such other and further relief as this Court deems just and equitable.


ROBERTA A. WERNER, EXECUTRIX OF THE ESTATE OF LOUIS GRECO, ROBERTA WERNER, ADMINISTRATRIX OF THE ESTATE OF LOUIS GRECO, JR., ROBERTA WERNER, AND EDWARD GRECO,

By their attorneys,


Richard D. Bickelman, BBO # 042440
Lawrence R. Holland, BBO # 554839
John Foskett, BBO # 175540
DEUTSCH WILLIAMS BROOKS DeRENSIS
  & HOLLAND, P.C.
99 Summer Street
Boston, MA   02110-1213
(617) 951-2300

Date:  October 7, 2002

::ODMA\GRPWISE\DW.Boston.Lib1:109985.1