## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| PETER J. LIMONE, ET AL | ) |
| Plaintiffs, | ) |
|  | ) **FILED/D** |
|  | ) **IN CLERK'S OFFICE** |
| v. | ) **C. A. 02-CV-10890-NG** |
|  | ) |
| UNITED STATES OF AMERICA, | ) |
| ET AL | ) |
|  | ) |
| Defendants. | ) |

## OPPOSITION TO THE GOVERNMENT'S MOTION TO DISMISS
## THE AMENDED COMPLAINT
## BY THE LIMONE AND TAMELO PLAINTIFFS

### I.    INTRODUCTION

FTCA liability in this case is based on the state torts of malicious prosecution, intentional infliction of emotional distress, negligent selection, supervision and retention of agents and employees, including informants, and by common law conspiracy.[1] We deal with these theories of liability in the sections of the brief that follow.

Plaintiffs do not challenge the government's argument that FTCA liability for malicious prosecution cannot be imposed based upon the actions by AUSA Edward Harrington.  FTCA liability based on malicious prosecution, however, is sufficiently supported by the actions of FBI agents alleged in the amended complaint.

FTCA liability for the torts of intentional infliction of emotional distress, negligent selection, supervision and retention of agents and employees, including informants, and by common law conspiracy is not excluded by § 2680 and thus liability





for these torts is not restricted to acts of "investigation or law enforcement officers."

Thus, with respect to these torts, plaintiffs rely on the actions of AUSA Edward

Harrington in addition to the actions of FBI agents as a basis for FTCA liability.

## II.   PLAINTIFFS HAVE PROPERLY PLEADED A CLAIM UNDER THE FTCA BASED UPON THE TORT OF MALICIOUS PROSECUTION.

The government has made a series of challenges to plaintiffs' malicious

prosecution theory of FTCA liability.  Plaintiffs submit that the claim is not barred by the

discretionary function exemption.  Plaintiffs further submit that federal law enforcement

agents did initiate or procure the malicious prosecution and were sufficiently involved in

the prosecution that the government is liable for the prosecution and its continuation.  In

addition, the FTCA claim for malicious prosecution is not barred by the United States

Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994).

### A.   Plaintiffs' FTCA Claim is not Barred by the Discretionary Function Exemption.

The government has argued that plaintiffs' claim that government agents failed to

disclose exculpatory evidence is barred by the discretionary function exemption to the

FTCA.  The government argues that the FBI has discretion with regard to sharing

information in its investigative files.  The argument entirely ignores, however, the fact

that the conduct of FBI agents in this case violated the plaintiffs' constitutional rights.

It is well established that the discretionary function exemption does not apply

where the conduct of government agents violated the Constitution. *Nurse v. United*

*States*, 226 F.3d 996, 1002 (9th Cir. 2000); *U.S. Fidelity & Guar. Co. v. United States*,

837 F.2d 116, 120 (3d Cir. 1988); *Sutton v. United States*, 819 F.2d 1289, 1293 (5th Cir.

1987); *Myers & Myers, Inc. v. United States Postal Serv.*, 527 F.2d 1252, 1261 (2d

---

[1]     Amended Complaint (hereinafter Am.Comp.) ¶ 47.

Cir.1975) ("It is, of course, a tautology that a federal official cannot have discretion to behave unconstitutionally ..."); *O'Ferrell v. United States*, 968 F.Supp. 1519, 1527 (M.D.Ala. 1997); *Garcia v. United States*, 896 F.Supp. 467, 473 (E.D. Pa. 1995); *Koch v. United States*, 814 F.Supp. 1221, 1228 (M.D.Pa. 1993); *Avery v. United States*, 434 F.Supp. 937, 944 (D. Conn. 1977) ("If trespasses in violation of government regulations are not 'discretionary functions,' then, a fortiori, trespasses in violation of constitutional guarantees are not 'discretionary functions.'"). See also, *Medina v. United States*, 259 F.3d 220, 226 (4th Cir. 2001) (recognizing application of discretionary function exemption for actions "authorized and implemented consistent with federal law and the Constitution of the United States"). [2]

Here, as in *Glickman v. United States*, 626 F.Supp. 171, 175 (S.D.N.Y. 1985) (citizen was administered LSD by CIA agents without his permission or knowledge, in violation of his constitutional rights), the government's discretionary function argument:

> really does not reckon with the extraordinary nature of the allegations made by plaintiff in this case. What plaintiff is alleging is conduct of such a serious and malevolent nature as to be beyond any reasonable discretion on the part of a Government agency. Plaintiff is alleging something which does not involve normal regulatory activities or the weighing of policy factors within the scope of proper governmental power, but rather something which goes beyond the constitutional powers of the Government, and seriously violates the constitutional rights of a citizen. It cannot be said that Congress meant to withdraw this kind of allegation from judicial scrutiny under the 'discretionary function' exception.

Plaintiffs have alleged both that FBI agents failed to disclose exculpatory evidence to the prosecutors who tried the criminal case against them,[3] and that FBI agents

---

[2] Although constitutional claims themselves are not actionable under the FTCA, where a claim is based on state law the fact that the defendants' actions also violated the Constitution does not take the case out of the FTCA. *Garcia v. United States*, 896 F.Supp. at 474-475, collecting the supporting authority and noting that there is no authority to the contrary. The propriety of such a claim was implicitly recognized by the Supreme Court in *Carlson v. Green*, 446 U.S. 14, 19-20 (1980), where the Court found that the same conduct might give rise to both *Bivens* and FTCA actions.

[3] Compl. ¶¶ 24, 26, 27-41.

participated in the creation of perjured testimony that falsely inculpated the plaintiffs.[4]

Federal agents do not have discretion to engage in these alleged constitutional violations.

It is clear that law enforcement officers have a constitutional duty to disclose

potentially exculpatory evidence to prosecutors. *Brady v. Maryland*, 373 U.S. 83 (1963);

*Brady v. Dill*, 187 F.3d 104, 114 (1st Cir. 1999) ("constitutional wrong results from the

officer's failure to deliver material information to competent authorities"); *Reid v. State*

*of New Hampshire*, 56 F.3d 332, 342 (1st Cir. 1995) (recognizing viability of § 1983

claim against officers for not disclosing exculpatory information to prosecutor; reversing

district court for abuse of discretion in not permitting plaintiff discovery on officers'

knowledge of exculpatory material before granting summary judgment for officers);

*Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001) (withholding from prosecutors

information about officers' coaching of witnesses and fact that witnesses earlier selected

pictures from a book of mug shots that did not contain plaintiff's photo, violated his

rights as criminal defendant); *Jean v. Collins*, 221 F.3d 656 (4th Cir. 2000) (police who

deliberately withhold exculpatory evidence and thus prevent prosecutors from complying

with Brady, violate due process clause); *McMillian v. Johnson*, 88 F.3d 1554 (11th Cir.

1996)(intentionally withholding exculpatory and impeachment evidence from the

prosecutor would violate plaintiff's rights); *Jones v. City of Chicago*, 856 F.2d 985 (7th

Cir. 1988)(liability based on police custom of maintaining information in "street files"

not furnished to prosecutors, with the result that exculpatory material  is not made

available to defendants).

It is equally clear that suborning perjury and manufacturing evidence violate the

constitutional rights of a criminal defendant. *Mooney v. Holohan*, 294 U.S. 103, 112

---

[4]       Compl. ¶ 23.

(1935); *Brown v. Mississippi*, 297 U.S. 278, 286 (1936); *Pyle v. Kansas*, 317 U.S. 213

(1942); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Miller v. Pate*, 386 U.S. 1 (1967);

*Moran v. Clarke*, 296 F.3d 638 (8th Cir., *en banc*, 2002) (conspiracy to manufacture and

manufacturing false evidence violates substantive due process rights); *Rowe v. Fort

Lauderdale*, 279 F.3d 1271 (11th Cir. 2002) (investigator's planting or fabricating

evidence in an effort to obtain a conviction violates clearly established law); *Paine v.

Lompoc*, 265 F.3d 975 (9th Cir. 2001) (absolute witness immunity for committing perjury

and conspiring to commit perjury does not shield officers from non-testimonial acts such

as fabricating evidence, officers are not entitled to absolute immunity for conspiratorial

conduct not "inextricably tied" to their testimony; immunity does not protect officers

from tampering with documentary or physical evidence or preventing witnesses from

coming forward); *Wilson v. Lawrence Co., Mo.*, 260 F.3d 946 (8th Cir. 2001) (liability for

coercing statement from third person; although witness would have had absolute

immunity for false testimony, officers are not protected by that immunity); *Spurlock v.

Satterfield*, 167 F.3d 995, 1004 (6th Cir. 1999) (officers would be liable where they knew

witness's testimony was false, supplied him with details of the murder, fabricated

probable cause, created a misleading tape recording, gave the witness "hush money").

It follows that suborning perjury and manufacturing evidence are an appropriate

basis for FTCA liability, not foreclosed by the discretionary function exemption. See,

*Tri-State Hospital Supply Corporation v. United States*, 142 F.Supp.2d 93 (D.D.C. 2001)

(recognizing in FTCA claim that customs officials had no discretion to falsify records

and to lie to bring about a prosecution); *Merritt v. Shuttle, Inc.*, 13 F.Supp. 2d 371, 380

(E.D.N.Y. 1998) (discretionary function exemption did not apply to conduct of FAA

inspectors who "conspired to place blame upon plaintiff"); *Chandler v. United States*, 875 F.Supp. 1250, 1266 (N.D. Tex. 1994) (giving false testimony and withholding material evidence from prosecutor fell outside discretionary function exemption); *Crow v. United States*, 659 F.Supp. 556, 569 (D.Kan. 1987) (where agents' memoranda, status reports, presentation letter and testimony before grand jury contained many inaccuracies and falsehoods, the discretionary function exemption did not bar an FTCA claim based on a malicious prosecution).

In addition to the fact that fabricating evidence and failing to disclose exculpatory evidence violate constitutional rights, it is likely that such conduct violates the regulations, rules, policies and procedures that govern FBI agents. Where certain conduct is required of federal employees by regulations and policies, including informal agency rules and pronouncements, the discretionary function exemption does not apply. *Irving v. United States*, 162 F.3d 154, 163-164 (1st Cir., *en banc*, 1998). Plaintiffs have not yet had an opportunity to review discovery furnished by the government. Given that, it would be premature to grant the motion to dismiss at this time.[5] Prior to ruling on a motion to dismiss, a district court "enjoys broad authority to order discovery, consider extrinsic evidence, and hold evidentiary hearings in order to determine its own jurisdiction." *Valentin v. Hospital Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001). *See, Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994)(approving district court's procedure of allowing discovery on jurisdictional issues); *Majd-Pour v. Georgiana Community Hosp., Inc.*, 724 F.2d 901, 903 (11th Cir. 1984)("the district court's dismissal [on jurisdictional grounds] without affording the plaintiff any

---

[5]     It would, however, be appropriate for the Court to deny the motion to dismiss based on the fact that the agents had no discretion to violate the plaintiffs' constitutional rights.

opportunity to proceed with reasonable discovery was premature and an abuse of the court's discretion"); *Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 431 n. 24 (9th Cir. 1977) (discovery "should be granted where pertinent facts bearing on the question of jurisdiction are controverted ... or where a more satisfactory showing of the facts is necessary."

Pursuant to the earlier ruling of the Court, plaintiffs requested discovery limited to government documents relevant to this motion to dismiss.[6] On Friday, November 18, 2002, government counsel advised plaintiffs' counsel that discovery was being sent to the U.S. Attorney's office in Boston, including a CD-ROM containing 6,681 pages of material. Needless to say, plaintiffs have been unable to review this material within the time allotted for filing this brief. Plaintiffs will attempt to locate the relevant material prior to oral argument on this matter.

**B.    Federal Law Enforcement Agents were Responsible for the Initiation and Continuation of the Criminal Prosecution of Plaintiffs.**

The government's attack on plaintiffs' malicious prosecution claim is based on the faulty premise that the Complaint merely alleges that the FBI provided information to the prosecution." On the contrary, the Amended Complaint alleges a series of actions that involved the FBI agents in the prosecution before, during and subsequent to the trial of Tameleo and Limone. Paragraph 23 of the Amended Complaint alleges the following:

> 23. FBI agents including, but not limited to, defendants Rico, Condon, Morris, Connolly and Handley, initiated, procured and continued the prosecution of Limone, Tameleo and Greco by actively participating in the said prosecution in numerous ways including, but not limited to, the following:
>        a. FBI agents including, but not limited to, Rico and Condon, met with Barboza during the spring of 1967 and induced or coerced him into becoming a cooperating witness with the state prosecution of the Deegan

---

[6]    A copy of plaintiffs' discovery request is attached hereto.

homicide and thereafter assisted state prosecutors in developing Barboza as a witness.

        b.  Before the grand jury appearance of Barboza that led to the indictment and during the prosecution of the Deegan homicide, Rico, Condon and other agents of the FBI and Walsh knowingly suborned from and assisted the principal Commonwealth witness Barboza in committing perjury in testimony against Limone, Tameleo and Greco and suborned from and assisted Anthony Stathopoulos in committing perjury against Greco.

        c.  Rico, Condon and other agents of the FBI provided material support and assistance to Barboza in exchange for his participation as a cooperating witness in the state prosecution of the Deegan homicide.

        d.  Rico, Condon and other agents of the FBI encouraged state prosecutors to prosecute Limone, Tameleo and Greco for the murder of Deegan, although they knew that the said persons were innocent of the crime.  The said agents encouraged the prosecution of innocent parties in order to cover up and keep secret the involvement of the FBI informant Flemmi in the murder.

        e.  Rico, Condon, Morris, Connolly and Handley and other agents of the FBI actively participated in the continuation of the prosecution of Limone, Tameleo and Greco and the post conviction defense of the judgment in that case in numerous ways including, but not limited to, those alleged below in paragraphs 27-40.

        f.  Participation of the FBI agents in the state prosecution of the Deegan murder was crucially important to the case, as reflected in a July 31, 1968 FBI memo after the convictions that stated, "Garrett H Byrne, District Attorney, Suffolk County, stated that prosecution was a direct result of FBI investigation and particularly noted development of principal government witness, Joseph Baron, aka Barboza, and Robert Glavin.  Byrne was extremely praiseworthy of cooperation between FBI and his office.  SAS H. Paul Rico and Dennis M. Condon were instrumental in development of Baron and Glavin."

      The significance of Barboza's perjured testimony to the prosecution of plaintiffs is demonstrated by the fact that once Barboza's credibility had been undermined by FBI documents that were furnished for the first time in December, 2000, the Commonwealth nolle prossed the case, having concluded "that it does not now have a good faith basis – legally or ethically – to proceed with any further prosecution of [Limone]."[7]

      The active role of the federal government's agents in this prosecution also included the fact that "on diverse dates between the murder of Deegan and the present,"

---

[7]    Compl. ¶ 20.

they "engaged in numerous acts to keep secret information and evidence exculpatory" to plaintiffs and "to cover up the identity of the true killers of Deegan."[8]  These acts, which included dissuading Barboza from recanting his testimony, assisting Barboza to obtain a light sentence for a murder in another jurisdiction, opposing a polygraph for Barboza, and interfering with plaintiffs' efforts to obtain commutations, are detailed in the complaint.[9]

Contrary to the government's argument, this was by no means a prosecution where federal agents gave information to a third person (state officials) and then left it "to the uncontrolled choice of the third person to bring the proceedings or not as he may see fit."[10]  Here plaintiffs have alleged that the federal government agents remained involved with the prosecution throughout, including decades of post-conviction proceedings.

The government takes an overly narrow view of the circumstances under which law enforcement officers may be held liable for malicious prosecutions under Massachusetts law.  The cases cited by the government actually stand only for the proposition that where one's exclusive connection to a prosecution is the mere supplying of information and where one has left the matter to the "judgment and responsibility" and "uncontrolled choice" of others, there is no liability for malicious prosecution.  See, *Correllas v. Viveiros,* 410 Mass. 314 (1991); *Conway v. Smerling*, 37 Mass. App. Ct. 1 (1994); *Ziemba v. Fo'cs'le, Inc.* 19 Mass.App.Ct. 484, 488 (1985).  It is clear, however, that where a defendant has done almost anything else in addition to that, he may be held liable for initiating and/or continuing a malicious prosecution.[11]

---

[8]      Compl. ¶ 26.

[9]      Compl. ¶¶ 27-41.

[10]      Gov't. brief, 13.

[11]      *Correllas v. Viveiros, supra,* on which the government relies heavily, is readily distinguishable from the instant case.  There the malicious prosecution defendant: provided information to police while she was a suspect in a theft already under investigation.  The prosecutor, in his affidavit, stated that, '[a]t no time did [defendant] come forward of her own free will and offer information concerning the missing

Thus in *Conway v. Smerling*, 37 Mass. App. Ct. at 5, the defendants "did no more than inquire about the progress of an investigation," and yet the court held that "taking that evidence most favorably to the plaintiff, it could be said that they were the instrument of the complaint." In *Ziemba v. Fo'cs'le, Inc*. 19 Mass.App.Ct. at 488, the court distinguished cases in which the police made an independent decision to initiate a prosecution from those in which a defendant has "furnished the police with false information to influence their actions." In *Carroll v. Gillespie*, 14 Mass.App.Ct. 12, 25 (1982), where a creditor told the police officer that "'he wanted the police to arrest' the plaintiff, or at least that he 'wanted her brought into court,'" the court held that there was sufficient evidence that the defendant creditor had initiated the prosecution.[12]

In *Seelig v. Harvard Cooperative Society*, 355 Mass. 532 (1969), a police officer initiated a criminal complaint against the plaintiff for larceny from a camera shop. The officer was employed one day per week in the shop, but there was no evidence he was working at the shop on the days he conducted his investigation or procured the complaint. He did have frequent conversations with the defendant's assistant general manager, who had initiated the train of events that led to the complaint and who never told the officer not to seek a criminal complaint. The court held that the jury would have been entitled to find that the defendant was responsible for the officer's actions. *Id.* at 536-537. The court held that there would be no liability if it were shown that the officer acted "entirely upon his own judgment and responsibility as a public officer," but that "where *by any means* it is shown that the officer is not expected to exercise his 'judgment and responsibility as a

---

money.' The plaintiff offered no evidence to the effect that [defendant] encouraged or demanded that police institute criminal proceedings against [plaintiff]. Id. at 319.
[12] In this case, the creditor had told the officer that plaintiff had forged a check when in fact he had no information that she had signed it.

10

public officer' the defendant is responsible for the officer's subsequent acts." (emphasis added) *Id.* at 536.

In *Mason v. Jacot*, 235 Mass. 521, 525 (1920), the Court said that where the defendants, based upon "*an improper motive* set in motion the train of causation which naturally and proximately resulted in the arrest and accusation of the plaintiff," they will be held liable for initiating a malicious prosecution. (emphasis added). Plaintiffs have alleged such a motive here, where they claim that FBI agents assisted the principal witness against plaintiffs in created perjured testimony in order to keep secret the fact that their own informant committed the murder in question. Under these circumstances, it can hardly be said that the agents "made a fair and full presentation of facts to the officer and left the course to be pursued to his judgment without pressure or coercion." *Id.* at 525-526.

The argument for recognizing the liability for malicious prosecution of law enforcement agents who manufacture evidence or suppress exculpatory evidence is particularly strong, as has been noted by Judge Posner:

> *If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him. They cannot hide behind the officials whom they have defrauded. Jones v. City of Chicago,* 856 F.2d 985, 993 (7th Cir. 1988) (jury could find that defendants systematically concealed from prosecutors, and misrepresented to them, facts highly material to decision whether to prosecute) (emphasis in original).

This Court has previously recognized that there is nothing "anomalous" about imposing liability on officers who fabricate false charges, even though the actual prosecution is not accomplished by the officers. For the same reason that "[o]fficers who fabricate allegations in a criminal case cannot cloak themselves in the guise of prosecutorial

immunity," *Britton v. Maloney*, 981 F.Supp. 25, 40, n. 27 (D.Mass. 1997), aff'd in part, rev'd in part on other grounds, 196 F.3d 24 (1st Cir. 1999), it is appropriate to impose FTCA liability on the government based on the actions of FBI agents who suborn perjury and suppress exculpatory information.

Plaintiffs have alleged that FBI agents were active throughout the prosecution and subsequent incarceration of plaintiffs in order to keep the lid of secrecy on their conspiracy. In *Mitchell v. City of Boston*, 130 F.Supp. 2d 201, 215 (D.Mass. 2001), Judge Saris recognized that a person "who takes an active part in continuing or procuring the continuation of criminal proceedings initiated ... by another is subject to the same liability for malicious prosecution as if he had then initiated the proceedings," citing Restatement (Second) of Torts § 655 (1976) and *Bicknell v. Dorion*, 33 Mass. (16 Pick.) 478 (1835).[13] See also, *Nieves v. McSweeney*, 241 F.3d 46, 53 (1st Cir. 2001); *Stromberg v. Costello*, 456 F.Supp, 848, 850 (D.Mass. 1978).

Other jurisdictions have recognized liability for one who assists in continuing a prosecution initiated by another. *Kaminske v. Wisconsin Cent. Ltd.,* 102 F.Supp.2d 1066, 1073 (E.D.Wis.2000) (applying Wisconsin law); *Ware v. United States*, 971 F.Supp. 1442, 1461-1462 (M.D.Fla. 1997) (in FTCA claim recognizing that government was the legal cause for malicious procecution where FBI agent played a key role in the

---

[13]     Section 655 provides: "A private person who takes an active part in continuing or procuring the continuation of criminal proceedings initiated by himself or by another is subject to the same liability for malicious prosecution as if he had then initiated the proceedings." Plaintiffs are not aware of any Massachusetts case in which the state courts have had an opportunity to explicitly embrace or reject Section 655. At the same time, the doctrinal underpinnings of imposing liability for continuing a prosecution are the same as those relied upon by the Massachusetts courts for imposing liability on those who influence public actors to initiate a prosecution and there is no doubt that Massachusetts courts would recognize liability under Section 655 if the occasion arose. In this respect we note that the Superior Court in Massachusetts has recognized liability under Section 647 of the Restatement (Second) of Torts, a parallel provision imposing liability on one who continues a malicious civil prosecution. *Fordham v. Cole,* 1991 WL 718188, p. 2 (Super. Ct. 1991).

proceedings); *Purvis v. Hamwi*, 828 F.Supp. 1479, 1482 (D.Colo. 1993) (person who

takes an active part in continuing criminal proceedings initiated by himself or another is

subject to the same liability for malicious prosecution as if he had actually initiated the

proceedings); *Banks v. Nordstrom, Inc.*, 57 Wash.App. 251, 256-257 (1990); *Simmons v.*

*Telcom Credit Union*, 177 Mich.App. 636, 639 (Ct. of Appeals, Mich. 1989) (discussing

liability for continuing a prosecution, the court notes, "when a defendant fails to make a

full and fair disclosure, including the failure to disclose material exculpatory information

which might dissuade a prosecutor from seeking a warrant … an action for malicious

prosecution may be pursued since the defendant's omission might effectively foreclose a

proper exercise of discretion by the prosecutor"); *Denton v. Allstate Insurance Co.*, 153

Ill.App.3d 578, 583 (App.Ct. Ill. 1987) (also recognizing liability equivalent to initiating

prosecution for participation of "so active and positive a character as to amount to advice

and cooperation," and for knowingly giving false information to police); *Martin v. City of*

*Albany,* 42 N.Y.2d 13, 16, 396 N.Y.S.2d 612, 614 (1977); *Seidel v. Greenberg*, 108

N.J.Super. 248, 257-258 (Superior Ct. of N.J. 1969).

Thus, it is established that the failure by an officer to disclose to the prosecutor

exculpatory evidence, resulting in the continuance of a prosecution, renders the officer in

possession of the information liable for malicious prosecution. *Sanders v. English*, 950

F.2d 1152, 1163 (5th Cir. 1992) ("Deliberately concealing or deliberately failing to

disclose exculpatory evidence, like maliciously tendering false information, can form

basis for inference that police officer acted with malice in initiating and maintaining

prosecution, for purposes of arrestee's malicious prosecution action …"); *Goodwin v.*

*Metts,* 885 F.2d 157, 162-163 (4th Cir.1989) ("a police officer who withholds

exculpatory information from the prosecutor can be found liable under both § 1983 and

the common law" for malicious prosecution – officer could not "escape liability merely

because he could not unilaterally have terminated the prosecution").

**C.      The Government's Argument Advocating Dismissal of the FTCA
         Claim for Malicious Prosecution Lacks Merit and Should be Rejected.**

**1.      The Government Mischaracterizes the First Circuit Court of
         Appeals's Pronouncement on the "reversal by proxy" Issue in
         the Context of Proving a Favorable Disposition in a Previous
         Criminal Matter.**

To the extent the Government argues that the First Circuit Court of Appeals in

*Figuero v. Rivera*, 147 F.3d 77, 81 (1st Cir. 1998), "dismissed" the "reversal by proxy"

argument as "insufficient" to prove a favorable disposition in a criminal matter,[14] the

Government's argument lacks merit because it mischaracterizes that Court's position on

the issue.  The Court did state, as the Government argues, that "[w]e are skeptical that a

section 1983 claimant can satisfy the Heck regiment by arguing a theory of reversal by

proxy." *Figueroa*, 147 F.3d at 81.  The First Circuit, however, <u>never</u> squarely addressed

the issue. *Id.* ("That said, however, we decline to grapple with the . . . argument.").  The

issue of whether a civil plaintiff can prove the element of favorable disposition in a

criminal matter by arguing "reversal by proxy" is one of first impression in this Circuit.

The unique circumstances of this case dictate that Tameleo's estate should be

permitted to show favorable termination via the Massachusetts Superior Court's decision

allowing Limone's motion for new trial.  It is indubitably certain that if Tameleo were

---

[14] *See* United States' Brief in Support of its Motion for Dismissal, pp.21-22.

alive today, his convictions would be reversed and vacated, and his case subsequently nolle prossed by the Commonwealth.

On January 8, 2001, the Massachusetts Superior Court granted Limone's motion for a new trial and the Commonwealth's motion to vacate Limone's convictions. *See* Supplemental Memorandum of Decision and Order on Defendant's Motion for New Trial, dated January 8, 2001, attached hereto as Exhibit A. On January 30, 2001, the Commonwealth filed a *Nolle Prosequi*, foregoing further prosecution of Limone on criminal charges arising from the Deegan murder. *See* Nolle Prosequi attached hereto as Exhibit B. Limone and Tameleo were tried together, and the only government witness who implicated the men at trial was the Commonwealth's "star" witness, Joseph Barboza.

In granting Limone's motion for new trial, the Superior Court set forth the basis for its decision in a multi-page written memorandum. Exhibit A. The Court based its decision on "newly discovered evidence." *Id.* at p.7. The Court found that the jury "would likely have reached a different conclusion by this previously undisclosed evidence for two reasons." *Id.*

First, the Court found that the new evidence cast "serious doubt on Barboza's credibility. . . ." *Id.* The Court found this particularly troubling given that Barboza was a "vital, principal prosecution witness at trial," and that "the principal issue before the jury was one of [Barboza's] credibility." *Id.* (internal citations omitted). Indeed, as stated, Barboza was the only government witness who implicated Limone and Tameleo. Second, the Superior Court found that the new evidence revealed that Vincent James Flemmi, a participant of some sort in the Deegan murder, was an F.B.I. informant around the time of the murder." Exhibit A, p.7. The Court reasoned as follows:

15

> Barboza, as noted, was the only government witness implicating Limone. If Limone had had information that Patriarca set up the murder and not Limone, and that Flemmi was an F.B.I. informant, it is highly likely that the defense theory that the F.B.I. was manipulating Barboza's testimony could have been buttressed. Moreover, the newly disclosed evidence about Vincent James Flemmi would have provided Limone considerable opportunity to challenge Barboza's testimony as to Flemmi. Barboza calls Flemmi his "partner" during March of 1965, the time of the Deegan murder. Barboza testified that Flemmi was at the Ebb Tide on the night of the murder. But Barboza denies that Flemmi left the Ebb Tide with Barboza and the others on the night of the murder.

*Id.* (internal citations omitted).

The Court's dispositive findings on the issues raised in Limone's motion for new trial apply equally to Tameleo. Barboza was the "principal prosecution witness" against Tameleo, and the only prosecution witness who implicated Tameleo in the Deegan murder. Tameleo's defense theory at trial, moreover, mirrored Limone's – that the F.B.I. was manipulating Barboza's testimony. The Superior Court's findings, therefore, that Barboza's credibility was a "principal issue before the jury," and that the "newly discovered evidence" cast "serious doubt on Barboza's credibility," carry precisely the same exculpatory weight in the context of Tameleo's convictions as the Court found them to have in the context of Limone's convictions.

Furthermore, the revelation that Vincent James Flemmi, a participant of some sort in the Deegan murder, was an F.B.I. informant around the time of the murder, is as important an exculpatory factor with respect to Tameleo as it was to Limone. In summary, in granting Limone's motion for a new trial, the Court based its decision on findings that would not have varied in any material way from findings based on the same "newly discovered evidence" were Tameleo eligible to file a motion for new trial.

Tameleo, however, unlike Limone, is as a matter of law precluded from filing a motion for new trial pursuant to Mass.R.Civ.P. 30 because he is deceased. As a result,

16

Tameleo, through no fault of his own, is unable to avail himself of the accessible remedy

obtained by Limone. In light of the unique circumstances of this case, this Court should

deny the Government's motion to dismiss the FTCA claim for malicious prosecution.

Furthermore, if Tameleo were alive today to challenge his convictions, it is

virtually certain that the Commonwealth would file a *Nolle Prosequi* in his favor. As

grounds for filing the *Nolle Prosequi* in Limone's case, the Commonwealth stated as

follows:

> There exists newly discovered evidence-various FBI documents disclosed to the
> Commonwealth and the defendant for the first time on December 19, 2000-which
> significantly undermines (a) the credibility of the Commonwealth's principal
> witness at the defendant's first trial, Joseph Barboza, and (b) the
> Commonwealth's theory of the defendant's role in the murder of Edward Deegan,
> as presented at the defendant's first trial.
> . . .
>
> As a result of [a] review and evaluation [of the newly discovered evidence], the
> Commonwealth has concluded that it does not now have a good faith basis-legally
> or ethically-to proceed with any further prosecution of the defendant.

Exhibit B.

As the "newly discovered evidence" considered by the Superior Court in

Limone's case would have the same material effect on Tameleo's convictions, the

Commonwealth would unquestionably file in Tameleo's case a *Nolle Prosequi* that

would virtually mirror in substance the *Nolle Prosequi* filed in Limone's case. Given the

Superior Court's findings on "newly discovered evidence" which exculpates to the same

degree Limone and Tameleo in the Deegan murder, Tameleo's estate should be permitted

to prove favorable termination via the Court's decision allowing Limone's motion for

new trial. The Government's motion to dismiss the FTCA claim for malicious

prosecution should, therefore, be denied.

2.   **The United States Supreme Court's Decision in *Heck v. Humphrey* is Not Controlling Authority in Light of Subsequent Supreme Court Precedent Eliminating the Favorable Termination Requirement For Individuals Who are Not "In Custody."**

Tameleo's FTCA claim for malicious prosecution should not be dismissed because the rule of *Heck v. Humphrey*, 512 U.S. 477 (1994), must be reconsidered in light of the United States Supreme Court's decision in *Spencer v. Kemna*, 523 U.S. 1 (1998). The *Spencer* plaintiff was incarcerated after being convicted on criminal charges, and later paroled. *Spencer*, 523 U.S. at 1. His parole was subsequently revoked and he was returned to prison. *Id.* Thereafter, he sought to invalidate the parole revocation, filing a habeas petition in federal district court. *Id.* Prior to the court addressing his petition, the plaintiff's sentence expired and the court later dismissed his petition as moot. *Id.* The Eighth Circuit affirmed. *Id.* The Supreme Court granted cert to decide the issue of whether the habeas petition was rendered moot by the expiration of the plaintiff's sentence. *Spencer*, 523 U.S. at 3.

The Supreme Court affirmed in a plurality opinion. *Id.* at 3. Most importantly, five of the justices in *Spencer* agreed that a former prisoner, no longer "in custody," should be permitted to bring a § 1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable termination requirement. *Id.* at 18-21. Justice Souter was joined in a concurring opinion by Justices O'Connor, Ginsburg and Breyer. *Id.* at 18. Justice Stevens took that position in a separately authored dissenting opinion. *Id.* at 25 n.8.

Given that a current majority of the Justices espouse the view that a former prisoner, no longer "in custody," should be permitted to bring a § 1983 action

18

establishing the unconstitutionality of a conviction or confinement without being bound

to satisfy a favorable termination requirement, *Heck v. Humphrey* is not controlling

authority under the circumstances presented here.  As a result of the Supreme Court's

elimination of the favorable termination requirement for individuals, like Tameleo, who

are not "in custody," Tameleo's estate should be permitted to pursue his FTCA claim for

malicious prosecution.

### 3.   Public Policy Weighs Heavily in Favor of Not Dismissing the FTCA Claim for Malicious Prosecution.

Finally, as a matter of public policy and fundamental fairness, the Government

should not solely as a result of Tameleo's death be insulated from liability for malicious

prosecution despite its egregious and deliberate mishandling of Tameleo's criminal case.

*See Burke v. Rivo*, 406 Mass. 764, 774 (1990) ("Tort law finds its source in social values

and ought to promote appropriate public policy.").  The interests of justice will in no way

be served by precluding Tameleo from prosecuting his FTCA claim for malicious

prosecution solely on the basis that Tameleo is ineligible to seek a favorable disposition

in his criminal case.  Though Limone's and Tameleo's alleged roles in the Deegan

murder varied, the evidence against them came from the same source – a source who's

credibility has been so irreparably damaged by "newly discovered evidence" that the

same Court who sentenced Limone found that his convictions could not stand.

Accordingly, the Government's motion should be denied.

### III.   PLAINTIFF HAS ALLEGED A VALID CLAIM BASED UPON THE NEGLIGENT HIRING, SUPERVISION AND RETENTION OF FBI INFORMANTS.

The government's motion to dismiss does not address as such plaintiffs' claim that there was negligence in the selection, supervision and retention of Flemmi and Barboza as informants and/or cooperating witnesses.[15]   Plaintiffs have alleged that these persons were not qualified, suitable or appropriate cooperating witnesses or informants, and that Rico, Condon and Handley and other FBI agents failed to follow proper procedures and guidelines with respect to their selection and monitoring.[16]   Plaintiffs have set out in detail why such persons were inappropriate and why their selection and monitoring were wrongful.[17]   It is shocking that the FBI selected Flemmi as an informant when he had already told agents that his aspiration was to become the number one "hit man" in this area.[18]   It is grimly ironic that the FBI should choose to use as an informant a person that the alleged bosses of organized crime in New England believed "did not use sufficient common sense when it came to killing people."[19]   The FBI's misplaced allegiance to Flemmi was a lynchpin of the malicious prosecution of and conspiracy against Limone, Tameleo and Greco, because Flemmi was the actual killer of Deegan,[20] and Limone, Tameleo and Greco were prosecuted to keep secret Flemmi's guilt.[21]

Liability on this theory is appropriate under the FTCA, inasmuch as Massachusetts recognizes tort liability for negligent hiring, supervision and retention of employees and agents, including by a public employer. *Worcester Ins. Co. v. Fells*

---

[15]   To the extent that there is factual support for it, this claim may be based on acts or omissions by AUSA Harrington.

[16]   Compl. ¶¶ 9, 10, 11.

[17]   Compl. ¶¶ 12-14.

[18]   Compl. ¶ 12.

[19]   Compl. ¶ 13.

[20]   Compl. ¶¶ 7, 14-16.

*AcresDay School, Inc.,* 408 Mass. 393 (1990); *Doe v. Town of Blanford*, 402 Mass. 831 (1988).[22]

The government does argue that decisions regarding which investigative techniques to use during an investigation and whether certain individuals were properly used as informants are protected by the discretionary function exemption. Whether the selection, supervision and retention of Barboza and Flemmi involved conduct not protected by the discretionary function exemption depends in large part on whether the FBI agents followed their own rules and regulations. As noted above, plaintiffs sought discovery on the relevant FBI materials and have just been furnished with computerized records of thousands of pages. Plaintiffs respectfully request leave to supplement this portion of their brief after these materials have been reviewed.

## IV. PLAINTIFF HAS ALLEGED A VALID CLAIM BASED UPON THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

The government may also be held liable under the FTCA because the allegations concerning the conduct of government agents would result in liability under Massachusetts law for the tort of intentional infliction of emotional distress.[23] The First Circuit has specifically held that intentional infliction of emotional distress is a permissible basis for FTCA liability in *Santiago-Ramirez v. Secretary of the Dep't. of*

---

[21]    Compl. ¶ 26, et seq.

[22]    All of the factual allegations on which the claim based on negligent selection, supervision and retention are contained within the original complaint. We have moved to amend paragraph 47 of the complaint for clarity, in order to specify the Massachusetts tort theories on which FTCA liability is based. The original complaint did contain the allegation that the government was liable "under the law of the place" where the acts and omissions alleged in the complaint had occurred.

[23]    Sufficient factual allegations to support a claim of intentional infliction of emotional distress are contained within the original complaint. We have moved to amend paragraph 47 of the complaint for clarity, in order to specify the Massachusetts tort theories on which FTCA liability is based. The original complaint did contain the allegation that the government was liable "under the law of the place" where the acts and omissions alleged in the complaint had occurred. To the extent that there is factual support for it, this claim may be based on acts or omissions by AUSA Harrington. See n. 1, supra.

*Defense*, 984 F.2d 16, 20-21 (1st Cir. 1993).  The court held that a claim for intentional infliction of emotional distress is actionable under the FTCA, although the factual allegations might also have supported a claim for false imprisonment or false arrest.  The court noted that the Supreme Court has taken a strict reading of § 2680 and held that there is no justification ... to read exemptions into the Act beyond those provided by Congress," citing *Rayonier, Inc. v. United States*, 352 U.S. 315, 322 (1957).  Massachusetts law recognizes liability for the tort of intentional infliction of emotional distress.  *Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456 (1997).*

There can be no argument that law enforcement agents who fabricate evidence and suppress exculpatory evidence in order to put innocent men on death row and to imprison them for decades "intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result," that such conduct is "extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community," and that it would cause emotional distress so "severe and of such a nature that no reasonable person could be expected to endure it." *Id.* at 466.

The government's motion to dismiss the FTCA claim based on intentional infliction of emotional distress is based on the argument that the case is essentially based on claims that are not cognizable under the FTCA and that the emotional distress claim is merely a pretext.  On the contrary, plaintiffs' principal claim is based on the tort of malicious prosecution, which is a proper claim under the FTCA.  Given that, under *Santiago-Ramirez* the intentional infliction of emotional distress claim is proper here, as it was in that case.

**V.    PLAINTIFFS HAVE PROPERLY ALLEGED AN FTCA CLAIM BASED ON THE TORT OF COMMON LAW CONSPIRACY.**

The government seeks to dismiss the FTCA claim based on a common law conspiracy based on the argument that plaintiffs are unable to establish the underlying Massachusetts torts which were the objects of the conspiracy.[24]  This argument should be rejected on the basis of the discussion in the sections of this brief discussion the theories of tort liability.

The government's argument is also based on the claim that plaintiffs seek to impose FTCA liability on the government based upon the actions of people who were not federal employees.  First, plaintiffs have alleged sufficient actions by federal government employees to establish a conspiracy among them and the motion may be denied on that basis.  Second, with respect to whether federal agents controlled and supervised the day-to-day activities of others, this argument is premature.  Plaintiffs are entitled to discovery on these issues.  Since the motion must be denied because there is a sufficient basis for the claim in the actions of federal employees, there is no reason not to permit discovery with respect to additional actors who might have been sufficiently controlled by the government.

**VI.    PLAINTIFFS HAVE NOT PLEADED AN FTCA CLAIM BASED UPON ANY MASSACHUSETTS TORT FOR SUBORNATION OF PERJURY.**

The government argues that no liability can be imposed under the FTCA based upon a Massachusetts tort for subornation of perjury.  The simple answer to this argument is that the plaintiffs are not making any such claim.  Plaintiffs have alleged that

FBI agents suborned perjury in this case to demonstrate that the agents were responsible

for the initiation and prosecution of a malicious prosecution against Tameleo and

Limone.  Subornation of perjury is unquestionably relevant to a malicious prosecution

claim.  See, e.g., *Della Jacova v. Widett*, 355 Mass. 266 (1969).

## VII.   PLAINTIFFS' CLAIMS DO NOT ARISE OUT OF LIBEL AND SLANDER.

The government contends that the plaintiffs' claim of malicious prosecution,

insofar as it is based on allegations that government agents interfered with commutation

petitions, is barred as a claim arising out of libel and slander.  This misstates the nature

of plaintiffs' claim, which is that FBI agents were involved for decades in continuing the

malicious prosecution against Limone, Tameleo and Greco and covering up their earlier

misconduct in initiating the prosecution.  It is manifest that the essence of plaintiffs'

complaint is that Limone, Tameleo and Greco were deprived of their liberty and

wrongfully prosecuted, not merely that their reputations were tarnished by defamatory

statements.  Under applicable Supreme Court and First Circuit precedent, plaintiffs are

not foreclosed from making this claim, whether or not the allegations against the

government agents might also have constituted the torts of libel and slander.

In *Block v. Neal*, 460 U.S. 289 (1983), plaintiff claimed that FmHA employees

had failed to properly inspect and supervise construction of her house.  The FmHA

employee assigned to the job had filed inspection reports containing no adverse

comments on the construction work, which was, in fact, defective in numerous respects.

---

[24]    To the extent that there is factual support for it, this claim may be based on acts or omissions by
AUSA Harrington, except to the extent the conspiracy's object was a malicious prosecution. See n. 1,
supra.

The government argued that suit was foreclosed by the exception to FTCA liability for claims based on misrepresentation.  The Supreme Court rejected this argument.

The Court held in *Block* that plaintiff's claim was not "wholly attributable" to reliance on the government's negligent misstatements, but rather alleged a breach of a different duty.  The misstatements to plaintiff were not essential to the plaintiff's claim that inspection and supervision of the builder were negligent.  The Court noted that in the absence of the exception to FTCA liability for misrepresentation, the plaintiff might have brought a claim for negligent misrepresentation, and that there would be common questions in that case and her case for negligent inspection, but concluded that "the partial overlap between these two tort actions does not support the conclusion that if one is excepted under the Tort Claims Act, the other must be as well." *Id.* at 298.

Similarly, in the present case plaintiffs' claim is not "wholly attributable" to false statements made in connection with commutation proceedings, but is rather based on the duty not to engage in malicious prosecution. First, the interference with the commutation proceedings did not consist only of making false statements.  Plaintiffs alleged that federal agents discouraged the commutations by various means, "including, but not limited to" the making of false statements.[25]  Plaintiffs specifically alleged that FBI agents continued to withhold exculpatory information in their files,[26] and conducted baseless investigations of members of the Advisory Board of Pardons who initially had voted for Limone's commutation in order to chill support for future petitions.[27]

Second, the false statements to the Advisory Board of Pardons and the Governor are not essential to the underlying claim that there was a malicious prosecution of

---

[25]   Compl. ¶¶ 36, 37, 40.
[26]   Compl. ¶ 35.

Limone, Tameleo and Greco. The fact that there is some potential overlap between a libel and slander claim and the malicious prosecution claim does not mean that the latter is excepted from the Tort Claims Act. Allegations that false statements were made are to be expected in most malicious prosecution claims. Thus the government's argument would render meaningless the fact that the FTCA permits malicious prosecution claims based on misconduct by law enforcement agents.

The First Circuit has recognized that where a plaintiff has alleged a claim not excepted from FTCA liability, the fact that the allegations might be read to support another claim which is excepted is not fatal to the claim. In *Santiago-Ramirez v. Secretary of the Dep't. of Defense*, 984 F.2d 16, 20-21 (1st Cir. 1993), the court followed *Block* in holding that a claim for intentional infliction of emotional distress is actionable under the FTCA, although the factual allegations might also have supported a claim for false imprisonment or false arrest. The court noted that the Supreme Court has taken a strict reading of § 2680 and held that there is no justification ... to read exemptions into the Act beyond those provided by Congress," citing *Rayonier, Inc. v. United States*, 352 U.S. 315, 322 (1957). For the same reason that plaintiff had a claim based on intentional infliction of emotional distress in *Santiago-Ramirez*, the plaintiffs here can base their malicious prosecution claim in part on interference with commutation proceedings, even though these allegations might also have given rise to a libel and slander claim.[28]

---

[27]     Compl. ¶¶ 38, 40.

[28]     The cases cited by the government from the Eleventh and Fifth Circuits read the applicable Supreme Court precedent far more narrowly than the First Circuit has and do not govern resolution of this case. These cases are also distinguishable on the facts. In *Metz v. United States*, 788 F.2d 1528 (11th Cir. 1986), the court concluded that there was "no other government conduct" not excepted from FTCA liability on which plaintiffs' claims might have rested. Id. at 1535. That is not the case here, as we discuss in the text. In *Commercial Union Ins. Co. v. United States*, 928 F.2d 176 (5th Cir. 1991), the court held that "chain of causation from the alleged negligence to the alleged injury depends upon the transmission of misinformation by a government agent," id. at 179, and thus that the action was barred by the

## VIII. CONCLUSION

For the foregoing reasons, the plaintiffs respectfully request that the Court deny the motion to dismiss with respect to the government's liability for malicious prosecution caused by law enforcement agents; and liability for negligent selection, supervision and retention of agents and employees, for intentional infliction of emotional distress, and for common law conspiracy, caused by any government employees.

Respectfully submitted,

The Plaintiffs,
By their attorneys,

Juliane Balliro (BBO# 028010)
Ronald J. Snyder (BBO# 638188)
PERKINS, SMITH & COHEN, LLP
One Beacon Street
Boston, Massachusetts  02108
(617) 854-4000

Michael Avery (BBO# 024500)
Suffolk University Law School
120 Tremont Street
Boston, MA  02108
(617) 573-8551

William T. Koski (BBO# 277820)
KOSKI & KEARNS LLP
One Bowdoin Square, Suite 300
Boston, MA  02114
(617) 973-4525

Dated:  November 27, 2002

---

misrepresentation exception because it could be distinguished from *Block*. In the present case the chain of causation of the malicious prosecution does not solely depend upon the transmission of the false information to the Massachusetts officials, as discussed in the text.

## CERTIFICATE OF SERVICE

I, Juliane Balliro, hereby certify that on this 27th day of November 2002, I served the foregoing by mailing a copy first class, postage prepaid, to all counsel of record and to counsel for the United States by facsimile.

Juliane Balliro

28483-2

# EXHIBIT

# A

Massachusetts Superior Court

**Massachusetts Superior Court**
**Opinions Courtesy of Lawyers Weekly**

**Massachusetts Lawyers Weekly**
*www.masslawyersweekly.com*

# COMMONWEALTH

## v.

## LIMONE

### COMMONWEALTH OF MASSACHUSETTS

### SUFFOLK, ss. SUPERIOR COURT

### CRIMINAL ACTION

### NOs. 32367, 32369, 32370

# COMMONWEALTH

## vs.

## PETER J. LIMONE

### SUPPLEMENTAL MEMORANDUM OF DECISION AND ORDER ON

### DEFENDANT'S MOTION FOR A NEW TRIAL AND

### COMMONWEALTH'S MOTION TO VACATE DEFENDANT'S CONVICTIONS, GRANT A NEW TRIAL AND ADMIT DEFENDANT TO BAIL

Defendant Peter J. Limone was convicted in 1968 for being an accessory before the fact in the murder of Edward Deegan, for conspiracy to murder Deegan and for conspiracy to murder Anthony J. Stathopoulos. The matter is now before me on defendant's motion for a new trial, under Mass. R. Crim. P. 30(b) and the Massachusetts and Federal Constitutions, on numerous grounds, and the Commonwealth's motion to vacate defendant's convictions, grant a new trial and admit the defendant to bail. Based upon certain developments, more fully described below, which occurred while discovery was proceeding, it became apparent that certain of Limone's new evidence-based claims were likely to prove dispositive of this motion favorably to Limone. For this reason, the scope of an evidentiary hearing was confined to address Limone's claims

regarding certain newly discovered exculpatory evidence.[1] This evidentiary hearing was conducted on January 5, 2001; at that time the court heard argument and received into evidence 26 pages of documents produced by the Justice Task Force to the parties on December 19, 2000. At the conclusion of the hearing, I allowed the parties' motions and stated that I would set forth my reasons in a written memorandum.

## BACKGROUND

### I. Background of the Case Before Defendant's Motion for a New Trial

The facts of this case are set forth in the opinion of the Supreme Judicial Court affirming the convictions of Limone and his five codefendants. See *Commonwealth v. French*, 357 Mass. 356, 361-370 (1970), judgments vacated as to death penalty *sub nom. Limone v. Massachusetts*, 408 U.S. 936 (1972). Between May 27, 1968 and July 31, 1968 Limone was tried jointly with five codefendants. Briefly stated, the evidence presented at trial through the key prosecution witness, one Joseph Barboza (also known as Joseph Baron), was that Limone offered Barboza a contract to kill Deegan for $7,500. Barboza testified that Limone later offered an additional $2,500 if Stathopoulos were also killed. During a break-in at a financial institution, Deegan was killed in an alley in Chelsea on March 12, 1965, but Stathopoulos drove away from the crime scene.

More specifically, Barboza testified at trial that about January 20, 1965, Limone saw Barboza and offered him a "contract" to kill Deegan for $7,500, and told Barboza that this had been approved by the "office." Barboza spoke with Tameleo a few days later to confirm that the "office" approved of the murder. Tameleo agreed to it. Some weeks later, after securing the assistance of others, some of whom would become Limone's codefendants at trial, Barboza reported to Limone that the murder would occur soon but that Stathopoulos would be involved. According to Barboza, Limone agreed to add $2,500 if Stathopoulos were also killed. Barboza confirmed with Tameleo that it was okay to kill Stathopoulos as well. According to the evidence presented at trial, the murder of Deegan was carried out by Barboza,[2] Cassesso, Salvati, French, Grieco and others, not including Limone.[3] Stathopoulos escaped. Some time later, Barboza testified, he met with Limone, who paid him for the Deegan murder.

A jury convicted Limone on the two counts of conspiracy to commit murder and of being an accessory before the fact. Limone was sentenced to death.[4] The convictions of Limone and all the codefendants were affirmed by the Supreme Judicial Court. *Commonwealth v. French*, 357 Mass. 356 (1970). Limone's death sentence was vacated by the United States Supreme Court following its decision in *Furman v. Georgia*, 408 U.S. 238 (1972). See *Limone v. Massachusetts*, 408 U.S. 936 (1972).[5]

Limone's first motion for a new trial was denied in 1970, and this denial was affirmed on appeal. *Commonwealth v. Cassesso*, 360 Mass. 570 (1971). A petition for habeas corpus filed in the United States District Court for the District of Massachusetts was dismissed, and this dismissal was affirmed by the Court of Appeals for the First Circuit. *Grieco v. Meachum*, 533 F.2d 713 (1st Cir. 1976), *cert. denied sub nom. Cassesso v. Meachum*, 429 U.S. 858 (1976). Limone's second motion for a new trial was denied in 1990, and this denial was affirmed on appeal. *Commonwealth v. Limone*, 410 Mass. 364 (1991). Other motions for a new trial were filed in 1993 and were denied, which was also affirmed. *Commonwealth v. Salvati*, 420 Mass. 499 (1995).

### II. Developments Since Defendant's Motion For a New Trial Was Filed

Defendant's motion for a new trial was filed on June 19, 2000. The case was assigned to me on August 2, 2000 because the trial judge (Forte, J.) had retired from the Superior Court. After a number of hearings, it became apparent that the Commonwealth had in its possession documents that the Commonwealth agreed should be made available to Limone. A discovery deadline was set, and the matter proceeded largely in compliance with that deadline. I issued an order setting forth the parties' responsibilities in compiling an itemized list of documentary evidence that would be introduced at an evidentiary hearing on defendant's motion, should I determine an evidentiary hearing to be appropriate.

Meanwhile, counsel for Limone had moved to intervene in *United States v. Stephen J. Flemmi et al.*, Crim. No. 94-10287-MLW (D. Mass.), pending before United States District Court Judge Mark L. Wolf. Judge Wolf denied intervention but indicated that certain documents might be discoverable in this proceeding. I thereafter gave notice to the United States Attorney's office of Limone's request for discovery of matters relating to the pending motion. The local United States Attorney's office agreed to review its files. This led to the parties each receiving a telephone call from John H. Durham, a

Special Attorney with the United States Attorney's office. This telephone contact was followed by a letter to the parties from AUSA Durham dated December 19, 2000 enclosing 26 pages of F.B.I. documents.[6] In that letter, AUSA Durham states that in response to Limone's November 2000 request for information, F.B.I. employees assigned to the Justice Task Force began reviewing Boston F.B.I. informant, intelligence and investigative files. According to AUSA Durham, that review showed that Vincent James Flemmi was an F.B.I. informant around the time of the Deegan murder. F.B.I. focus on Flemmi as a potential source began on March 9, 1965, and the first reported contact with Flemmi as an informant was by F.B.I. Special Agent H. Paul Rico on April 5, 1965. In his letter, AUSA Durham also states that F.B.I. files show that Flemmi was contacted five times as an informant by Special Agent Rico, and that Flemmi's file was closed on September 15, 1965 after Flemmi was charged with a crime "unrelated to the Deegan murder."

AUSA Durham further states in his letter that Vincent Flemmi's F.B.I. file contains two documents relating to the Deegan murder. One is a summary of information known by the Boston F.B.I. about Flemmi's criminal activities at the time Flemmi became an F.B.I. informant. The Justice Task Force attempted to locate other investigative files that relate to the Deegan murder. Five such documents had been located as of December 19, 2000. I refer to these documents collectively as the "F.B.I. documents." These are:

(1) Memorandum dated March 15, 1965 from Special Agent Rico to the "SAC, Boston" reporting a contact with a source on March 10, 1965.

(2) Memorandum dated March 15, 1965 from Special Agent Rico to the SAC, Boston, reporting a contact with the same source on March 13, 1965.

(3) March 19, 1965 "Airtel" from SAC, Boston, to "Director, F.B.I." titled, "Criminal Intelligence Program, Boston Division" which summarizes that week's developments.

(4) Memorandum dated April 22, 1965 from a Boston "Correlator" to SAC, Boston titled "Vincent James Flemmi, Aka." which summarizes information in F.B.I. files known about Flemmi at the time he was opened as an informant.

(5) June 9, 1965 Airtel from SAC, Boston to Director, F.B.I. titled "BS 919-PC" which reports on the status of efforts to develop Vincent James Flemmi as an F.B.I. informant.

These documents are heavily redacted, and portions are of marginal legibility.[7] I summarize them below.

AUSA Durham's letter states that there were "[s]everal impediments" to the Justice Task Force's search for records, including routine destruction of files. The result of this is that, for example, the April 22, 1965 summary memorandum "represents the only surviving record of its information. Simply stated, the raw source data that was originally reported appears to no longer exist." However, "a case file containing information from Joseph Baron (Barboza) was located on this date, and a review of that file will begin shortly." In addition, AUSA Durham states that "it can not be stated with certainty at this time that the attached documents represent the only relevant materials in FBI files." AUSA Durham invites counsel for Limone to provide "greater specificity" as to what materials are relevant, but states that in any event the Justice Task Force will advise the parties of additional relevant documents that are discovered.

AUSA Durham included with his letter five documents, whose pages were numbered sequentially 00001 through 000026:

Document 1 is a memorandum from Special Agent Rico to the SAC, dated March 15, 1965. As noted, it states that the date of contact was March 10, 1965 and under "Titles and File [illegible] on which contacted" states "Edward [illegible] Deegan." The memorandum states:

Informant advised that he had just heard from "JIMMY FLEMMI" that FLEMMI told the informant that RAYMOND PATRIARCA has put out the word that EDWARD "TEDDY" DEEGAN is to be "hit" and that a dry run has already been made and that a close associate of DEEGAN's has agreed to set him up.

FLEMMI told the informant that the informant, for the next few evenings, should have a provable alibi in case he is suspected of killing DEEGAN. FLEMMI indicated to the informant that PATRIARCA put the word out on DEEGAN because DEEGAN evidently pulled a gun and threatened some people in the Ebb Tide restaurant, Revere, Mass.

Document 2 is a memorandum from Special Agent Rico to the SAC dated March 15, 1965. It lists March 13, 1965 as the date of contact and "Edward F. Deegan" as the title/file on which the informant was contacted. This document states:

Informant advised that "JIMMY" FLEMMI contacted him and told him that the previous evening DEEGAN was lured to a finance company in Chelsea and that the door of the finance company had been left open by an employee of the company and that when they got to the door ROY FRENCH, who was setting DEEGAN up, shot DEEGAN, and JOSEPH ROMEO MARTIN and RONNIE CASESSA came out of the door and one of them fired into DEEGAN's body. While DEEGAN was approaching the doorway, he (FLEMMI) and JOE BARBOZA walked over towards a car driven by TONY "STATS" and they were going to kill "STATS" but "STATS" saw them coming and drove off before any shots were fired.

FLEMMI told informant that RONNIE CASESSA and ROMEO MARTIN wanted to prove to RAYMOND PATRIARCA they were capable individuals, and that is why they wanted to "hit" DEEGAN. FLEMMI indicated that they did an "awful sloppy job."

This information has been disseminated by SA DONALD V. SHANNON to Capt. ROBERT RENFREW (NA) of the Chelsea, Mass. PD.

Document 3 is from SAC, Boston to Director, F.B.I. (then J. Edgar Hoover). It begins by summarizing much of the information contained in the March 1965 Memoranda.[8] It then states:

It should be noted that this information was furnished to the Chelsea PD and it has been established by the Chelsea Police that ROY FRENCH, BARBOZA, FLEMMI, CASESSA, and MARTIN were all together at the Ebb Tide night club in Revere, Mass. and they all left at approximately 9 o'clock and returned 45 minutes later.

It should be noted that the killing took place at approximately 9:30 p.m., Friday, 3/12/65.

[What appears to be two paragraphs of text is redacted here].

Informant also advises that [redacted] had given the "OK" to JOE BARBOZA and "JIMMY" FLEMMI to kill [redacted] who was killed approximately one month ago.

Following this is an additional page which states that it "is being deleted in its entirety for codes: F, B."

Document 4 is from "correlator" to SAC, Boston, regarding Vincent James Flemmi. It is a lengthy, heavily redacted document and need not be quoted in its entirety. Relevant portions state:[9]

Boston airtel to Director, FBI dated 10/23/64 captioned [redacted].

[Redacted] advised that Peter Limone had mentioned to Raymond Patriarca that Jimmy FLEMMI is the type of individual who is difficult to control and when FLEMMI visited his club, the West End Veterans Club recently Limone asked FLEMMI to leave because of the heat that was on FLEMMI at that time. FLEMMI denied that any heat was on him and at that time FLEMMI inquired about Edward Deegan, close associate of [redacted]. Limone told FLEMMI that Deegan does not visit the club and immediately after FLEMMI departed Limone telephonically contacted Deegan and told him that FLEMMI was looking for him allegedly for a $300 loan which FLEMMI claimed DEEGAN owed to him. Deegan denied that he owed such a loan and Limone and Deegan were of the opinion that FLEMMI was out to kill DEEGAN.

Boston airtel to Director, FBI dated 10/19/64 captioned [redacted].

[Redacted] advised that he received a telephone call from JAMES FLEMMI, on 10/18/64, who told him that he had been with Edward "Teddy" Deegan and Tony (LNU) at the West End Social Club during the early morning hours of 10/17/64. Informant stated the name of [redacted] was mentioned in a conversation but FLEMMI stated he could not recall what was said. FLEMMI stated that he definitely knows that Deegan, after leaving the West End Social Club, murdered [redacted] and he was concerned about leaving his fingerprints in the car in which [redacted] was murdered.

Y.

FLEMMI told informant that he wants to kill Deegan. Information relating to Deegan's participating in the killing of [redacted] was furnished to the Everett, Mass., Police Department on 10/18/64. [Redacted] mentioned as [redacted].

Y.

Memo. of H. Paul Rico to SAC, Boston 10/8/64 and captioned: [redacted]

Informant advised 10/5/64, that he is friendly with the FLEMMI's, but VINCENT FLEMMI is an extremely dangerous individual Y. Informant also advised that he suspects that FLEMMI had committed several murders Y. Informant advised that [several lines redacted] and "JIMMY" FLEMMI wanted to be considered the "best hit man" in the area.

Y.

Boston airtel to Director, FBI & SACS Las Vegas, Phoenix 1/7/65 captioned: [redacted]

A review of information furnished by [redacted] on 1/4/65 reflected that Ronald Cassessa, JAMES FLEMMI, [redacted] contacted Patriarca. Cassessa told Patriarca that "that thing was straightened out." (Informant did not know what it pertained to.)

Y.

[Document identifying data redacted].

Gennaro J. Angiulo and Peter Limone contacted Patriarca. Angiulo stated that Larry Baione, Boston hoodlum, had contacted him when he (Baione) was released from prison concerning the loan shark business of [redacted].

Patriarca advised that [redacted] and JAMES FLEMMI, both of Boston, contacted him. This contact was arranged by Ronnie Cassessa, and Angiulo had knowledge of same.

Patriarca stated that the word was that "we" (meaning Patriarca and his group) wanted FLEMMI and [redacted] for something and consequently they both arranged the meet.

[Paragraph redacted]

Y.

According to Angiulo, [redacted] told Peter Limone that JIMMY FLEMMI had told [redacted], "Don't worry about [redacted]," (indicating that he knew [redacted] was going to get hit.).

Boston Airtel to Director, 3/10/65 entitled: [redacted]

[Redacted] advised on 3/3/65 that [redacted] contacted Patriarca and stated he had brought down VINCENT FLEMMI and another individual (who was later identified as Joe Barboza from East Boston, Mass.) It appeared that [redacted], Boston hoodlum, was giving orders to FLEMMI to "hit this guy and that guy".

Y.

According to Patriarca, another reason that FLEMMI came to Providence to contact him was to get the "OK" to kill Eddie Deegan of Boston who was "with [redacted.] It was not clear to the informant whether he received permission to kill Deegan; however, the story that FLEMMI had concerning the activities of Deegan in connection with his, Deegan's, killing of [redacted] was not the same as Jerry Angiulo's.

Boston's Airtel to Director and SACS Albany, Buffalo, Miami 3/12/65 captioned: [redacted].

[Redacted] advised on 3/9/65 that JAMES FLEMMI and Joseph Barboza contacted Patriarca, and they explained that they are having a problem with Teddy Deegan and desired to get the "OK" to kill him.

They told Patriarca that Deegan is looking for an excuse to "whack" [redacted] who is friendly with [redacted].

FLEMMI stated that Deegan is an arrogant, nasty sneak and should be killed.

Patriarca instructed them to obtain more information relative to Deegan and then to contact Jerry Angiulo at Boston who would furnish them a decision.

Y..

Memo. of [redacted] 4/6/65 captioned: [redacted]

Y.

PCI stated that JIMMY FLEMMA had gone to Providence just before Teddy Deegan was slain in Chelsea.

Document 5 is from SAC, Boston to Director, F.B.I. and reports on the status of efforts to develop Vincent James Flemmi as an informant for the F.B.I. Much of this document is illegible, but it provides in relevant part:

Concerning the informant's emotional stability, the Agent handling the informant believes, from information obtained from other informants and sources, that BS 919-PC has murdered [redacted], [redacted], [redacted], [redacted], EDWARD "TEDDY" DEEGAN, and [redacted], as well as a fellow inmate at the Massachusetts Correctional Institution, Walpole, Mass., and, from all indications, he is going to continue to commit murder.

Some of the information provided by the informant has been corroborated by other sources and informants of this office. Although the informant will be difficult to contact once he is released from the hospital because he feels that [redacted] will try to kill him, the informant's potential outweighs the risk involved.

## DISCUSSION

Massachusetts Rule of Criminal Procedure 30(b) provides that a motion for a new trial may be granted "at any time if it appears that justice may not have been done." Grounds for a new trial include newly discovered evidence and failure to disclose exculpatory evidence. Among the grounds Limone now asserts in support of his motion for a new trial is newly discovered exculpatory evidence.

Limone's claim that the government improperly failed to disclose exculpatory evidence fits into a number of analytical boxes, with differing standards. On the one hand, it can be analyzed as a typical claim for a new trial based on newly discovered evidence. *Commonwealth* v. *Tucceri*, 412 Mass. 401, 408-09 (1992). Such a motion based on newly discovered evidence may be made without regard to whether that evidence was improperly withheld by the government. *Id.*; *Commonwealth* v. *Grace*, 397 Mass. 303, 305 (1986). Limone's claim can also be analyzed as a claim that there was a violation of *Brady* v. *Maryland*, 373

U.S. 83 (1963), because a *Brady* claim may be made in the context of a claim regarding newly discovered evidence. *Tucceri*, 412 Mass. 408-09. A *Brady* claim may also, however, be made even if the undisclosed evidence is not "newly" discovered. *Id.* at 409. In ruling on the pending motions, I address only the newly discovered evidence ground and do not address Limone's claim in the context of *Brady*.

## I. Newly Discovered Evidence

A defendant seeking a new trial on grounds of newly discovered evidence must establish both that the evidence is newly discovered and that it casts "real doubt" on the justice of the conviction. *Commonwealth v. LeFave*, 430 Mass. 169, 176 (1999). Limone has satisfied both parts of that standard. Evidence is newly discovered when it was unavailable at the time of trial and could not have been, with reasonable diligence, discovered at trial or at the time of a prior motion for a new trial. *Id.*; *Commonwealth v. Moore*, 408 Mass. 117, 126 (1990); *Grace*, 397 Mass. at 306. The Commonwealth concedes that these documents are "newly" discovered.[10] The evidence "not only must be material and credible but also must carry a measure of strength in support of the defendant's position." *Commonwealth v. Scanlon*, 412 Mass. 664, 680 (1992), quoting *Grace*, 397 Mass. at 305-06. Thus, if the newly discovered evidence is cumulative of evidence admitted at trial, it tends to carry less weight than evidence that is different in kind. *Scanlon*, 397 Mass. at 680. "Moreover, the judge must find there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial."[11] *Grace*, 397 Mass. at 306. Where, as here, I was not the trial judge, I must carefully scrutinize the trial record to determine fairly whether newly discovered evidence demonstrates that justice may not have been done. *Commonwealth v. Hill*, 432 Mass. 704, 710 (2000); *Commonwealth v. Leaster*, 395 Mass. 96, 101 (1985). I have conducted that review by reading the entire trial transcript.[12]

Here, the jury would likely have reached a different conclusion by this previously undisclosed evidence for two principal reasons. First, the new evidence casts serious doubt on Barboza's credibility in his account of Limone's role. Second, the new evidence reveals that Vincent James Flemmi, a participant of some sort in the Deegan murder, was an F.B.I. informant around the time of the murder.

Turning first to the Barboza issue, Barboza was a "vital, principal prosecution witness at trial." *Commonwealth v. Cassesso*, 360 Mass. 570, 572 (1971). In effect, "the principal issue before the jury was one of [Barboza's] credibility."[13] *Commonwealth v. French*, 357 Mass. 356, 397 (1970). Barboza, as noted, was the only government witness implicating Limone. If Limone had had information that Patriarca set up the murder and not Limone, and that Flemmi was an F.B.I. informant, it is highly likely that the defense theory that the F.B.I. was manipulating Barboza's testimony could have been buttressed. Moreover, the newly disclosed evidence about Vincent James Flemmi would have provided Limone considerable opportunity to challenge Barboza's testimony as to Flemmi. Barboza calls Flemmi his "partner" during March of 1965, the time of the Deegan murder. Trial Transcript (hereafter the "Transcript") Vol. 34, pp. 4160-61. Barboza testified that Flemmi was at the Ebb Tide on the night of the murder. Transcript Vol. 34, p. 4167; *id.* at Vol. 35, p. 4431. But Barboza denies that Flemmi left the Ebb Tide with Barboza and the others on the night of the murder. Transcript Vol. 34, p. 4172.

In addition, the newly discovered evidence is consistent with other evidence Limone has previously submitted to the court in his prior new trial motions. For example, in an affidavit submitted in 1970, Barboza stated that he is "free from duress or coercion" and wishes "to recant certain portions of [his] testimony [concerning] the involvement of Henry Tameleo, Peter J. Limone, Joseph L. Salvati and Lewis Grieco in the killing of Teddy Deegan." *Cassesso*, 360 Mass. at 573. He further stated that the testimony he was offering "to give concerning the killing of Deegan and those individuals responsible for his death will be the whole truth known to" him. *Id.* See also *id.* at 574-75 (detailing affidavit of counsel for Limone). The Supreme Judicial Court observed that this affidavit was deficient in a number of respects, but left it open to Limone and his codefendants to renew their new trial motion if they could expand on Barboza's affidavit. *Id.* at 573, 579. In an affidavit dated April 9, 1976 and submitted in 1990, Gerald Alch, Esq. states that he and Barboza had several conversations in July and August 1970 at the Massachusetts Correctional Institute in Walpole to discuss Barboza's trial testimony. Alch states that Barboza told him that "any testimony [Barboza] had given in the trial of the Deegan case which in any way implicated Peter Limone was false; that Mr. Limone was neither present at the time of the commission of said crime, nor had any knowledge thereof and was in no way involved under any circumstances which could classify him as an accessory before or after the fact." Barboza states that he was motivated at trial by his belief that implicating Limone in the murder would help him (Barboza) obtain a new identity, relocation and financial assistance from law enforcement officials.[14] He also claimed that the prosecution promised him post-trial protection. Because the promises made to him had not been kept, Barboza "felt no longer obligated to adhere to his false implication of Limone." Mem. of Decision of Dolan, J., dated Feb 13, 1990, at 9.

For these reasons, I find and rule that the F.B.I. documents are newly discovered evidence which, as both the Commonwealth and Limone state, cast "real doubt" on the justice of Limone's convictions. They are material **[15]** and carry a measure of strength in support of Limone's position. Thus, I find and rule that there is a substantial likelihood that the jury would have reached a different conclusion had this evidence been available at trial. **[16]** Accordingly, I allow the motions for a new trial and I also allow the Commonwealth's motion to vacate the convictions.

**II. BAIL**

Also before me are motions of the defendant and the Commonwealth to admit Limone to bail. After a bail hearing and consultation with the Department of Probation, I allowed the defendant's request (which the Commonwealth did not oppose) that Limone be released on personal recognizance subject to strict conditions detailed on the record. I did so having considered the factors enumerated in G.L. c. 276, ' 58 on the basis of the information before me. That information showed, among other factors, the following:

Limone is now about 65 years old. His wife, Olympia Limone, still resides in the same house in Medford, Mass. where she and Limone lived before Limone was incarcerated; she and their children have maintained contact with Limone throughout his incarceration and Limone will reside with them now. Limone has also maintained contact with his immediate and extended family during his incarceration.

I also note that the materials provided me at today's bail hearing include a commendation letter from the Superintendent of M.C.I. Norfolk to Limone. This letter expresses appreciation to Limone for his participation in resolving a hostage situation at M.C.I. Norfolk on March 6, 1975, where two correctional officers were taken hostage and later shot. The letter also states that Limone helped to resolve the situation by negotiating personally with the hostage takers. Among the other factors I take into consideration is that Limone successfully completed approximately 170 furloughs before that program was eliminated. I also take into consideration that the Commonwealth states it is not now in a position to decide whether it will prosecute Limone again on the pending indictments.

**ORDER**

For the foregoing reasons, the motion for a new trial of Peter J. Limone is **ALLOWED**; the Commonwealth's motion to vacate defendant's convictions, grant a new trial and admit Limone to bail is also **ALLOWED**.

—————————————————

Margaret R. Hinkle

Justice of the Superior Court

DATED: January 8, 2001

## FOOTNOTES:

**[1]** The day before this hearing, i.e. Jan. 4, 2001, the Commonwealth filed its motion to vacate defendant's convictions, grant a new trial and admit defendant to bail.

**[2]** Barboza pled guilty to two indictments for conspiracy on the first day of jury selection. He was murdered in 1976.

**[3]** Barboza mentions Vincent James Flemmi as a participant in the scheme. Flemmi, who is now deceased, was never indicted. The newly disclosed evidence reveals that Flemmi was an F.B.I. informant around the time Deegan was murdered and for a period thereafter.

COMMONWEALTH v. LIMONE

[4] French, who the trial evidence showed shot Deegan, was found guilty of murder in the first degree with a recommendation that death not be imposed. Salvati was convicted of being an accessory, also with a recommendation against death. Grieco, who the evidence also showed shot Deegan, was found guilty of murder in the first degree, and Cassesso and Tameleo were found guilty as accessories. Grieco, Cassesso and Tameleo were convicted on two conspiracy indictments; each was sentenced to death.

[5] Limone was resentenced to life imprisonment.

[6] Durham's letter and the attached F.B.I. records were admitted into evidence at the hearing on this motion.

[7] On December 20, 2000, the District Attorney's office filed the documents received from the Justice Task Force as a pleading in this case.

[8] The document states:

The following are the developments during the current week:

On 3/12/65, EDWARD "TEDDY" DEEGAN was found killed in an alleyway in Chelsea, Mass. in gangland fashion.

Informants report that RONALD CASESSA, ROMEO MARTIN, VINCENT JAMES FLEMMI, and JOSEPH BARBOZA, prominent local hoodlums, were responsible for the killing. They accomplished this by having ROY FRENCH, another Boston hoodlum, set DEEGAN up in a proposed "breaking & entering" in Chelsea, Mass. FRENCH apparently walked in behind DEEGAN when they were gaining entrance to the building and fired the first shot hitting DEEGAN in the back of the head. CASESSA and MARTIN immediately thereafter shot DEEGAN from the front.

ANTHONY STATHOPOULOS was also in on the burglary but had remained outside in the car.

When FLEMMI and BARBOZA walked over to STATHOPOULOS's car, STATHOPOULOS thought it was the law and took off. FLEMMI and BARBOZA were going to kill STATHOPOULOS also.

Immediately thereafter, STATHOPOULOS proceeded to Atty. AL FARESE. FARESE called the Chelsea, Mass. PD before Chelsea knew of the killing and FARESE wanted to bail out ROY FRENCH and "TEDDY" DEEGAN. Shortly thereafter the Chelsea PD found the body of DEEGAN and immediately called Atty. FARESE's office, and Atty. JOHN FITZGERALD, FARESE's law partner, came to the Chelsea PD.

Efforts are now being made by the Chelsea PD to force STATHOPOULOS to furnish them the necessary information to prosecute the persons responsible.

[9] The document contains what appears to be a form of document code numbers, which I omit.

[10] There is no credible evidence before me that the Suffolk District Attorney's office had actual possession of the F.B.I. documents or of the information contained therein before those documents were produced by the Justice Task Force on December 19, 2000.

[11] The Commonwealth argues that the proper standard in this regard for the trial court is whether there is a "substantial

likelihood of a miscarriage of justice." That argument is based on *Commonwealth v. Simmons*, 417 Mass. 60, 73 (1994). In *Simmons*, the procedural posture of the case was such that the Court decided the defendant's (1) direct appeal from his conviction for murder in the first degree, (2) appeal from the denial of his motion for a new trial filed in and decided by the Superior Court and (3) appeal from the denial of his second motion for a new trial filed with and decided by a single justice of the Supreme Judicial Court. *Simmons*, 417 Mass. at 61. There, the Court held that "[w]here the prosecution denies the defendant exculpatory evidence but the defendant has not requested it or has made only a general request, *this court* will order a new trial or reduction of the verdict whenever the court concludes that there has been a substantial likelihood of a miscarriage of justice." *Id.* at 73 (emphasis added). The Court's decision was based on G.L. c. 278, ' 33E. *Commonwealth v. Tucceri*, 412 Mass. 401, 412-13 (1992), which articulated the standard to govern motions for a new trial where the prosecution improperly failed to deliver exculpatory evidence to a defendant, involved a defendant who was not convicted of first degree murder. That case was before the Court on an appeal from the allowance of the defendant's motion for a new trial by the Superior Court; that appears to have been the defendant's first motion for a new trial and first appeal, although it was filed years after his conviction. *Id.* In *Tucceri*, the Court held that when the defendant has made no request or only a general request for exculpatory evidence, the standard for the trial court is "whether there is a substantial risk that the jury would have reached a different conclusion." *Tucceri*, 412 Mass. at 413. *Tucceri* cited *Grace*, 397 Mass. at 306, which also used the language *Tucceri* used. *Grace* involved the motion for a new trial of a defendant convicted of murder in the first degree. *Grace*, 397 Mass. at 304. That motion, which did not involve exculpatory evidence allegedly withheld by the government, was filed in the Superior Court years after the defendant's conviction was affirmed by the Supreme Judicial Court. The upshot of this discussion is that it appears that it is the *Tucceri* "substantial risk" standard that governs Limone's present motion for a new trial, rather than the *Simmons* "substantial likelihood of a miscarriage of justice" standard. This is so because this case is in a procedural position similar to *Grace*, and is not part of an appeal to the Supreme Judicial Court under G.L. c. 278, ' 33E, as was *Simmons*. See *Commonwealth v. Wright*, 411 Mass. 678, 681 (1992) (standard of review by Supreme Judicial Court of unpreserved claim of error in context of claim of ineffective assistance of counsel is "substantial likelihood of a miscarriage of justice"). This was the standard used in *Commonwealth v. Salvati*, 420 Mass. 499, 506 (1995). That said, however, which of these standards applies is not determinative of the issues I now consider. As I note below, see *infra* note 20, I conclude that the newly discovered evidence creates a substantial likelihood of a miscarriage of justice as well as a substantial risk that the jury would have reached a different conclusion vis-à-vis Limone.

[12] I did not review the transcript of the lengthy jury empanelment.

[13] Barboza was a "highly vulnerable" witness in another case. See *Patriarca v. United States*, 402 F.2d 314 (1st Cir. 1968) (where Barboza testified against defendants Patriarca as well as Cassesso and Tameleo).

[14] Barboza had been placed in protective custody by Federal officials before trial of this case. Transcript, Vol. 42, p. 5810.

[15] I make no finding, of course, as to the *accuracy* of the information set forth in the F.B.I. documents.

[16] I also find that the newly discovered evidence satisfies the higher standard of *Simmons*, 417 Mass. 60. The newly discovered F.B.I. documents create a substantial likelihood of a miscarriage of justice.

# EXHIBIT

# B

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                          SUPERIOR COURT DEPARTMENT
                                     NO. 32367

COMMONWEALTH

v.

PETER LIMONE

---

## NOLLE PROSEQUI

---

Now comes the Commonwealth in the above-captioned matter and respectfully

states that it will not prosecute Indictment No. 32367 any further.

As grounds therefor, the Commonwealth respectfully states as follows:

(1)   There exists newly discovered evidence – various FBI documents
      disclosed to the Commonwealth and the defendant for the first time
      on December 19, 2000 – which significantly undermines (a) the
      credibility of the Commonwealth's principal witness at the
      defendant's first trial, Joseph Barboza, and (b) the Commonwealth's
      theory of the defendant's role in the murder of Edward Deegan, as
      presented at the defendant's first trial.

(2)   Joseph Barboza was shot and killed on February 11, 1976.

(3)   The Commonwealth has conducted a comprehensive review of the
      facts and circumstances surrounding the arrest, trial, and conviction
      of the defendant for his alleged role in the murder of Edward
      Deegan, including the impact of the contents of the newly
      discovered FBI documents.

(4)   In addition, the Commonwealth has carefully and thoroughly
      evaluated the nature, quality, and sufficiency of the alleged
      evidence against the defendant.

(5)   As a result of that review and evaluation, the Commonwealth has
      concluded that it does not now have a good faith basis – legally or
      ethically – to proceed with any further prosecution of the
      defendant.

Respectfully Submitted
For the Commonwealth,

RALPH C. MARTIN, II
DISTRICT ATTORNEY

By: _____
MARK LEE
Assistant District Attorney
Homicide Unit

By: _____
DAVID E. MEIER
Chief of Homicide
One Bulfinch Place
Boston, MA  02114
(617) 619-4240

Dated:  January 30, 2001