UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PETER J. LIMONE, ET AL, ) | |
| ) | |
| Plaintiffs, ) | FILED/D |
| ) | IN CLERK'S OFFICE |
| v. ) | C. A. 02-CV-10890-NG |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ET AL, ) | |
| ) | |
| Defendants. ) | |

## OPPOSITION TO DEFENDANT CONDON'S MOTION TO DISMISS THE AMENDED COMPLAINT BY THE LIMONE AND TAMELO PLAINTIFFS

## I.   INTRODUCTION

Plaintiffs acknowledge that their common law claims against defendant Condon in Counts V, VI and VII may be dismissed. In all other respects, they urge the Court to deny the motion to dismiss by this defendant.

## II.   PLAINTIFFS' STATE LAW CLAIMS IN COUNTS V, VI AND VII MAY BE DISMISSED.

The defendant Condon has moved, pursuant to 28 U.S.C. § 2679(b)(1) that his state law claims be dismissed, given that the Department of Justice has filed a certificate pursuant to 28 U.S.C. § 2679 that he was acting within the scope of his employment with respect to the matters alleged in plaintiffs' amended complaint. Plaintiffs do not oppose defendant Condon's motion to dismiss on this ground.





III.    **THE TAMELEO PLAINTIFFS HAVE A CAUSE OF ACTION THAT IS NOT PRECLUDED BY *HECK V. HUMPHREY*.**

A.      **The Government Mischaracterizes the First Circuit Court of Appeals's Pronouncement on the "reversal by proxy" Issue in the Context of Proving a Favorable Disposition in a Previous Criminal Matter.**

To the extent the Government argues that the First Circuit Court of Appeals in *Figuero v. Rivera*, 147 F.3d 77, 81 (1st Cir. 1998), "dismissed" the "reversal by proxy" argument as "insufficient" to prove a favorable disposition in a criminal matter,[1] the Government's argument lacks merit because it mischaracterizes that Court's position on the issue. The Court did state, as the Government argues, that "[w]e are skeptical that a section 1983 claimant can satisfy the Heck regiment by arguing a theory of reversal by proxy." *Figueroa*, 147 F.3d at 81. The First Circuit, however, <u>never</u> squarely addressed the issue. *Id.* ("That said, however, we decline to grapple with the . . . argument."). The issue of whether a civil plaintiff can prove the element of favorable disposition in a criminal matter by arguing "reversal by proxy" is one of first impression in this Circuit.

The unique circumstances of this case dictate that Tameleo's estate should be permitted to show favorable termination via the Massachusetts Superior Court's decision allowing Limone's motion for new trial. It is indubitably certain that if Tameleo were alive today, his convictions would be reversed and vacated, and his case subsequently nolle prossed by the Commonwealth.

On January 8, 2001, the Massachusetts Superior Court granted Limone's motion for a new trial and the Commonwealth's motion to vacate Limone's convictions. *See* Supplemental Memorandum of Decision and Order on Defendant's Motion for New

---

[1] *See* United States' Brief in Support of its Motion for Dismissal, pp.21-22.

Trial, dated January 8, 2001, attached hereto as Exhibit A. On January 30, 2001, the

Commonwealth filed a *Nolle Prosequi*, foregoing further prosecution of Limone on

criminal charges arising from the Deegan murder. *See* Nolle Prosequi attached hereto as

Exhibit B. Limone and Tameleo were tried together, and the only government witness

who implicated the men at trial was the Commonwealth's "star" witness, Joseph Barboza.

In granting Limone's motion for new trial, the Superior Court set forth the basis

for its decision in a multi-page written memorandum. Exhibit A. The Court based its

decision on "newly discovered evidence." *Id.* at p.7. The Court found that the jury

"would likely have reached a different conclusion by this previously undisclosed

evidence for two reasons." *Id.*

First, the Court found that the new evidence cast "serious doubt on Barboza's

credibility. . . ." *Id.* The Court found this particularly troubling given that Barboza was a

"vital, principal prosecution witness at trial," and that "the principal issue before the jury

was one of [Barboza's] credibility." *Id.* (internal citations omitted). Indeed, as stated,

Barboza was the only government witness who implicated Limone and Tameleo.

Second, the Superior Court found that the new evidence revealed that Vincent James

Flemmi, a participant of some sort in the Deegan murder, was an F.B.I. informant around

the time of the murder." Exhibit A, p.7. The Court reasoned as follows:

> Barboza, as noted, was the only government witness implicating Limone. If
> Limone had had information that Patriarca set up the murder and not Limone, and
> that Flemmi was an F.B.I. informant, it is highly likely that the defense theory that
> the F.B.I. was manipulating Barboza's testimony could have been buttressed.
> Moreover, the newly disclosed evidence about Vincent James Flemmi would have
> provided Limone considerable opportunity to challenge Barboza's testimony as to
> Flemmi. Barboza calls Flemmi his "partner" during March of 1965, the time of
> the Deegan murder. Barboza testified that Flemmi was at the Ebb Tide on the
> night of the murder. But Barboza denies that Flemmi left the Ebb Tide with
> Barboza and the others on the night of the murder.

*Id.* (internal citations omitted).

The Court's dispositive findings on the issues raised in Limone's motion for new trial apply equally to Tameleo. Barboza was the "principal prosecution witness" against Tameleo, and the only prosecution witness who implicated Tameleo in the Deegan murder. Tameleo's defense theory at trial, moreover, mirrored Limone's – that the F.B.I. was manipulating Barboza's testimony. The Superior Court's findings, therefore, that Barboza's credibility was a "principal issue before the jury," and that the "newly discovered evidence" cast "serious doubt on Barboza's credibility," carry precisely the same exculpatory weight in the context of Tameleo's convictions as the Court found them to have in the context of Limone's convictions.

Furthermore, the revelation that Vincent James Flemmi, a participant of some sort in the Deegan murder, was an F.B.I. informant around the time of the murder, is as important an exculpatory factor with respect to Tameleo as it was to Limone. In summary, in granting Limone's motion for a new trial, the Court based its decision on findings that would not have varied in any material way from findings based on the same "newly discovered evidence" were Tameleo eligible to file a motion for new trial.

Tameleo, however, unlike Limone, is as a matter of law precluded from filing a motion for new trial pursuant to Mass.R.Civ.P. 30 because he is deceased. As a result, Tameleo, through no fault of his own, is unable to avail himself of the accessible remedy obtained by Limone. In light of the unique circumstances of this case, this Court should deny the Government's motion to dismiss the FTCA claim for malicious prosecution.

Furthermore, if Tameleo were alive today to challenge his convictions, it is virtually certain that the Commonwealth would file a *Nolle Prosequi* in his favor. As

grounds for filing the *Nolle Prosequi* in Limone's case, the Commonwealth stated as

follows:

> There exists newly discovered evidence-various FBI documents disclosed to the
> Commonwealth and the defendant for the first time on December 19,
> 2000-which significantly undermines (a) the credibility of the Commonwealth's principal
> witness at the defendant's first trial, Joseph Barboza, and (b) the
> Commonwealth's theory of the defendant's role in the murder of Edward Deegan,
> as presented at the defendant's first trial.
> . . .

> As a result of [a] review and evaluation [of the newly discovered evidence], the
> Commonwealth has concluded that it does not now have a good faith basis-legally
> or ethically-to proceed with any further prosecution of the defendant.

Exhibit B.

As the "newly discovered evidence" considered by the Superior Court in

Limone's case would have the same material effect on Tameleo's convictions, the

Commonwealth would unquestionably file in Tameleo's case a *Nolle Prosequi* that

would virtually mirror in substance the *Nolle Prosequi* filed in Limone's case. Given the

Superior Court's findings on "newly discovered evidence" which exculpates to the same

degree Limone and Tameleo in the Deegan murder, Tameleo's estate should be permitted

to prove favorable termination via the Court's decision allowing Limone's motion for

new trial. The Government's motion to dismiss the FTCA claim for malicious

prosecution should, therefore, be denied.

**B.**     **The United States Supreme Court's Decision in *Heck v. Humphrey* is
Not Controlling Authority in Light of Subsequent Supreme Court
Precedent Eliminating the Favorable Termination Requirement For
Individuals Who are Not "In Custody."**

Tameleo's FTCA claim for malicious prosecution should not be dismissed

because the rule of *Heck v. Humphrey*, 512 U.S. 477 (1994), must be reconsidered in

light of the United States Supreme Court's decision in *Spencer v. Kemna*, 523 U.S. 1

(1998). The *Spencer* plaintiff was incarcerated after being convicted on criminal charges, and later paroled. *Spencer*, 523 U.S. at 1. His parole was subsequently revoked and he was returned to prison. *Id.* Thereafter, he sought to invalidate the parole revocation, filing a habeas petition in federal district court. *Id.* Prior to the court addressing his petition, the plaintiff's sentence expired and the court later dismissed his petition as moot. *Id.* The Eighth Circuit affirmed. *Id.* The Supreme Court granted cert to decide the issue of whether the habeas petition was rendered moot by the expiration of the plaintiff's sentence. *Spencer*, 523 U.S. at 3.

The Supreme Court affirmed in a plurality opinion. *Id.* at 3. Most importantly, five of the justices in *Spencer* agreed that a former prisoner, no longer "in custody," should be permitted to bring a § 1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable termination requirement. *Id.* at 18-21. Justice Souter was joined in a concurring opinion by Justices O'Connor, Ginsburg and Breyer. *Id.* at 18. Justice Stevens took that position in a separately authored dissenting opinion. *Id.* at 25 n.8.

Given that a current majority of the Justices espouse the view that a former prisoner, no longer "in custody," should be permitted to bring a § 1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable termination requirement, *Heck v. Humphrey* is not controlling authority under the circumstances presented here. As a result of the Supreme Court's elimination of the favorable termination requirement for individuals, like Tameleo, who are not "in custody," Tameleo's estate should be permitted to pursue his FTCA claim for malicious prosecution.

**C.**   **Public Policy Weighs Heavily in Favor of Not Dismissing the FTCA Claim for Malicious Prosecution.**

Finally, as a matter of public policy and fundamental fairness, the Government should not solely as a result of Tameleo's death be insulated from liability for malicious prosecution despite its egregious and deliberate mishandling of Tameleo's criminal case. *See Burke v. Rivo*, 406 Mass. 764, 774 (1990) ("Tort law finds its source in social values and ought to promote appropriate public policy."). The interests of justice will in no way be served by precluding Tameleo from prosecuting his FTCA claim for malicious prosecution solely on the basis that Tameleo is ineligible to seek a favorable disposition in his criminal case. Though Limone's and Tameleo's alleged roles in the Deegan murder varied, the evidence against them came from the same source – a source who's credibility has been so irreparably damaged by "newly discovered evidence" that the same Court who sentenced Limone found that his convictions could not stand. Accordingly, the Government's motion should be denied.

**IV.   DEFENDANT CONDON IS NOT ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFFS' CLAIMS THAT HE DEPRIVED LIMONE AND TAMELEO OF THEIR LIBERTY WITHOUT DUE PROCESS OF LAW.**

The first question in the qualified immunity inquiry is whether the constitutional rights the plaintiff claims were violated were clearly established at the time of the incidents in question. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Here plaintiffs claim that Limone and Tameleo were deprived of their liberty without due process, specifically

as a result of the subornation of perjured testimony and the suppression of exculpatory evidence. That these specific rights were clearly established by 1967 is beyond doubt.

The Supreme Court declared that "depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured" violated the Fourteenth Amendment due process clause in *Mooney v. Holohan*, 294 U.S. 103, 112 (1935). The Court affirmed this principle the following year in *Brown v. Mississippi*, 297 U.S. 278, 286 (1936).

In 1942, in *Pyle v. Kansas*, 317 U.S. 213, it required only one paragraph for the Court to conclude that "allegations that [habeas petitioner's] imprisonment resulted from perjured testimony, knowingly used by the State authorities to obtain his conviction, and from the deliberate suppression by those same authorities of evidence favorable to him … sufficiently charge a deprivation of rights guaranteed by the Federal Constitution." In 1959, in *Napue v. Illinois*, 360 U.S. 264, 269, the Court reiterated that, "it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." The Court held that due process is violated by allowing false evidence to go uncorrected when it appears, even where the evidence was not solicited by the state. The Court explicitly concluded that the proscription against the knowing use of false evidence, including false testimony, to obtain a tainted conviction was "implicit in any concept of ordered liberty." *Id.*

In 1951 the First Circuit recognized that the right to be free from a criminal conviction based on the knowing employment of perjury was clearly established. *Coggins v. O'Brien*, 188 F.2d 130 (1st Cir. 1951). Relying on *Mooney* and *Pyle* the court

8

characterized the principle that a conviction obtained by the deliberate use of perjured testimony deprived the accused of due process of law as a "well settled rule." *Id.* at 138.

In 1963, the Supreme Court decided *Brady v. Maryland*, 373 U.S. 83, 87, holding that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The decision was based on *Mooney* and *Pyle*. In 1967 in *Miller v. Pate*, 386 U.S. 1, 6, the Supreme Court followed *Mooney* in holding that "the Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence," and noted that since *Mooney* "there has been no deviation from that established principle."

The history of these decisions clearly established by 1967 that the use of perjured testimony and the suppression of exculpatory evidence violated the due process rights of a criminal defendant.

The second question in the qualified immunity inquiry is whether a reasonable officer would have known that the conduct he is alleged to have committed would have violated the clearly established right at issue. *Anderson v. Creighton*, 483 U.S. 635 (1987). Condon makes no argument that a reasonable law enforcement officer could fail to recognize that the subornation of perjury against a defendant in a capital murder case violates the constitutional rights of the accused. Evidently Condon concedes that an FBI agent is not entitled to qualified immunity for suborning perjury,[2] and his motion to

---

[2]     Condon does argue that he is entitled to absolute immunity for suborning perjury, as an extension of the absolute immunity that protects the witness who gives the perjured testimony. We discuss this argument in Section VI, infra.

dismiss on qualified immunity grounds is addressed only to the *Bivens* claim based on the failure to disclose exculpatory evidence.[3]

Condon argues that a reasonable FBI agent would not have known in 1967 that his failure to disclose exculpatory evidence to prosecutors would violate the constitutional rights of a criminal defendant. First, it must be noted that 1967 is not the only relevant time period at issue in this litigation. Plaintiffs have alleged that Condon participated in a conspiracy to suppress exculpatory evidence that lasted past the death of Tameleo in prison in 1985 and until evidence sufficient to exonerate Limone was finally furnished to him in December, 2000. To the extent that it should have become apparent to a reasonable FBI agent at any time prior to Tameleo's death, or the release of exculpatory information to Limone in December, 2000, the respective plaintiffs would have a cause of action for damages suffered during the incarceration of Tameleo and Limone from that time.

Second, the conduct of Condon in suborning perjury and suppressing exculpatory evidence cannot really be distinguished. The Supreme Court recognized as much in *Imbler v. Pachtman*, 424 U.S. 409 (1976), in which the Court held that prosecutors have absolute immunity from claims that they have suborned perjury. Justices White, Brennan and Marshall joined in a concurrence in which they agreed that a prosecutor should enjoy absolute immunity for suborning perjury, but argued that less protection should be available for the failure to disclose exculpatory evidence. The remaining Justices in the majority concluded that the two theories of liability could not be distinguished:

> We do not accept the distinction urged by Mr. Justice White for several reasons. As a matter of principle, we perceive no less an infringement of a defendant's rights by the knowing use of perjured testimony than by the deliberate

---

[3]     Condon Br., 9.

withholding of exculpatory information. The conduct in either case is reprehensible, warranting criminal prosecution as well as disbarment. ... Moreover, the distinction is not susceptible of practical application. A claim of using perjured testimony simply may be reframed and asserted as a claim of suppression of the evidence upon which the knowledge of perjury rested. That the two types of claims can thus be viewed is clear from our cases discussing the constitutional prohibitions against both practices.

*Id.* at 431, n. 24 (citing *Mooney*; *Alcorta v. Texas*, 355 U.S. 28, 31-32, (1957); *Brady*;

*Miller*; and *Giglio v. United States*, 405 U.S. 150, 151-155(1972).

*Miller v. Pate* is particularly illustrative in demonstrating that no meaningful distinction can be drawn between manufacturing evidence and suppressing exculpatory evidence. Miller had been convicted of murder in a trial in which the state relied heavily on the probative value of a pair of undershorts that a forensic scientist described as stained with human blood. At a later habeas corpus proceeding it was proved that the shorts were stained with paint, not blood, and that the prosecutor and the police had known of this at the time of the trial. Obviously the evidence could be viewed either as the manufacture of false evidence and testimony that the shorts were stained with blood, or suppression of the exculpatory evidence that there was no blood, only paint.

In the present case plaintiffs have alleged that Condon conspired with others to suborn perjury inculpating Tameleo and Limone in a murder, and to suppress exculpatory evidence that they were not involved and that the murder was committed and engineered by others, including Condon's informant Vincent James Flemmi. Plaintiffs specifically alleged that Condon encouraged the prosecution of the innocent Tameleo and Limone to "cover up and keep secret the involvement of the FBI informant Flemmi in the murder."[4] Under these circumstances, the subornation of perjury and the suppression of exculpatory

---

[4]     Am. Compl. ¶ 23 (d).

evidence were two sides of the same coin and a reasonable agent would have known that both taken together violated the constitutional rights of Tameleo and Limone.

Condon argues that because the immediate responsibility for furnishing exculpatory evidence to law enforcement officers rests with prosecutors, law enforcement officers were not on notice at the time of relevant events in this case that their failure to furnish the evidence to prosecutors would violate a defendant's constitutional rights. Although it is true, as Condon notes, that civil rights cases imposing liability on police officers for failing to furnish exculpatory evidence to prosecutors only began to be reported in the late 1980's and in the 1990's, that does not mean that a reasonable officer would not have known before those cases that the conduct in this case violated constitutional rights.

The Supreme Court has recognized that "general statements of the law are not inherently incapable of giving fair and clear warning," and that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *United States v. Lanier,* 520 U.S. 259, 271 (1997), citing *Anderson v. Creighton,* 483 U.S. at 640. The First Circuit has noted that to justify denying qualified immunity, "[W]e need not find a ruling that considered the precise situation at hand. It is enough, rather, that there existed case law sufficient to clearly establish that, if a court *were* presented with such a situation, the court would find that plaintiffs' rights were violated." *Hall v. Ochs,* 817 F.2d 920, 925 (1987). The Ninth Circuit concluded in *Devereaux v. Abbey,* 263 F.3d 1070, 1075 (9th Cir. 2001), a case alleging the fabrication of evidence, that, "Precedent directly on point is not necessary to demonstrate that a right

12

is clearly established. Rather, if the unlawfulness is apparent in light of preexisting law, then the standard is met. In addition, even if there is no closely analogous case law, a right can be clearly established on the basis of common sense."

It is hard to imagine how a law enforcement officer could justify in his own mind keeping exculpatory evidence secret while defendants went to trial on a murder case, were convicted, sentenced to death, incarcerated on death row and subsequently languished in prison until the death of one and for thirty-three years in the case of the other. It is impossible to imagine how such an officer might think the prosecutor could perform his duty of furnishing exculpatory evidence to defense counsel if the officer never furnished it to the prosecutor in the first place.

In *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), one of the first cases to impose civil liability for the failure to disclose exculpatory evidence, the court did not treat the proposition that such conduct by officers would violate the constitution as novel or controversial. Rather the court condemned the conduct in harsh terms and congratulated the City of Chicago for its good sense in not defending the practice:

> *Brady v. Maryland* does not require the police to keep written records of all their investigatory activities; but attempts to circumvent the rule of that case by retaining records in clandestine files deliberately concealed from prosecutors and defense counsel cannot be tolerated. The City sensibly does not attempt to defend such behavior in this court.

*Id.* at 995. In addition, in discussing the liability of police officers for false arrest when they have misrepresented the facts to prosecutors, the *Jones* court rejected the concept that the role played by prosecutors frees officers from liability:

> *If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him. They cannot hide behind the officials whom they have defrauded.*

*Id.* at 994 (emphasis in original).  This language applies with equal force to the liability of officers for failing to disclose exculpatory evidence to prosecutors.

Condon notes that the First Circuit has recognized the duty of law enforcement officers to supply exculpatory information to prosecutors and courts.  Indeed, in *Brady v. Dill*, 187 F.3d 104 (1st Cir. 1999), the court has said that a police officer may not treat evidence of innocence with impunity and that a "standard police function" is to provide such evidence.  The court has recognized that a "constitutional wrong results from the officer's failure to deliver material information to competent authorities." *Id.* at 114. Condon attempts to minimize the impact of this language by stressing that the court wrote that this will "sometimes" result in liability against the officer.  It is not clear, however, what the court meant to imply by the use of this qualifier.  It is possible that in some instances an officer's failure to furnish exculpatory evidence might be excused by the particular facts of a case.  In any event, the *Brady* opinion puts no limits on the scope of the officer's obligation to furnish exculpatory information to prosecutors.  Nor did the First Circuit recognize any limitations on this duty in *Reid v. State of New Hampshire*, 56 F.3d 332, 342 (1st Cir. 1995) (recognizing viability of § 1983 claim against officers for not disclosing exculpatory information to prosecutor; reversing district court for abuse of discretion in not permitting plaintiff discovery on officers' knowledge of exculpatory material before granting summary judgment for officers).

In any event, the instant case is not remotely close to any line that might be drawn limiting the liability of law enforcement officers to turn over exculpatory evidence to prosecutors.  Taken as a whole, any reasonable officer would have realized that the conduct allegedly engaged in by Condon in this case violated the constitutional rights of

14

Tameleo and Limone.  In *Devereaux v. Abbey*, 263 F.3d at 1074-1075, the court concludes that the proposition that subjecting a person to criminal charges on the basis of false evidence violates constitutional due process rights as "virtually self-evident." Similarly, the court held in *Young v. Biggers*, 938 F.2d 565, 570 (5th Cir. 1991), "A reasonable person, however, surely would realize that 'framing' someone for a crime that he did not commit deprives that person of his constitutional rights."  Here the plaintiffs have alleged that Condon suborned perjury and suppressed exculpatory information in order to frame Tameleo and Limone for a murder that was in fact engineered by Condon's own informant, Flemmi.  No reasonable FBI agent could have failed to appreciate the constitutional wrongfulness of this conduct.

## V.      THE PLAINTIFFS' COMPLAINT MEETS THE LEVEL OF SPECIFICITY REQUIRED BY RULE 8(a) OF THE FEDERAL RULES OF CIVIL PROCEDURE.

Defendant Condon has moved to dismiss on the ground that plaintiffs failed to plead specific facts in support of their claims that he suborned perjury and withheld exculpatory evidence.  Condon's argument is based on the First Circuit decision in *Judge v. Lowell*, 160 F.3d 67 (1998).  In that case the First Circuit held that a heightened pleading standard applied to cases where the plaintiff's cause of action required proof of an improper motive, as in equal protection claims alleging racial discrimination. The present case, in which plaintiffs allege that Condon violated their due process rights by suborning perjury and failing to disclose exculpatory evidence, is not such a claim. It is doubtful that the First Circuit would have applied the heightened pleading standard to this claim under *Judge*.  In *Judge* the court indicated that it was the requirement of proof of an

improper motive, and not the qualified immunity defense, that justified the heightened pleading standard. *Id*. at 74, n. 9.

Moreover, the First Circuit's decision in *Judge v. Lowell* did not survive the Supreme Court's most recent rejection of heightened pleading standards in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), a case which Condon has failed to cite. *Swierkiewicz* was a Title VII employment discrimination claim in which the Second Circuit had held that in order to state a claim, a plaintiff was required to allege specific facts establishing a prima facie case of discrimination under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The Supreme Court reversed the Second Circuit and rejected the heightened pleading standard.

The Supreme Court's unanimous rejection of the heightened pleading standard in *Swierkiewicz* was not limited to Title VII cases, but was explicitly held to apply to all civil actions controlled by Rule 8(a)(2) of the Federal Rules of Civil Procedure. Rule 8(a)(2) requires merely that a plaintiff set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." The only exceptions to the notice pleading permitted by Rule 8(a)(2) that the Supreme Court has recognized are those actions described in Rule 9(b). The *Swierkiewicz* Court pointedly noted, "This Court ... has declined to extend such exceptions to other contexts." *Id*. at 513. The Court cited its earlier language in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993) where it had noted that only limited actions covered by Rule 9(b) required particularity in pleading and concluded, "Expressio unius est exclusion alterius." *Id*. The Court concluded that, "A requirement of greater specificity for particular claims is a result that 'must be obtained by the process of

amending the Federal Rules, and not by judicial interpretation.'" *Id.* at 515, citing *Leatherman*, 507 U.S. at 168. *Swierkiewicz* followed *Leatherman* and *Crawford-El v. Britton*, 523 U.S. 574 (1998) as the third case in nine years in which the Supreme Court has rejected attempts by the Courts of Appeals to impose heightened pleading requirements in civil rights cases.[5]

The District Court for Maine recognized that *Swierkiewicz* had abrogated the First Circuit's decision in *Judge* in its recent decision in *Greenier v. Pace, Local No. 1188*, 201 F.Supp.2d 172 (D.Me. 2002). The court explained that "*Swierkiewicz* clearly indicates that it is not fatal to Plaintiff's case that some of his allegations at this stage may be legal conclusions rather than facts." *Id.* at 177. The court also acknowledged its obligation to follow intervening Supreme Court precedent that called into question an earlier First Circuit decision. In *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125 (9th Cir. 2002), the Ninth Circuit also recognized that *Swierkiewicz* rejected any heightened pleading requirements in civil rights claims. As a consequence, that court overruled its earlier decision which had imposed a heightened pleading requirement, *Branch v. Tunnell*, 14 F.3d 449 (9th Cir. 1994).[6]

Condon's attempt to dissect plaintiffs' complaint to suggest insufficient specificity ignores the Supreme Court's reminder in *Swierkiewicz* that, "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." 534 U.S. at 514, citing *Conley v. Gibson*, 355

---

[5]      *Crawford-El* also cited the earlier case, *Gomez v. Toledo*, 446 U.S. 635, 639-640 (1980), for the proposition that the Court had "refused to change the Federal Rules governing pleading by requiring the plaintiff to anticipate the immunity defense." 523 U.S. at 595.

U.S. 41, 48 (1957). Plaintiffs' complaint is more than adequate under Rule 8(a)(2) to put

Condon on notice of his claims with respect to subornation of perjury and failure to

disclose exculpatory evidence.

## VI. DEFENDANT CONDON IS NOT ENTITLED TO ABSOLUTE IMMUNITY ON CLAIMS THAT HE SUBORNED PERJURY FROM OTHER WITNESSES AT LIMONE AND TAMELEO'S CAPITAL MURDER TRIAL.

Defendant Condon argues that he is protected by absolute immunity from

plaintiffs' claims that he suborned perjury from the witness Barboza.[7] Condon argues

that Barboza would have been entitled to absolute immunity for his own testimony,

although perjured, under *Briscoe v. LaHue*, 460 U.S. 325 (1983) and that "subornation of

perjury is embraced within the absolute immunity afforded by *Briscoe*.[8] The sole case

which supports this radical proposition is *Jones v. Cannon*, 174 F.3d 1271 (11th Cir.

1999).

Plaintiffs submit that defendant Condon violated Limone and Tameleo's due

process rights by suborning perjury and that Condon is not protected by absolute

immunity for these acts. This position is supported by all the lower federal courts that

have considered this issue, other than the Eleventh Circuit. In *Wilson v. Lawrence Co.,

Mo.*, 260 F.3d 946 (8th Cir. 2001), the court held that the plaintiff had a viable claim that

his clearly established due process rights were violated by the fact that officers had

allegedly coerced a statement implicating him from a third person, which they used to

secure his conviction. The court held that although this third person would have had

absolute immunity for his testimony against the plaintiff, the officers were not entitled to

---

[6]     Condon, evidently unaware that *Branch* has been overruled, relies upon it for this argument in his brief. Condon Br., 20.

[7]     Pl.Comp. ¶ 23.

absolute immunity for using his coerced statement. In *Milstein v. Cooley*, 257 F.3d 1004 (9th Cir. 2001), the court held that there is no absolute immunity for acquiring known false statements from a witness. The court held that even prosecutors, who are protected while performing quasi-judicial functions by absolute immunity, do not have such immunity for knowingly taking false statements prior to the existence of probable cause, arrest and empanelment of grand jury. In *Zahrey v. Coffey*, 221 F.3d 342 (2nd Cir. 2000), the court held that an Assistant United States Attorney (AUSA) fabricated evidence in his investigatory capacity, when he promised witnesses various forms of consideration, including early release from custody, financial assistance and early release from a drug rehabilitation program in exchange for false information. The court held that where plaintiff was held without bail as a result of the fabricated information, he had a claim for deprivation of liberty without due process and the prosecutor was not protected by absolute immunity for fabricating the witness statements, although he would have been for his later actions in introducing it into evidence. In *Spurlock v. Satterfield*, 167 F.3d 995 (6th Cir. 1999) the court held that absolute immunity did not shield a deputy sheriff whose non-testimonial actions served to pressure and coerce a witness into testifying falsely against the plaintiff, although the deputy had absolute immunity for his own testimony.

In the one case to raise this question squarely in the First Circuit, another judge of this Court concluded that a police officer was not protected by absolute immunity for his actions in suborning perjury from another officer. *Mitchell v. City of Boston*, 130 F.Supp. 2d 201, 213 (D.Mass. 2001)

---

[8]     Condon Br., 22.

*Jones v. Cannon* stands alone as authority for the argument that Condon has advanced. To our knowledge, no other court has held that a law enforcement officer is protected by absolute immunity from liability for coercing a confession and suborning perjury from a witness who then falsely accuses others of crimes. The authority on which *Jones v. Cannon* relied for affording absolute immunity to a police officer who suborns perjury does not support that proposition. Moreover, since the decision in *Jones v. Cannon*, no other court has relied upon it to hold that an officer is protected by absolute immunity for suborning perjury.

Prior to *Jones v. Cannon*, a number of federal Courts of Appeals had addressed the question of whether testifying witnesses who conspired among themselves to commit perjury would be entitled to absolute immunity from damages in a civil conspiracy claim. Under *Briscoe*, such witnesses would be entitled to absolute immunity for their own testimony at trial, even where the testimony was false or perjured. The courts reasoned that an allegation that witnesses conspired *among themselves* to commit perjury added little to the claim that they had testified falsely. These courts concluded that the absolute immunity that protected the testimony would also protect the witnesses from liability for conspiring with each other to testify falsely. *See, Hunt v. Bennett*, 17 F.3d 1263 (10th Cir. 1994); *Snelling v. Westhoff*, 972 F.2d 199 (8th Cir. 1992); *McArdle v. Tronetti,* 961 F.2d 1083 (3d Cir. 1992);[9] *House v. Belford*, 956 F.2d 711 (7th Cir. 1992); *Alioto v. City of*

---

[9]     While *McArdle* stands for the proposition that when two witnesses conspire to give perjury, the allegation of conspiracy does not defeat their absolute immunity, it also stands for the proposition that other acts not connected to their own testimony are not protected by absolute immunity. Hence, the court denied absolute immunity to the defendants for conspiring to institute a petition for involuntary commitment of the plaintiff, although it afforded them immunity for their testimony at the hearing.

*Shively, Ky.,* 835 F.2d 1173 (6th Cir. 1987); *Miller v. Glanz*, 948 F.2d 1562 (10th Cir.

1991).[10]   These cases simply do not support the argument that Condon is making here.

In *Jones v. Cannon*, a panel of the Eleventh Circuit stretched the authority of

these cases to hold that a police officer who suborns perjury from a trial witness is

entitled to absolute immunity.  None of the earlier cases had gone so far, and none would

support such a conclusion.  The *Jones* court failed to cite a single case where a police

officer had received absolute immunity for coercing a confession or suborning perjury.

The court relied only upon cases in which witnesses had conspired among themselves, or

with a prosecutor, to testify falsely.

Prosecutors are protected by absolute immunity for their quasi-judicial function in

calling witnesses and presenting testimony at trial, even where the testimony may be

perjured.  *Imbler v. Pachtman*, 424 U.S. 409 (1976).  Police officers, however, are

entitled to no such immunity in connection with interrogating witnesses during the

investigative stages of criminal proceedings.  Nothing in any of the Supreme Court=s

decisions would suggest that police officers perform a quasi-judicial function during

criminal investigations.  Indeed, the Supreme Court has specifically held that even

prosecutors are not entitled to absolute immunity, including for the fabrication of

evidence, when performing investigative functions.  *Buckley v. Fitzsimmons*, 509 U.S.

259 (1993); *Burns v. Reed*, 500 U.S. 478 (1991).

The court in *Jones v. Cannon* noted the conclusion of earlier cases that the

absolute immunity enjoyed by witnesses for their testimony would be too readily

---

[10]   *Watterson v. Page*, 987 F.2d 1, 8-9 (1st Cir. 1993) dealt with the testimony of a single witness and held that she was protected by absolute immunity for her own testimony, even if she had conspired with someone else to give the testimony.

defeated if they could simply be sued on the theory that they had conspired to give the false testimony. It then leapt from that conclusion to the proposition that a police officer who suborns perjury from a witness is protected by the same absolute immunity that protects the witness. This is a *non sequitur*. This is demonstrated by the Tenth Circuit cases. The *Jones v. Cannon* opinion cited *Hunt v. Bennett, supra* and *Miller v. Glanz, supra,* concluding, AWe concur with the Tenth Circuit that the extension of absolute immunity from civil liability to those who allegedly procure the perjured testimony serves the same important purposes as the immunity to witnesses themselves. At 174 F.3d at 1289. The Tenth Circuit had not extended liability from those who testified to falsely to those who procured their false testimony; it had simply extended immunity for testifying to immunity for conspiring to testify falsely. This is evident from the Tenth Circuit=s subsequent opinion in *Clanton v. Cooper*, 129 F.3d 1147 (10th Cir. 1997), which was inexplicably ignored by the panel in *Jones v. Cannon*.

In *Clanton v. Cooper, supra*, a police officer had coerced a confession from a witness by threatening him with a 25-year sentence if he did not confess, while promising leniency if he did. The confession implicated plaintiff and the court found that the officer's actions violated plaintiff's due process rights. Not only did the court fail to give the officer absolute immunity, it held that he would not be entitled to qualified immunity. The court held that Ait was clearly established at the time of the interrogation that a promise of leniency may render a confession involuntary if it was sufficiently compelling and linked to the confession so that it could be said that the defendant's will was overcome by the offer. At 129 F.3d at 1159. The court further held that a reasonable officer would have known that using the coerced confession against plaintiff would

22

violate her due process rights. *Id.* *Clanton* makes it clear that the Eleventh Circuit simply misread, or ignored, the Tenth Circuit law.

Subsequent to *Jones v. Cannon*, no other court has cited it in support of affording absolute immunity to a law enforcement officer who suborns perjury. At most, other courts have held that witnesses who conspire among themselves to commit perjury are entitled to absolute immunity for their testimony. See, e.g. *Mowbray v. Cameron County, Texas*, 274 F.3d 269 (5th Cir. 2001); *Franklin v. Terr*, 201 F.3d 1098 (9th Cir. 2000); *Marshall v. Odom*, 156 F.Supp. 2d 525 (D. Md. 2001). This Court should be guided by the decisions by the Second, Sixth, Eighth and Ninth Courts of Appeals, that an officer does not have absolute immunity for the subornation of perjury, and not by the aberrant and indefensible decision of the Eleventh Circuit in *Jones*.

## VII.   CONCLUSION

For the foregoing reasons, this Court should deny the defendant Condon's motion to dismiss, except as noted in Section II, *supra*.

Respectfully submitted,

The Plaintiffs,
By their attorneys,

Juliane Balliro (BBO# 028010)
Ronald J. Snyder (BBO# 638188)
PERKINS, SMITH & COHEN, LLP
One Beacon Street
Boston, Massachusetts  02108
(617) 854-4000

Michael Avery (BBO# 024500)
Suffolk University Law School
120 Tremont Street
Boston, MA  02108
(617) 573-8551

William T. Koski (BBO# 277820)
KOSKI & KEARNS LLP
One Bowdoin Square, Suite 300
Boston, MA  02114
(617) 973-4525

Dated:  November 27, 2002

## CERTIFICATE OF SERVICE

I, Juliane Balliro, hereby certify that on this 27th day of November 2002, I served the foregoing by mailing a copy first class, postage prepaid, to all counsel of record and to counsel for the United States by facsimile.

Juliane Balliro

28483-2

24

# EXHIBIT

# A

Massachusetts Superior Court

Massachusetts Superior Court
Opinions Courtesy of Lawyers Weekly

Massachusetts Lawyers Weekly
www.masslawyersweekly.com

# COMMONWEALTH

## v.

# LIMONE

### COMMONWEALTH OF MASSACHUSETTS

### SUFFOLK, ss. SUPERIOR COURT

### CRIMINAL ACTION

### NOs. 32367, 32369, 32370

# COMMONWEALTH

## vs.

# PETER J. LIMONE

### SUPPLEMENTAL MEMORANDUM OF DECISION AND ORDER ON

### DEFENDANT'S MOTION FOR A NEW TRIAL AND

### COMMONWEALTH'S MOTION TO VACATE DEFENDANT'S CONVICTIONS, GRANT A NEW TRIAL AND ADMIT DEFENDANT TO BAIL

Defendant Peter J. Limone was convicted in 1968 for being an accessory before the fact in the murder of Edward Deegan, for conspiracy to murder Deegan and for conspiracy to murder Anthony J. Stathopoulos. The matter is now before me on defendant's motion for a new trial, under Mass. R. Crim. P. 30(b) and the Massachusetts and Federal Constitutions, on numerous grounds, and the Commonwealth's motion to vacate defendant's convictions, grant a new trial and admit the defendant to bail. Based upon certain developments, more fully described below, which occurred while discovery was proceeding, it became apparent that certain of Limone's new evidence-based claims were likely to prove dispositive of this motion favorably to Limone. For this reason, the scope of an evidentiary hearing was confined to address Limone's claims

regarding certain newly discovered exculpatory evidence.[1] This evidentiary hearing was conducted on January 5, 2001; at that time the court heard argument and received into evidence 26 pages of documents produced by the Justice Task Force to the parties on December 19, 2000. At the conclusion of the hearing, I allowed the parties' motions and stated that I would set forth my reasons in a written memorandum.

## BACKGROUND

### I. Background of the Case Before Defendant's Motion for a New Trial

The facts of this case are set forth in the opinion of the Supreme Judicial Court affirming the convictions of Limone and his five codefendants. See *Commonwealth* v. *French*, 357 Mass. 356, 361-370 (1970), judgments vacated as to death penalty *sub nom. Limone* v. *Massachusetts*, 408 U.S. 936 (1972). Between May 27, 1968 and July 31, 1968 Limone was tried jointly with five codefendants. Briefly stated, the evidence presented at trial through the key prosecution witness, one Joseph Barboza (also known as Joseph Baron), was that Limone offered Barboza a contract to kill Deegan for $7,500. Barboza testified that Limone later offered an additional $2,500 if Stathopoulos were also killed. During a break-in at a financial institution, Deegan was killed in an alley in Chelsea on March 12, 1965, but Stathopoulos drove away from the crime scene.

More specifically, Barboza testified at trial that about January 20, 1965, Limone saw Barboza and offered him a "contract" to kill Deegan for $7,500, and told Barboza that this had been approved by the "office." Barboza spoke with Tameleo a few days later to confirm that the "office" approved of the murder. Tameleo agreed to it. Some weeks later, after securing the assistance of others, some of whom would become Limone's codefendants at trial, Barboza reported to Limone that the murder would occur soon but that Stathopoulos would be involved. According to Barboza, Limone agreed to add $2,500 if Stathopoulos were also killed. Barboza confirmed with Tameleo that it was okay to kill Stathopoulos as well. According to the evidence presented at trial, the murder of Deegan was carried out by Barboza,[2] Cassesso, Salvati, French, Grieco and others, not including Limone.[3] Stathopoulos escaped. Some time later, Barboza testified, he met with Limone, who paid him for the Deegan murder.

A jury convicted Limone on the two counts of conspiracy to commit murder and of being an accessory before the fact. Limone was sentenced to death.[4] The convictions of Limone and all the codefendants were affirmed by the Supreme Judicial Court. *Commonwealth* v. *French*, 357 Mass. 356 (1970). Limone's death sentence was vacated by the United States Supreme Court following its decision in *Furman* v. *Georgia*, 408 U.S. 238 (1972). See *Limone* v. *Massachusetts*, 408 U.S. 936 (1972).[5]

Limone's first motion for a new trial was denied in 1970, and this denial was affirmed on appeal. *Commonwealth* v. *Cassesso*, 360 Mass. 570 (1971). A petition for habeas corpus filed in the United States District Court for the District of Massachusetts was dismissed, and this dismissal was affirmed by the Court of Appeals for the First Circuit. *Grieco* v. *Meachum*, 533 F.2d 713 (1st Cir. 1976), *cert. denied sub nom. Cassesso* v. *Meachum*, 429 U.S. 858 (1976). Limone's second motion for a new trial was denied in 1990, and this denial was affirmed on appeal. *Commonwealth* v. *Limone*, 410 Mass. 364 (1991). Other motions for a new trial were filed in 1993 and were denied, which was also affirmed. *Commonwealth* v. *Salvati*, 420 Mass. 499 (1995).

### II. Developments Since Defendant's Motion For a New Trial Was Filed

Defendant's motion for a new trial was filed on June 19, 2000. The case was assigned to me on August 2, 2000 because the trial judge (Forte, J.) had retired from the Superior Court. After a number of hearings, it became apparent that the Commonwealth had in its possession documents that the Commonwealth agreed should be made available to Limone. A discovery deadline was set, and the matter proceeded largely in compliance with that deadline. I issued an order setting forth the parties' responsibilities in compiling an itemized list of documentary evidence that would be introduced at an evidentiary hearing on defendant's motion, should I determine an evidentiary hearing to be appropriate.

Meanwhile, counsel for Limone had moved to intervene in *United States* v. *Stephen J. Flemmi et al.*, Crim. No. 94-10287-MLW (D. Mass.), pending before United States District Court Judge Mark L. Wolf. Judge Wolf denied intervention but indicated that certain documents might be discoverable in this proceeding. I thereafter gave notice to the United States Attorney's office of Limone's request for discovery of matters relating to the pending motion. The local United States Attorney's office agreed to review its files. This led to the parties each receiving a telephone call from John H. Durham, a

Special Attorney with the United States Attorney's office. This telephone contact was followed by a letter to the parties from AUSA Durham dated December 19, 2000 enclosing 26 pages of F.B.I. documents.**[6]** In that letter, AUSA Durham states that in response to Limone's November 2000 request for information, F.B.I. employees assigned to the Justice Task Force began reviewing Boston F.B.I. informant, intelligence and investigative files. According to AUSA Durham, that review showed that Vincent James Flemmi was an F.B.I. informant around the time of the Deegan murder. F.B.I. focus on Flemmi as a potential source began on March 9, 1965, and the first reported contact with Flemmi as an informant was by F.B.I. Special Agent H. Paul Rico on April 5, 1965. In his letter, AUSA Durham also states that F.B.I. files show that Flemmi was contacted five times as an informant by Special Agent Rico, and that Flemmi's file was closed on September 15, 1965 after Flemmi was charged with a crime "unrelated to the Deegan murder."

AUSA Durham further states in his letter that Vincent Flemmi's F.B.I. file contains two documents relating to the Deegan murder. One is a summary of information known by the Boston F.B.I. about Flemmi's criminal activities at the time Flemmi became an F.B.I. informant. The Justice Task Force attempted to locate other investigative files that relate to the Deegan murder. Five such documents had been located as of December 19, 2000. I refer to these documents collectively as the "F.B.I. documents." These are:

(1) Memorandum dated March 15, 1965 from Special Agent Rico to the "SAC, Boston" reporting a contact with a source on March 10, 1965.

(2) Memorandum dated March 15, 1965 from Special Agent Rico to the SAC, Boston, reporting a contact with the same source on March 13, 1965.

(3) March 19, 1965 "Airtel" from SAC, Boston, to "Director, F.B.I." titled, "Criminal Intelligence Program, Boston Division" which summarizes that week's developments.

(4) Memorandum dated April 22, 1965 from a Boston "Correlator" to SAC, Boston titled "Vincent James Flemmi, Aka." which summarizes information in F.B.I. files known about Flemmi at the time he was opened as an informant.

(5) June 9, 1965 Airtel from SAC, Boston to Director, F.B.I. titled "BS 919-PC" which reports on the status of efforts to develop Vincent James Flemmi as an F.B.I. informant.

These documents are heavily redacted, and portions are of marginal legibility.**[7]** I summarize them below.

AUSA Durham's letter states that there were "[s]everal impediments" to the Justice Task Force's search for records, including routine destruction of files. The result of this is that, for example, the April 22, 1965 summary memorandum "represents the only surviving record of its information. Simply stated, the raw source data that was originally reported appears to no longer exist." However, "a case file containing information from Joseph Baron (Barboza) was located on this date, and a review of that file will begin shortly." In addition, AUSA Durham states that "it can not be stated with certainty at this time that the attached documents represent the only relevant materials in FBI files." AUSA Durham invites counsel for Limone to provide "greater specificity" as to what materials are relevant, but states that in any event the Justice Task Force will advise the parties of additional relevant documents that are discovered.

AUSA Durham included with his letter five documents, whose pages were numbered sequentially 00001 through 000026:

Document 1 is a memorandum from Special Agent Rico to the SAC, dated March 15, 1965. As noted, it states that the date of contact was March 10, 1965 and under "Titles and File [illegible] on which contacted" states "Edward [illegible] Deegan." The memorandum states:

Informant advised that he had just heard from "JIMMY FLEMMI" that FLEMMI told the informant that RAYMOND PATRIARCA has put out the word that EDWARD "TEDDY" DEEGAN is to be "hit" and that a dry run has already been made and that a close associate of DEEGAN's has agreed to set him up.

FLEMMI told the informant that the informant, for the next few evenings, should have a provable alibi in case he is suspected of killing DEEGAN. FLEMMI indicated to the informant that PATRIARCA put the word out on DEEGAN because DEEGAN evidently pulled a gun and threatened some people in the Ebb Tide restaurant, Revere, Mass.

Document 2 is a memorandum from Special Agent Rico to the SAC dated March 15, 1965. It lists March 13, 1965 as the date of contact and "Edward F. Deegan" as the title/file on which the informant was contacted. This document states:

Informant advised that "JIMMY" FLEMMI contacted him and told him that the previous evening DEEGAN was lured to a finance company in Chelsea and that the door of the finance company had been left open by an employee of the company and that when they got to the door ROY FRENCH, who was setting DEEGAN up, shot DEEGAN, and JOSEPH ROMEO MARTIN and RONNIE CASESSA came out of the door and one of them fired into DEEGAN's body. While DEEGAN was approaching the doorway, he (FLEMMI) and JOE BARBOZA walked over towards a car driven by TONY "STATS" and they were going to kill "STATS" but "STATS" saw them coming and drove off before any shots were fired.

FLEMMI told informant that RONNIE CASESSA and ROMEO MARTIN wanted to prove to RAYMOND PATRIARCA they were capable individuals, and that is why they wanted to "hit" DEEGAN. FLEMMI indicated that they did an "awful sloppy job."

This information has been disseminated by SA DONALD V. SHANNON to Capt. ROBERT RENFREW (NA) of the Chelsea, Mass. PD.

Document 3 is from SAC, Boston to Director, F.B.I. (then J. Edgar Hoover). It begins by summarizing much of the information contained in the March 1965 Memoranda.[8] It then states:

It should be noted that this information was furnished to the Chelsea PD and it has been established by the Chelsea Police that ROY FRENCH, BARBOZA, FLEMMI, CASESSA, and MARTIN were all together at the Ebb Tide night club in Revere, Mass. and they all left at approximately 9 o'clock and returned 45 minutes later.

It should be noted that the killing took place at approximately 9:30 p.m., Friday, 3/12/65.

[What appears to be two paragraphs of text is redacted here].

Informant also advises that [redacted] had given the "OK" to JOE BARBOZA and "JIMMY" FLEMMI to kill [redacted] who was killed approximately one month ago.

Following this is an additional page which states that it "is being deleted in its entirety for codes: F, B."

Document 4 is from "correlator" to SAC, Boston, regarding Vincent James Flemmi. It is a lengthy, heavily redacted document and need not be quoted in its entirety. Relevant portions state:[9]

Boston airtel to Director, FBI dated 10/23/64 captioned [redacted]

[Redacted] advised that Peter Limone had mentioned to Raymond Patriarca that Jimmy FLEMMI is the type of individual who is difficult to control and when FLEMMI visited his club, the West End Veterans Club recently Limone asked FLEMMI to leave because of the heat that was on FLEMMI at that time. FLEMMI denied that any heat was on him and at that time FLEMMI inquired about Edward Deegan, close associate of [redacted]. Limone told FLEMMI that Deegan does not visit the club and immediately after FLEMMI departed Limone telephonically contacted Deegan and told him that FLEMMI was looking for him allegedly for a $300 loan which FLEMMI claimed DEEGAN owed to him. Deegan denied that he owed such a loan and Limone and Deegan were of the opinion that FLEMMI was out to kill DEEGAN.

Boston airtel to Director, FBI dated 10/19/64 captioned [redacted].

[Redacted] advised that he received a telephone call from JAMES FLEMMI, on 10/18/64, who told him that he had been with Edward "Teddy" Deegan and Tony (LNU) at the West End Social Club during the early morning hours of 10/17/64. Informant stated the name of [redacted] was mentioned in a conversation but FLEMMI Stated he could not recall what was said. FLEMMI stated that he definitely knows that Deegan, after leaving the West End Social Club, murdered [redacted] and he was concerned about leaving his fingerprints in the car in which [redacted] was murdered.

Y.

FLEMMI told informant that he wants to kill Deegan. Information relating to Deegan's participating in the killing of [redacted] was furnished to the Everett, Mass., Police Department on 10/18/64. [Redacted] mentioned as [redacted].

Y.

Memo. of H. Paul Rico to SAC, Boston 10/8/64 and captioned: [redacted]

Informant advised 10/5/64, that he is friendly with the FLEMMI's, but VINCENT FLEMMI is an extremely dangerous individualY.Informant also advised that he suspects that FLEMMI had committed several murdersY.Informant advised that [several lines redacted] and "JIMMY" FLEMMI wanted to be considered the "best hit man" in the area.

Y.

Boston airtel to Director, FBI & SACS Las Vegas, Phoenix 1/7/65 captioned: [redacted]

A review of information furnished by [redacted] on 1/4/65 reflected that Ronald Cassessa, JAMES FLEMMI, [redacted] contacted Patriarca. Cassessa told Patriarca that "that thing was straightened out." (Informant did not know what it pertained to.)

Y.

[Document identifying data redacted].

Gennaro J. Angiulo and Peter Limone contacted Patriarca. Angiulo stated that Larry Baione, Boston hoodlum, had contacted him when he (Baione) was released from prison concerning the loan shark business of [redacted].

Patriarca advised that [redacted] and JAMES FLEMMI, both of Boston, contacted him. This contact was arranged by Ronnie Cassessa, and Angiulo had knowledge of same.

Patriarca stated that the word was that "we" (meaning Patriarca and his group) wanted FLEMMI and [redacted] for something and consequently they both arranged the meet.

[Paragraph redacted]

Y.

According to Angiulo, [redacted] told Peter Limone that JIMMY FLEMMI had told [redacted], "Don't worry about [redacted]," (indicating that he knew [redacted] was going to get hit.).

Boston Airtel to Director, 3/10/65 entitled: [redacted]

[Redacted] advised on 3/3/65 that [redacted] contacted Patriarca and stated he had brought down VINCENT FLEMMI and another individual (who was later identified as Joe Barboza from East Boston, Mass.) It appeared that [redacted], Boston hoodlum, was giving orders to FLEMMI to "hit this guy and that guy".

Y.

According to Patriarca, another reason that FLEMMI came to Providence to contact him was to get the "OK" to kill Eddie Deegan of Boston who was "with [redacted.] It was not clear to the informant whether he received permission to kill Deegan; however, the story that FLEMMI had concerning the activities of Deegan in connection with his, Deegan's, killing of [redacted] was not the same as Jerry Angiulo's.

Boston's Airtel to Director and SACS Albany, Buffalo, Miami 3/12/65 captioned: [redacted].

[Redacted] advised on 3/9/65 that JAMES FLEMMI and Joseph Barboza contacted Patriarca, and they explained that they are having a problem with Teddy Deegan and desired to get the "OK" to kill him.

They told Patriarca that Deegan is looking for an excuse to "whack" [redacted] who is friendly with [redacted].

FLEMMI stated that Deegan is an arrogant, nasty sneak and should be killed.

Patriarca instructed them to obtain more information relative to Deegan and then to contact Jerry Angiulo at Boston who would furnish them a decision.

Y..

Memo. of [redacted] 4/6/65 captioned: [redacted]

Y.

PCI stated that JIMMY FLEMMA had gone to Providence just before Teddy Deegan was slain in Chelsea.

Document 5 is from SAC, Boston to Director, F.B.I. and reports on the status of efforts to develop Vincent James Flemmi as an informant for the F.B.I. Much of this document is illegible, but it provides in relevant part:

Concerning the informant's emotional stability, the Agent handling the informant believes, from information obtained from other informants and sources, that BS 919-PC has murdered [redacted], [redacted], [redacted], [redacted], EDWARD "TEDDY" DEEGAN, and [redacted], as well as a fellow inmate at the Massachusetts Correctional Institution, Walpole, Mass., and, from all indications, he is going to continue to commit murder.

Some of the information provided by the informant has been corroborated by other sources and informants of this office. Although the informant will be difficult to contact once he is released from the hospital because he feels that [redacted] will try to kill him, the informant's potential outweighs the risk involved.

## DISCUSSION

Massachusetts Rule of Criminal Procedure 30(b) provides that a motion for a new trial may be granted "at any time if it appears that justice may not have been done." Grounds for a new trial include newly discovered evidence and failure to disclose exculpatory evidence. Among the grounds Limone now asserts in support of his motion for a new trial is newly discovered exculpatory evidence.

Limone's claim that the government improperly failed to disclose exculpatory evidence fits into a number of analytical boxes, with differing standards. On the one hand, it can be analyzed as a typical claim for a new trial based on newly discovered evidence. *Commonwealth* v. *Tucceri*, 412 Mass. 401, 408-09 (1992). Such a motion based on newly discovered evidence may be made without regard to whether that evidence was improperly withheld by the government. *Id.*; *Commonwealth* v. *Grace*, 397 Mass. 303, 305 (1986). Limone's claim can also be analyzed as a claim that there was a violation of *Brady* v. *Maryland*, 373

U.S. 83 (1963), because a *Brady* claim may be made in the context of a claim regarding newly discovered evidence. *Tucceri*, 412 Mass. 408-09. A *Brady* claim may also, however, be made even if the undisclosed evidence is not "newly" discovered. *Id.* at 409. In ruling on the pending motions, I address only the newly discovered evidence ground and do not address Limone's claim in the context of *Brady*.

## I. Newly Discovered Evidence

A defendant seeking a new trial on grounds of newly discovered evidence must establish both that the evidence is newly discovered and that it casts "real doubt" on the justice of the conviction. *Commonwealth* v. *LeFave*, 430 Mass. 169, 176 (1999). Limone has satisfied both parts of that standard. Evidence is newly discovered when it was unavailable at the time of trial and could not have been, with reasonable diligence, discovered at trial or at the time of a prior motion for a new trial. *Id.*; *Commonwealth* v. *Moore*, 408 Mass. 117, 126 (1990); *Grace*, 397 Mass. at 306. The Commonwealth concedes that these documents are "newly" discovered.[10] The evidence "not only must be material and credibleY but also must carry a measure of strength in support of the defendant's position." *Commonwealth* v. *Scanlon*, 412 Mass. 664, 680 (1992), quoting *Grace*, 397 Mass. at 305-06. Thus, if the newly discovered evidence is cumulative of evidence admitted at trial, it tends to carry less weight than evidence that is different in kind. *Scanlon*, 397 Mass. at 680. "Moreover, the judge must find there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial."[11] *Grace*, 397 Mass. at 306. Where, as here, I was not the trial judge, I must carefully scrutinize the trial record to determine fairly whether newly discovered evidence demonstrates that justice may not have been done. *Commonwealth* v. *Hill*, 432 Mass. 704, 710 (2000); *Commonwealth* v. *Leaster*, 395 Mass. 96, 101 (1985). I have conducted that review by reading the entire trial transcript.[12]

Here, the jury would likely have reached a different conclusion by this previously undisclosed evidence for two principal reasons. First, the new evidence casts serious doubt on Barboza's credibility in his account of Limone's role. Second, the new evidence reveals that Vincent James Flemmi, a participant of some sort in the Deegan murder, was an F.B.I. informant around the time of the murder.

Turning first to the Barboza issue, Barboza was a "vital, principal prosecution witness at trial." *Commonwealth* v. *Cassesso*, 360 Mass. 570, 572 (1971). In effect, "the principal issue before the jury was one of [Barboza's] credibility."[13] *Commonwealth* v. *French*, 357 Mass. 356, 397 (1970). Barboza, as noted, was the only government witness implicating Limone. If Limone had had information that Patriarca set up the murder and not Limone, and that Flemmi was an F.B.I. informant, it is highly likely that the defense theory that the F.B.I. was manipulating Barboza's testimony could have been buttressed. Moreover, the newly disclosed evidence about Vincent James Flemmi would have provided Limone considerable opportunity to challenge Barboza's testimony as to Flemmi. Barboza calls Flemmi his "partner" during March of 1965, the time of the Deegan murder. Trial Transcript (hereafter the "Transcript") Vol. 34, pp. 4160-61. Barboza testified that Flemmi was at the Ebb Tide on the night of the murder. Transcript Vol. 34, p. 4167; *id.* at Vol. 35, p. 4431. But Barboza denies that Flemmi left the Ebb Tide with Barboza and the others on the night of the murder. Transcript Vol. 34, p. 4172.

In addition, the newly discovered evidence is consistent with other evidence Limone has previously submitted to the court in his prior new trial motions. For example, in an affidavit submitted in 1970, Barboza stated that he is "free from duress or coercion" and wishes "to recant certain portions of Y[his] testimony Y[concerning] the involvement of Henry Tameleo, Peter J. Limone, Joseph L. Salvati and Lewis Grieco in the killing of Teddy Deegan." *Cassesso*, 360 Mass. at 573. He further stated that the testimony he was offering "to give concerning the killing of Y Deegan and those individuals responsible for his death will be the whole truth known to" him. *Id.* See also *id.* at 574-75 (detailing affidavit of counsel for Limone). The Supreme Judicial Court observed that this affidavit was deficient in a number of respects, but left it open to Limone and his codefendants to renew their new trial motion if they could expand on Barboza's affidavit. *Id.* at 573, 579. In an affidavit dated April 9, 1976 and submitted in 1990, Gerald Alch, Esq. states that he and Barboza had several conversations in July and August 1970 at the Massachusetts Correctional Institution in Walpole to discuss Barboza's trial testimony. Alch states that Barboza told him that "any testimony [Barboza] had given in the trial of the Deegan case which in any way implicated Peter Limone was false; that Mr. Limone was neither present at the time of the commission of said crime, nor had any knowledge thereof and was in no way involved under any circumstances which could classify him as an accessory before or after the fact." Barboza states that he was motivated at trial by his belief that implicating Limone in the murder would help him (Barboza) obtain a new identity, relocation and financial assistance from law enforcement officials.[14] He also claimed that the prosecution promised him post-trial protection. Because the promises made to him had not been kept, Barboza "felt no longer obligated to adhere to his false implication of Limone." Mem. of Decision of Dolan, J., dated Feb 13, 1990, at 9.

For these reasons, I find and rule that the F.B.I. documents are newly discovered evidence which, as both the Commonwealth and Limone state, cast "real doubt" on the justice of Limone's convictions. They are material**[15]** and carry a measure of strength in support of Limone's position. Thus, I find and rule that there is a substantial likelihood that the jury would have reached a different conclusion had this evidence been available at trial.**[16]** Accordingly, I allow the motions for a new trial and I also allow the Commonwealth's motion to vacate the convictions.

## II. BAIL

Also before me are motions of the defendant and the Commonwealth to admit Limone to bail. After a bail hearing and consultation with the Department of Probation, I allowed the defendant's request (which the Commonwealth did not oppose) that Limone be released on personal recognizance subject to strict conditions detailed on the record. I did so having considered the factors enumerated in G.L. c. 276, ' 58 on the basis of the information before me. That information showed, among other factors, the following:

Limone is now about 65 years old. His wife, Olympia Limone, still resides in the same house in Medford, Mass. where she and Limone lived before Limone was incarcerated; she and their children have maintained contact with Limone throughout his incarceration and Limone will reside with them now. Limone has also maintained contact with his immediate and extended family during his incarceration.

I also note that the materials provided me at today's bail hearing include a commendation letter from the Superintendent of M.C.I. Norfolk to Limone. This letter expresses appreciation to Limone for his participation in resolving a hostage situation at M.C.I. Norfolk on March 6, 1975, where two correctional officers were taken hostage and later shot. The letter also states that Limone helped to resolve the situation by negotiating personally with the hostage takers. Among the other factors I take into consideration is that Limone successfully completed approximately 170 furloughs before that program was eliminated. I also take into consideration that the Commonwealth states it is not now in a position to decide whether it will prosecute Limone again on the pending indictments.

### **ORDER**

For the foregoing reasons, the motion for a new trial of Peter J. Limone is **ALLOWED**; the Commonwealth's motion to vacate defendant's convictions, grant a new trial and admit Limone to bail is also **ALLOWED**.

_____

Margaret R. Hinkle

Justice of the Superior Court

DATED: January 8, 2001

## FOOTNOTES:

**[1]** The day before this hearing, i.e. Jan. 4, 2001, the Commonwealth filed its motion to vacate defendant's convictions, grant a new trial and admit defendant to bail.

**[2]** Barboza pled guilty to two indictments for conspiracy on the first day of jury selection. He was murdered in 1976.

**[3]** Barboza mentions Vincent James Flemmi as a participant in the scheme. Flemmi, who is now deceased, was never indicted. The newly disclosed evidence reveals that Flemmi was an F.B.I. informant around the time Deegan was murdered and for a period thereafter.

[4] French, who the trial evidence showed shot Deegan, was found guilty of murder in the first degree with a recommendation that death not be imposed. Salvati was convicted of being an accessory, also with a recommendation against death. Grieco, who the evidence also showed shot Deegan, was found guilty of murder in the first degree, and Cassesso and Tameleo were found guilty as accessories. Grieco, Cassesso and Tameleo were convicted on two conspiracy indictments; each was sentenced to death.

[5] Limone was resentenced to life imprisonment.

[6] Durham's letter and the attached F.B.I. records were admitted into evidence at the hearing on this motion.

[7] On December 20, 2000, the District Attorney's office filed the documents received from the Justice Task Force as a pleading in this case.

[8] The document states:

> The following are the developments during the current week:
>
> On 3/12/65, EDWARD "TEDDY" DEEGAN was found killed in an alleyway in Chelsea, Mass. in gangland fashion.
>
> Informants report that RONALD CASESSA, ROMEO MARTIN, VINCENT JAMES FLEMMI, and JOSEPH BARBOZA, prominent local hoodlums, were responsible for the killing. They accomplished this by having ROY FRENCH, another Boston hoodlum, set DEEGAN up in a proposed "breaking & entering" in Chelsea, Mass. FRENCH apparently walked in behind DEEGAN when they were gaining entrance to the building and fired the first shot hitting DEEGAN in the back of the head. CASESSA and MARTIN immediately thereafter shot DEEGAN from the front.
>
> ANTHONY STATHOPOULOS was also in on the burglary but had remained outside in the car.
>
> When FLEMMI and BARBOZA walked over to STATHOPOULOS's car, STATHOPOULOS thought it was the law and took off. FLEMMI and BARBOZA were going to kill STATHOPOULOS also.
>
> Immediately thereafter, STATHOPOULOS proceeded to Atty. AL FARESE. FARESE called the Chelsea, Mass. PD before Chelsea knew of the killing and FARESE wanted to bail out ROY FRENCH and "TEDDY" DEEGAN. Shortly thereafter the Chelsea PD found the body of DEEGAN and immediately called Atty. FARESE's office, and Atty. JOHN FITZGERALD, FARESE's law partner, came to the Chelsea PD.
>
> Efforts are now being made by the Chelsea PD to force STATHOPOULOS to furnish them the necessary information to prosecute the persons responsible.

[9] The document contains what appears to be a form of document code numbers, which I omit.

[10] There is no credible evidence before me that the Suffolk District Attorney's office had actual possession of the F.B.I. documents or of the information contained therein before those documents were produced by the Justice Task Force on December 19, 2000.

[11] The Commonwealth argues that the proper standard in this regard for the trial court is whether there is a "substantial

likelihood of a miscarriage of justice." That argument is based on *Commonwealth* v. *Simmons*, 417 Mass. 60, 73 (1994). In *Simmons*, the procedural posture of the case was such that the Court decided the defendant's (1) direct appeal from his conviction for murder in the first degree, (2) appeal from the denial of his motion for a new trial filed in and decided by the Superior Court and (3) appeal from the denial of his second motion for a new trial filed with an decided by a single justice of the Supreme Judicial Court. *Simmons*, 417 Mass. at 61. There, the Court held that "[w]here the prosecution denies the defendant exculpatory evidence but the defendant has not requested it or has made only a general request, *this court* will order a new trial or reduction of the verdict whenever the court concludes that there has been a substantial likelihood of a miscarriage of justice." *Id.* at 73 (emphasis added). The Court's decision was based on G.L. c. 278, ' 33E. *Commonwealth* v. *Tucceri*, 412 Mass. 401, 412-13 (1992), which articulated the standard to govern motions for a new trial where the prosecution improperly failed to deliver exculpatory evidence to a defendant, involved a defendant who was not convicted of first degree murder. That case was before the Court on an appeal from the allowance of the defendant's motion for a new trial by the Superior Court; that appears to have been the defendant's first motion for a new trial and first appeal, although it was filed years after his conviction. *Id.* In *Tucceri*, the Court held that when the defendant has made no request or only a general request for exculpatory evidence, the standard for the trial court is "whether there is a substantial risk that the jury would have reached a different conclusion." *Tucceri*, 412 Mass. at 413. *Tucceri* cited *Grace*, 397 Mass. at 306, which also used the language *Tucceri* used. *Grace* involved the motion for a new trial of a defendant convicted of murder in the first degree. *Grace*, 397 Mass. at 304. That motion, which did not involve exculpatory evidence allegedly withheld by the government, was filed in the Superior Court years after the defendant's conviction was affirmed by the Supreme Judicial Court. The upshot of this discussion is that it appears that it is the *Tucceri* "substantial risk" standard that governs Limone's present motion for a new trial, rather than the *Simmons* "substantial likelihood of a miscarriage of justice" standard. This is so because this case is in a procedural position similar to *Grace*, and is not part of an appeal to the Supreme Judicial Court under G.L. c. 278, ' 33E, as was *Simmons*. See *Commonwealth* v. *Wright*, 411 Mass. 678, 681 (1992) (standard of review by Supreme Judicial Court of unpreserved claim of error in context of claim of ineffective assistance of counsel is "substantial likelihood of a miscarriage of justice"). This was the standard used in *Commonwealth* v. *Salvati*, 420 Mass. 499, 506 (1995). That said, however, which of these standards applies is not determinative of the issues I now consider. As I note below, see *infra* note 20, I conclude that the newly discovered evidence creates a substantial likelihood of a miscarriage of justice as well as a substantial risk that the jury would have reached a different conclusion vis-à-vis Limone.

[12] I did not review the transcript of the lengthy jury empanelment.

[13] Barboza was a "highly vulnerable" witness in another case. See *Patriarca* v. *United States*, 402 F.2d 314 (1st Cir. 1968) (where Barboza testified against defendants Patriarca as well as Cassesso and Tameleo).

[14] Barboza had been placed in protective custody by Federal officials before trial of this case. Transcript, Vol. 42, p. 5810.

[15] I make no finding, of course, as to the *accuracy* of the information set forth in the F.B.I. documents.

[16] I also find that the newly discovered evidence satisfies the higher standard of *Simmons*, 417 Mass. 60. The newly discovered F.B.I. documents create a substantial likelihood of a miscarriage of justice.

# EXHIBIT

# B

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                          SUPERIOR COURT DEPARTMENT
                                     NO. 32367

COMMONWEALTH

v.

PETER LIMONE

## NOLLE PROSEQUI

Now comes the Commonwealth in the above-captioned matter and respectfully states that it will not prosecute Indictment No. 32367 any further.

As grounds therefor, the Commonwealth respectfully states as follows:

(1)   There exists newly discovered evidence – various FBI documents disclosed to the Commonwealth and the defendant for the first time on December 19, 2000 – which significantly undermines (a) the credibility of the Commonwealth's principal witness at the defendant's first trial, Joseph Barboza, and (b) the Commonwealth's theory of the defendant's role in the murder of Edward Deegan, as presented at the defendant's first trial.

(2)   Joseph Barboza was shot and killed on February 11, 1976.

(3)   The Commonwealth has conducted a comprehensive review of the facts and circumstances surrounding the arrest, trial, and conviction of the defendant for his alleged role in the murder of Edward Deegan, including the impact of the contents of the newly discovered FBI documents.

(4)   In addition, the Commonwealth has carefully and thoroughly evaluated the nature, quality, and sufficiency of the alleged evidence against the defendant.

(5)   As a result of that review and evaluation, the Commonwealth has concluded that it does not now have a good faith basis – legally or ethically – to proceed with any further prosecution of the defendant.

Respectfully Submitted
For the Commonwealth,

RALPH C. MARTIN, II
DISTRICT ATTORNEY

By: _____
MARK LEE
Assistant District Attorney
Homicide Unit


By: _____
DAVID E. MEIER
Chief of Homicide
One Bulfinch Place
Boston, MA  02114
(617) 619-4240


Dated:  January 30, 2001