UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PETER J. LIMONE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>Defendants. | C. A. 02-CV-10890-NG |
| EDWARD GRECO,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>Defendants. | C. A. 03-CV-10599-NG |

## THE PLAINTIFFS' JOINT OPPOSITION TO UNITED STATES' MOTION TO DISMISS CONSOLIDATED CASES

The Limone, Tameleo and Edward Greco Plaintiffs oppose the United States' Motion to Dismiss the Consolidated Cases.

I.  **THE PROVISO DOES NOT ENTITLE THE UNITED STATES TO DISMISSAL OF THE PLAINTIFFS' CLAIMS.**

The United States argues that the Complaints must be dismissed because the amendment to the Tort Claims Act that made the government liable for certain intentional torts was not enacted until 1974 and plaintiffs were prosecuted and sentenced for murder in 1968. The government's argument fails for two reasons. First, the amendment by its

terms applies to "any claim arising, on or after the date of the enactment of this proviso, out of ... malicious prosecution." Plaintiffs' claims for malicious prosecution did not arise until after the date of the amendment. Second, plaintiffs have alleged a number of actions by law enforcement officers of the United States that occurred subsequent to 1974 that are clearly covered by the amendment.

### (a) The Plaintiffs' Claims Did Not Arise Until Long After the Operative Amendment To The FTCA.

Under both Massachusetts law with respect to actions for malicious prosecution and under federal law with respect to actions for wrongful conviction, no claim arises until a plaintiff obtains a favorable termination of the criminal case against him. Where there has been a conviction in a criminal trial, that conviction must be reversed or vacated for a plaintiff's claim to arise.

Favorable termination has long been an element of the tort of malicious prosecution under Massachusetts law. *Wynne v. Rosen*, 391 Mass. 797, 798-799 (1984) (favorable termination includes dismissal of charges or nolle prosequi by prosecutor where the reasons stated for the action are consistent with the innocence of the accused). No claim may be filed until the favorable termination has been obtained. This means that the cause of action does not arise until favorable termination occurs. As another judge of this Court held in *Nieves v. McSweeney*, 73 F.Supp. 2d 98, 104 (D.Mass. 1999), "favorable termination is an essential element of the tort of malicious prosecution. ... Therefore, plaintiffs' causes of action for conspiracy to commit malicious prosecution *did not arise,* let alone accrue, until the underlying criminal proceedings were terminated in their favor." (emphasis added)

Under federal jurisprudence applicable to claims under 42 U.S.C. § 1983 for wrongful conviction, a civil claim does not arise until the conviction has been reversed or otherwise vacated. *Heck v. Humphrey*, 512 U.S. 477 (1994). The government has argued that the rule of *Heck* applies to the plaintiffs' FTCA claim in this case. In *Heck* the Court held that no claim arises in a wrongful conviction case until there is a favorable termination:

> Under our analysis the statute of limitations poses no difficulty while the state challenges are being pursued, since the §1983 *claim has not yet arisen*. Just as a cause of action for malicious prosecution does not accrue until the criminal proceedings have terminated in the plaintiff's favor ... so also a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated. *Id.* at 489-490. (citations omitted, emphasis added).[1]

The issue in the present case is analogous to the question decided by the court in *Ellis v. Ford Motor Co.*, 628 F.Supp. 849 (D.Mass. 1986). Plaintiff's decedent was injured in an auto accident in 1973, but did not die until 1983. The wrongful death statute in existence in 1973 provided that there was no cause of action for wrongful death where death did not occur within two years of an injury that caused death. By 1983 the statute had been amended to delete the two year limitation. The court was required to decide whether the version of the statute that applied in 1973 or in 1983 governed the case.

---

[1] Notice that in *Heck* the Supreme Court uses the terms "arising" and "accruing" interchangeably. When one is speaking about when a cause of action comes into being there is no difference between the terms. The word "accrues" may also be used to describe the point at which the statute of limitations begins to run in the case of actions the filing of which has been justifiably delayed because the statute of limitations was tolled, e.g. during the minority of the plaintiff, or because the existence of the action was not known to plaintiff. The plaintiffs in the instant case are not claiming that running of the statute of limitations was tolled in this sense. Plaintiffs are rather arguing that they simply had no cause of action for malicious prosecution, that no such action had arisen, until a favorable termination (constructive in the cases of Messrs. Tameleo and Greco) of the underlying criminal prosecution.

3

In *Ellis* the amendment that had been passed in 1981 was applicable by its terms to "causes of action *arising on or after January 1, 1982.*" 628 F.Supp. at 853 (emphasis added by *Ellis* court). The court applied this phrase and held that the cause of action for wrongful death did not "arise" until the death. *Id.* at 854. Thus it held that the later version of the statute controlled the case and allowed the claim to proceed. The court specifically reasoned that the amended statute was "*silent* as to the time when any injuries or accidents had to occur." *Id.* (emphasis in original). The court contrasted this statute with others that were limited "'only to actions for death resulting from *injuries sustained* or *accidents occurring*' on or after the effective date." *Id.* (emphasis added by *Ellis* court).

There is no basis in this case in the language of the amendment for the government's argument that liability for the specified intentional torts lies against the United States only for "acts" that "occurred" after the date of the enactment. The amendment defines its reach in terms of "claims" that "arise" after the date of enactment.

Nor do the cases that the government has cited compel the conclusion that plaintiffs' case must be dismissed. The cases did not address the question that must be decided in the instant case. In *Gaudet v. United States*, 517 F.2d 1034 (5th Cir. 1975), the plaintiff did not stand trial and suffered no conviction. The opinion does not discuss precisely when criminal charges against plaintiff were "dropped" and does not specifically address a claim for malicious prosecution, nor when any such claim arose. Indeed, it is unclear from the opinion that plaintiff actually premised FTCA liability on a malicious prosecution theory. The thrust of his complaint, insofar as it is set out in the opinion, appears to have been that plaintiff was pursued and assaulted. Although the

complaint as quoted in the opinion alleges that criminal charges were filed against plaintiff, it does not appear to set forth other elements of a claim of malicious prosecution.

In *Ames v. United States*, 600 F.2d 183 (8th Cir. 1979), the court did not dispose of plaintiff's malicious prosecution claim on the ground that it was not covered by the 1974 amendment, although it did dismiss the abuse of process, false arrest and false imprisonment claims on that basis. The malicious prosecution claim was dismissed because plaintiff did not allege that federal officers initiated or procured the prosecution against him, and because the court held that the grand jury indictment would break any causal chain that might have existed, because plaintiff had not alleged that the officers presented false evidence or withheld evidence. The opinion does not address the question of whether the malicious prosecution claim would have been covered by the 1974 amendment if it had been otherwise viable.

In *Diminnie v. United States*, 728 F.2d 301 (6th Cir. 1984), plaintiff was originally arrested and indicted prior to the 1974 amendment, and the prosecution was not ultimately terminated in his favor until 1975. The Sixth Circuit opinion summarily affirmed the district court's conclusion that the malicious prosecution claim "accrued at the time of the original arrest and indictment." *Id.* at 303. Evidently the plaintiff did not argue that his claim did not arise until favorable termination, and the thrust of his argument on appeal related to other counts and an argument about when the statute of limitations began to run as to them. *Id.* at 303. Consequently, the Court of Appeals did not engage in any analysis of the favorable termination issue.

5

The treatment of the FTCA malicious prosecution issue in the district court was limited to the simple conclusion that the plaintiff's claims for assault, battery, false imprisonment, false arrest, and malicious prosecution were barred because they "arise out of the original arrest and indictment which occurred on or about June 12, 1973." *Diminnie v. United States*, 522 F.Supp. 1192, 1196 (E.D.Mich. 1981). It does not appear that plaintiff had argued that the malicious prosecution claim did not arise until favorable termination in the district court. Plaintiffs' research has disclosed no other cases where an FTCA plaintiff had been originally charged prior to the enactment of the 1974 amendments and favorable termination of the prosecution came after the enactment.

The government also argues that the legislative history of the 1974 amendment supports its position here. The government cites the Senate Report, which states:

> Thus, after the date of the enactment of this measure, innocent individuals who are subjected to raids of the type conducted in Collinsville, Illinois will have a cause of action against the individual Federal agents and the Federal Government.[2]

The language in question does not purport to address the question of when a claim for malicious prosecution accrues. It simply notes that a particularly well publicized instance of law enforcement misconduct would have been subject to a remedy under the amendment. The Senate Report does make clear that the purpose of the statute was to correct the injustice of having "no effective legal remedy against the Federal Government for . . . physical damage, . . . pain, suffering and humiliation" resulting from intentional torts committed by individual Federal officers.[3]

If Congress had intended the proviso to apply only to actions by Federal agents after the date of its enactment, it would have limited its reach to "acts occurring" after the

---

[2] Senate Rep. No. 93-588, at pp. 3-4 (1973), *reprinted in* 1974 U.S.C.C.A.N. 2789, 2791.
[3] *Id.*

6

enactment. By using the term "claims arising" in the statute, Congress waived sovereign immunity for all intentional torts arising after the date of enactment, regardless of when they occurred. To read the proviso differently would contradict the purpose of the statute.

### (b) The Plaintiffs Allege Unlawful Conduct Occurring Subsequent to the Date of the Amendment Permitting Claims Based Upon Malicious Prosecution.

The Government's argument also ignores the fact that in the present case plaintiffs have alleged not only that a malicious prosecution was initiated by federal law enforcement agents, but that the prosecution was continued for over thirty years by wrongdoing by federal agents. The duty to disclose exculpatory evidence in the possession of FBI agents was an ongoing one. Their failure to make the necessary disclosures constituted a continuing violation of their duty to plaintiffs and resulted in the continuation of the malicious prosecution.

Moreover, plaintiffs have alleged that FBI agents engaged in other actions throughout incarceration of plaintiffs in order to keep the lid of secrecy on their conspiracy. In *Mitchell v. City of Boston*, 130 F.Supp. 2d 201, 215 (D.Mass. 2001), Judge Saris recognized that a person "who takes an active part in continuing or procuring the continuation of criminal proceedings initiated ... by another is subject to the same liability for malicious prosecution as if he had then initiated the proceedings," citing Restatement (Second) of Torts § 655 (1976) and *Bicknell v. Dorion*, 33 Mass. (16 Pick.) 478 (1835).[4] See also, *Nieves v. McSweeney*, 241 F.3d 46, 53 (1st Cir. 2001); *Stromberg v. Costello*, 456 F.Supp, 848, 850 (D.Mass. 1978).[5]

---

[4] Section 655 provides: "A private person who takes an active part in continuing or procuring the continuation of criminal proceedings initiated by himself or by another is subject to the same liability for malicious prosecution as if he had then initiated the proceedings." Plaintiffs are not aware of any Massachusetts case in which the state courts have had an opportunity to explicitly embrace or reject Section

7

Tameleo, Limone and Greco were incarcerated for a substantial period of time subsequent to 1974; Tameleo until his death in 1985, Greco until his death in 1995 and Limone until his release in 2001. During the entirety of that period the incarcerations were caused by the ongoing suppression of exculpatory evidence by federal agents and by the additional wrongful acts alleged in plaintiffs' complaint through which the agents sought to keep secret the innocence of Tameleo, Limone and Greco.

## II. FBI SUPERVISORS' NEGLIGENT SUPERVISION AND RETENTION OF THE INDIVIDUAL FBI DEFENDANTS IS NOT PROTECTED BY THE DISCRETIONARY FUNCTION EXCEPTION TO THE FTCA.

In its brief, the Government fails to engage in a meaningful analysis of this issue, and overlooks relevant mandatory, internal FBI directives and operating procedures which were violated by FBI supervisors.[6]

---

655. At the same time, the doctrinal underpinnings of imposing liability for continuing a prosecution are the same as those relied upon by the Massachusetts courts for imposing liability on those who influence public actors to initiate a prosecution and there is no doubt that Massachusetts courts would recognize liability under Section 655 if the occasion arose. In this respect we note that the Superior Court in Massachusetts has recognized liability under Section 647 of the Restatement (Second) of Torts, a parallel provision imposing liability on one who continues a malicious civil prosecution. *Fordham v. Cole*, 1991 WL 718188, p. 2 (Super. Ct. 1991).

[5] Other jurisdictions have recognized liability for one who assists in continuing a prosecution. *Kaminske v. Wisconsin Cent. Ltd.*, 102 F.Supp.2d 1066, 1073 (E.D.Wis.2000) (applying Wisconsin law); *Ware v. United States*, 971 F.Supp. 1442, 1461-1462 (M.D.Fla. 1997) (in FTCA claim recognizing that government was the legal cause for malicious prosecution where FBI agent played a key role in the proceedings); *Purvis v. Hamwi*, 828 F.Supp. 1479, 1482 (D.Colo. 1993) (person who takes an active part in continuing criminal proceedings initiated by himself or another is subject to the same liability for malicious prosecution as if he had actually initiated the proceedings); *Banks v. Nordstrom, Inc.*, 57 Wash.App. 251, 256-257 (1990); *Simmons v. Telcom Credit Union*, 177 Mich.App. 636, 639 (Ct. of Appeals, Mich. 1989) (discussing liability for continuing a prosecution, the court notes, "when a defendant fails to make a full and fair disclosure, including the failure to disclose material exculpatory information which might dissuade a prosecutor from seeking a warrant ... an action for malicious prosecution may be pursued since the defendant's omission might effectively foreclose a proper exercise of discretion by the prosecutor"); *Denton v. Allstate Insurance Co.*, 153 Ill.App.3d 578, 583 (App.Ct. Ill. 1987) (also recognizing liability equivalent to initiating prosecution for participation of "so active and positive a character as to amount to advice and cooperation," and for knowingly giving false information to police); *Martin v. City of Albany*, 42 N.Y.2d 13, 16, 396 N.Y.S.2d 612, 614 (1977); *Seidel v. Greenberg*, 108 N.J.Super. 248, 257-258 (Superior Ct. of N.J. 1969).

[6] The Government has failed to satisfy its burden to show that the discretionary function exception applies. *See Smith v. United States*, 943 F.Supp. 159, 168 (D.R.I. 1996) (United States has burden to show discretionary function exception applies).

To determine whether the discretionary function exception bars the negligent supervision and retention claims this Court must determine (1) whether the government actor's conduct was discretionary in nature, in that it involved an element of judgment or choice, and (2) "whether that judgment is of the kind that the discretionary function was designed to shield," in that it involves considerations of "social, economic, and political policy." *United States v. Gaubert*, 499 U.S. 315, 322-323 (1991); *Berkovitz v. United States*, 486 U.S. 531, 536 (1987). If the answer to either question is "no," the exception does not apply. *Attallah v. United States*, 955 F.2d 776, 783 (1st Cir. 1992).

(a) **The FBI Supervisors' Conduct Regarding the Supervision and Retention of the Individual FBI Defendants Violated Mandatory, Internal Directives and Operating Procedures.**

Whether the actor's conduct involves an element of judgment or choice is contingent on the nature of his conduct, not his status. *Gaubert*, 499 U.S. at 322. Where certain conduct is required of federal employees by regulations and policies of their government agency, including informal agency rules and pronouncements, the discretionary function exception does not apply. *Id.* at 322-323 (*quoting, Berkovitz*, 486 U.S. at 536). *See also, Irving v. United States*, 162 F.3d 154, 163-164 (1st Cir. 1998) (*en banc*), *cert. denied*, 528 U.S. 812 (1999); *Tri-State Hosp. Supply Corp. v. United States*, 142 F.Supp.2d 93, 101 (D.D.C. 2001) (discretionary function exception did not apply when conduct of United States Customs officials violated mandatory Customs regulations). The FBI's internal manuals fall within the categories of documents pertinent to the discretionary function exception inquiry.[7] *See, e.g., Flax v. United States*, 847 F.Supp. 1183, 1188-1189 (D.N.J. 1994).

---

[7] The United States has produced during discovery certain editions (and published revisions) of the FBI's Manual of Instructions ("MOI"), Manual of Investigative Operations and Guidelines ("MIOG"), Manual of

9

In this case the FBI supervisors' conduct regarding the supervision and retention of the individual FBI defendants violated mandatory, internal FBI directives and operating procedures. The Limone and Tameleo Plaintiffs have alleged that the individual FBI defendants, most notably, H. Paul Rico ("Rico") and Dennis Condon ("Condon"), (i) failed to disclose exculpatory evidence;[8] (ii) participated in the creation of perjured testimony that falsely inculpated Limone and Tameleo;[9] (iii) suborned perjury;[10] and (iv) engaged in other conduct for the purpose of covering up the involvement of FBI informants Joseph Barboza ("Barboza") and Vincent James Flemmi in the Deegan murder.[11] The Amended Complaint alleges, that over a period of several decades, the federal defendants conspired to and engaged in the malicious prosecution of Limone and Tameleo, took action to cover-up their earlier misconduct in initiating the prosecution, and in the process wrongfully deprived Limone and Tameleo of their liberty. *See generally* Amended Complaint. By engaging in the foregoing conduct, the individual FBI Defendants violated federal law and numerous internal FBI directives and operating procedures.

In their Amended Complaint, the Limone and Tameleo Plaintiffs allege that FBI supervisory officials were aware of the unlawful activities of their agents yet negligently failed to properly supervise, discipline and control them.

By allowing the individual FBI defendants to engage in conduct which was illegal and violated Bureau rules and regulations, FBI supervisors themselves violated

---

Rules and Regulations ("MRR"), and Manual of Administrative Operations and Procedures ("MAOP") in electronic and hard-copy form. The MRR was replaced by the MAOP in 1978. The MOI was replaced by the MIOG in 1977.

[8] *See* First Amended Complaint of the Limone and Tameleo Plaintiffs ("Amended Complaint"), ¶¶ 24, 26, 27-41.

[9] Amended Complaint, ¶ 23.

[10] *Id.* at ¶ 23(b).

[11] *Id.* at ¶¶ 23, 26, 30, 32, 36-39.

mandatory, internal FBI directives and operating procedures including, but not limited to, the following:

MRR § I(1):   . . . [E]mployees shall:

> 1. Conduct themselves in a manner that creates and maintains respect for the Department of Justice and the U.S. Government ...
>
> 3. Avoid any action which might result in, or create the appearance of –
>
> . . .
>
> > (c) Impeding Government efficiency or economy
> > (d) Losing complete independence or impartiality . . .
> > (f) Affecting adversely the confidence of the public in the integrity of the Government...
>
> <u>Failure by an employee to follow these regulations will result in appropriate disciplinary action</u> including possible dismissal.[12] (Emphasis added).

MRR § I(1)(A)(1):   Special Agents in Charge (SACs) <u>must</u> report immediately any improper conduct of employees in their territory.[13] (Emphasis added).

MRR § I(1)(A)(2):   All employees <u>must</u> report immediately neglect of duty or any conduct prejudicial to the best interests of the Bureau, or any matter which may result in embarrassment to the Bureau.[14] (Emphasis added).

MRR § I(1)(A)(3):   . . . It is . . . expected that employees will obey not only the letter of the law but the spirit of the law as well whether they be engaged in activities of a personal or official nature.[15]

MRR § I(1)(A)(3):   . . . FBI employees must at all times zealously guard and defend the rights and liberties guaranteed to all individuals by the Constitution.[16]

---

[12] This mandatory directive is found in the MRR as early as March 27, 1973.
[13] This mandatory directive is found in the MRR as early as March 29, 1963.
[14] This mandatory directive is found in the MRR as early as March 29, 1963.
[15] This mandatory directive is found in the MRR as early as March 27, 1973. This directive was continued in the MAOP, Part I, § 1-4(1), when it was first published in 1978, and continued at least through February 10, 1998.
[16] This mandatory directive is found in the MRR as early as December 27, 1973. This directive was continued in the MAOP, Part I, § 1-4(2), when it was first published in 1978, and revised to read as follows:

| | |
|---|---|
| MRR § I(1)(B): | **ACTS RESULTING IN DRASTIC DISCIPLINARY ACTION INCLUDING POSSIBLE DISMISSAL** |
| | 3. Employees <u>must</u> not be involved in personal misconduct which would reflect unfavorably upon the Bureau.[17] (Emphasis added). |
| MRR § I(1)(D)(17)(a)(1): | ... [E]mployees <u>shall</u> [c]onduct themselves in a manner that creates and maintains respect for the Department of Justice and the U.S. Government.[18] (Emphasis added). |
| MRR § I(1)(D)(18): | No employee <u>shall</u> engage in criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct or other conduct prejudicial to the Government.[19] (Emphasis added). |
| MRR § I(9)(A): | It is imperative that any information pertaining to allegations of misconduct or improper performance of duty coming to the attention of any Bureau employee be promptly and fully reported to the Bureau, and it is the continuing responsibility of Bureau officials to see to it that the employees under their supervision are properly indoctrinated regarding this requirement so that they not only will fully understand it but will comply with it.[20] |
| MRR § I(9)(B): | There <u>must</u> be no delay in notifying the Bureau concerning any allegations of either misconduct or improper performance of duty on the part of Bureau personnel.[21] (Emphasis added). |

---

... under no circumstances shall employees of the FBI engage in any conduct which may result in defaming the character, reputation, integrity, or dignity of any citizen or organization of citizens of the United States.

(*See* MAOP revision dated 05/15/80). This directive was continued in the MAOP at least through February 10, 1998.

[17] This mandatory directive is found in the MRR as early as March 29, 1963, and continued until at least March 27, 1973.

[18] This mandatory directive is found in the MRR as early as February 28, 1966.

[19] This mandatory directive was added to the MRR in a revision dated February 28, 1966. On March 27, 1973, this directive was moved and revised to read, as follows:

| | |
|---|---|
| § I(1)(A)(1): | Employees ... must not, at any time, engage in criminal, dishonest, immoral or disgraceful conduct or other conduct prejudicial to the Government. |

This directive was continued in the MAOP, Part I, § 1-2, when it was first published in 1978. Accordingly, this mandatory directive was in effect at all material times.

[20] This mandatory directive is found in the MRR as early as March 27, 1969. This directive was continued in the MAOP, Part I, § 13-1(2), when it was first published in 1978.

[21] This mandatory directive is found in the MRR as early as March 27, 1969.

| | |
|---|---|
| MRR § I(9)(D): | Interviews of employees involved in allegations of misconduct or improper performance of duty should be conducted at the earliest logical time and in a forthright manner.[22] |
| MRR § I(9)(I): | SCHEDULE OF DISCIPLINARY OFFENSES AND PENALTIES FOR FBI EMPLOYEES[23] |

"3. Work deficiencies and/or inattention to duty."

| | |
|---|---|
| First Offense: | Oral reprimand to removal |
| Second Offense: | 5-day suspension to removal |
| Third Offense: | 15-day suspension to removal |

"9. Criminal, dishonest, immoral, infamous or notoriously disgraceful conduct."

| | |
|---|---|
| First Offense: | Oral reprimand to removal |
| Second Offense: | 5-day suspension to removal |
| Third Offense: | 30-day suspension to removal |

| | |
|---|---|
| MAOP Part I, § 1(5)(n): | Employees shall endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards promulgated pursuant to this order.[24] (Emphasis added). |
| MOI § 108(IV): | ... [W]hile it is proper for the FBI to use informants in appropriate investigations, it is imperative that special care be taken not only to minimize their use but also to ensure that individual rights are not infringed and that the government itself does not become a violator of the law.[25] |
| MOI § 108(IV)(C)(1): | Under no circumstances shall the FBI take any action to conceal a crime by one of its informants.[26] |

---

[22] This mandatory directive is found in the MRR as early as March 27, 1969. This directive was continued in the MAOP, Part I, § 13-4, when it was first published in 1978, and continued to at least February 10, 1998.

[23] This mandatory directive was added to the MRR in a revision dated June 27, 1977. This directive was continued in the MAOP, Part I, § 13-12, when it was first published in 1978, and continued to at least February 10, 1998.

[24] This mandatory directive is found in the MAOP as early as November 24, 1989.

[25] This directive was added to the MOI in a revision dated January 12, 1977. It is unclear whether the directive was included in the MIOG when it was published in 1977, however, the directive is found in the MIOG as early as January 12, 1981 at § 137-17(A)(1). It was moved to § 137-16 (A)(1) in a revision dated March 28, 1984, where it remained as late as May 26, 1989.

[26] This directive was added to the MOI in a revision dated January 12, 1977. In the MIOG, the successor to the MOI, this directive was moved over the years, but was never deleted or revised in any material way. In a revision to the MIOG dated January 12, 1981, the directive was moved to § 137-17(G)(5). On November

MOI § 108(D)(4): Bureau Agents cannot promise any immunity or any reduction in sentence to a criminal who furnishes information and they must not put themselves in a position where they might subsequently be accused of having done so.[27]

Thus, it is clear that the supervisory conduct relative to the discipline, supervision and retention of the individual FBI Defendants was not discretionary in nature.[28] The failure of FBI supervisors to comply with these mandatory directives and operating procedures precludes the United States' reliance on the discretionary function exception to shield it from liability for negligent supervision and retention under the FTCA. *See Gaubert*, 499 U.S. at 322.

    (b)    <u>**FBI Supervisors' Decisions Regarding the Supervision and Retention of the Individual FBI Defendants Under the Circumstances Presented Here Did Not Implicate Social, Political or Economic Policy Considerations.**</u>

If this Court finds that the FBI supervisors' conduct at issue was discretionary in nature, the Court must next determine whether the challenged conduct involves the type of discretion that Congress intended to shield from liability – that is, whether the choice or judgment was one involving social, economic or political policy. *Berkovitz*, 486 U.S. at 536.

Even if this court were to conclude that FBI supervisors had discretion to supervise and retain the individual FBI defendants the discretionary function exception does not apply because the conduct at issue is not the kind that the discretionary function exception was intended to shield. FBI supervisors acted in a manner not grounded in

---

20, 1990, the directive was moved to § 137-4(5). On March 10, 1994, it was moved to § 137-5.2(3), and the word "FBI" was changed to "field office."

[27] This mandatory directive is found in the MOI as early as April 15, 1963, and continued until at least July 13, 1976.

[28] Use of terms such as "shall" and "must" are significant in that they provide FBI supervisors no discretion in these areas. *See Tri-State Hosp. Supply Corp.*, 142 F.Supp.2d at 101 (*citing, Berkovitz*, 486 U.S. at 542-543).

14

plausible FBI policy; indeed, it is not plausible FBI policy for its supervisors to engage in the negligent supervision and retention of agents who commit illegal acts that violate FBI rules and regulations.

The United States Court of Appeals for the Eighth Circuit's opinion in *Tonelli v. United States*, 60 F.3d 492 (8th Cir. 1995) is instructive. In *Tonelli*, the plaintiff brought suit against the United States on the basis of the illegal conduct of postal service employees. *Tonelli*, 60 F.3d at 494. The plaintiff brought a claim under the FTCA for the negligent selection, supervision and retention of the subject employees. *Id.* at 494. The plaintiff appealed, among other things, the district court's award of summary judgment based upon the discretionary function exception in favor of the United States on the negligent selection, supervision and retention claim. *Id.* at 495-496. The Appeals Court reversed. *Id.* While noting that issues of employee supervision and retention generally involve the permissible exercise of policy judgment the Court in *Tonelli* held that the discretionary function exception was inapplicable because the failure to take action against the subject employees after notice of their illegal behavior did not represent a choice based on plausible policy considerations. *Id.*

Like the plaintiff in *Tonelli*, the Plaintiffs here allege that the FBI failed to take action against the individual FBI defendants despite knowledge that they had engaged in illegal acts. Accordingly, this Court should deny the motion to dismiss with respect to the claims for negligent supervision and retention.

### (c) In the Alternative, This Court Should Allow the Limone and Tameleo Plaintiffs to Amend Their Complaint.

In the alternative, the Plaintiffs respectfully request that the Court grant them leave to file the Second Amended Complaint attached as <u>Exhibit A</u>. Rule 15(a)

encourages the court to grant leave to amend when justice requires it. Fed.R.Civ.P. 15(a); *Aversa v. United States*, 99 F.3d 1200, 1214 n.13 (1st Cir. 1996). Leave to amend is to be "freely given," unless it would be futile. *Northeast Fed. Credit Union v. Neves*, 837 F.2d 531, 536 (1st Cir. 1988). In addition, undue delay, bad faith, dilatory motive, or undue prejudice to the opposing parties by virtue of allowance of the motion are "adequate" reasons for denial. *Glassman v. Computervision Corp.*, 90 F.3d 617, 622 (1st Cir. 1996).

In this case the Plaintiffs merely seek leave to amend so that they may clarify their negligent supervision and retention claims against the United States based at least in part on facts that were not available when they filed their original and First Amended Complaints. These facts were included in the November 2003 written report of the United States House of Representatives subcommittee investigating the FBI's conduct in relation to the Deegan murder and the use of Barboza as an informant (the "Committee").[29] Since the Plaintiffs' request is not made in bad faith or with a dilatory

---

[29] It is clear that the individual FBI defendants violated federal law and Bureau rules and regulations. FBI supervisors at best, failed to discipline, and at worst, rewarded the individual FBI Defendants for their misconduct. This is supported by the following findings of the Committee:

- The FBI's Office of Professional Responsibility, which in 1997 conducted its own investigation of the Barboza and Deegan matters, found that "a number of violations of FBI rules and regulations which . . . warranted administrative action" took place. House Committee on Government Reform, Everything Secret Degenerates: The FBI's Use of Murderers as Informants ("Committee Report"), p.137 (Nov. 20, 2003) (*citing*, FBI Office of Professional Responsibility Report by Joshua Hochberg and Charles S. Prouty (Aug. 13, 1997) at 2).
- The Committee found that "[t]o date, there have been **no** adverse consequences for those who permitted [Barboza's] false testimony [*i.e.*, the Defendant FBI Special Agents Rico and Condon, and others]." Committee Report, p.5 (emphasis added).
- The Committee found that despite Rico's and Condon's lack of concern that Barboza would commit perjury in a death penalty case despite considerable evidence that such conduct would occur at trial, Rico and Condon were recommended for pay increases as a result of their development of Barboza as a witness. *Id.* at 24.
- The Committee found that the year prior to Rico's and Condon's development of Barboza's testimony, Condon was found to have improperly disseminated information obtained from an informant. *Id.* at 25 n.74. The Committee found that despite this error, a few weeks after Rico and Condon first interviewed Barboza, Condon's participation in the informant program was considered outstanding. *Id.*

motive nor will an amendment delay discovery or trial or result in any prejudice to any other defendant there exists no just reason for denying the request for leave to amend.

### III. THE GOVERNMENT'S MOTION TO DISMISS THE CLAIMS FOR LOSS OF CONSORTIUM, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, AND CONSPIRACY SHOULD BE DENIED.

Despite this Court's unambiguous and conclusive decision on the point, *Limone*, 271 F. Supp. 2d at 363, the Government here rehashes the argument that the claims for loss of consortium, intentional infliction of emotional distress, and conspiracy should be dismissed because, the Government argues, they "arise out of" the torts of false imprisonment and malicious prosecution. Government's Memorandum In Support Of Its Second Motion To Dismiss at 9-10. However, as this Court has already explained, the law of the First Circuit is to the contrary, and the facts as alleged by the Plaintiffs do not support the Government's position that the loss of consortium, intentional infliction of emotional distress, and conspiracy claims are attempts to evade the limits of the FTCA by re-characterizing claims of false imprisonment and malicious prosecution.

The law of the First Circuit is clear: "Claims for intentional infliction of emotional distress are not excluded from the FTCA. Nor has any such exclusion been read into the statute." *Santiago-Ramirez v. United States*, 984 F.2d 16, 20 (1st Cir. 1993). In fact, the Government in its Memorandum does not take issue with this point of law. *See* Government's Memorandum In Support Of Its Second Motion To Dismiss at 10.

---

- The Committee found that FBI supervisors awarded bonuses and commendations for the "successful" effort to develop the Deegan case, which presumably includes the development of Barboza as the principle witness. *See id.* at 39. For example, FBI then FBI Director J. Edgar Hoover himself expressly praised Condon for his efforts relative to the Deegan case. *See id.* at 40.

By failing to discipline and/or terminate the individual FBI defendants for conduct which was illegal and violated Bureau rules and regulations, FBI supervisors themselves violated mandatory, internal FBI directives and operating procedures.

17

Instead, the Government seems to argue that because the United States has not waived sovereign immunity in regard to false imprisonment and malicious prosecution claims stemming from pre-1974 misconduct by government agents, then it follows that the United States also has not waived sovereign immunity for loss of consortium, intentional infliction of emotional distress, and conspiracy claims stemming from pre-1974 misconduct. *See id.*

Notwithstanding the deficiencies of the Government's argument concerning the timing of the FBI's misconduct and its effect on the instant claims, *See* Section I, *supra*, that issue is irrelevant here. The fact that the United States, by the 1974 amendment to Section 2680(h), consented to suit for certain intentional tort claims stemming from misconduct by government agents does not change the fact that loss of consortium, intentional infliction of emotional distress, and conspiracy claims were never excluded from the FTCA to begin with. Both the First Circuit, and this Court, have made that absolutely clear, specifically in regard to claims for intentional infliction of emotional distress. *See Santiago-Rameriez*, 984 F.2d at 20; *Limone*, 271 F. Supp. 2d at 363. Likewise, there is no reason that the instant claims for loss of consortium and conspiracy should be treated any differently than the intentional infliction of emotional distress claim. Given the strictness with which Section 2680 is to be read, the loss of consortium and conspiracy claims are not barred by the FTCA, because they, like intentional infliction of emotional distress claims, are not explicitly excluded by Section 2680. *See Rayonier, Inc. v. United States*, 352 U.S. 315, 321 (1957); *id.*

Moreover, although many of the facts alleged by the Plaintiffs naturally overlap this Court has already ruled that this does not necessarily defeat any of the claims.

Allowing the loss of consortium, intentional infliction of emotional distress, and conspiracy claims to proceed would not be akin to allowing the Plaintiffs to circumvent the limits set forth in Section 2680(h). To the contrary, the facts alleged describe a course of conduct by the FBI sufficient to support all of the distinct claims.

For example, the Plaintiffs allege a pervasive course of conduct undertaken by the FBI not only to put two innocent men in prison, but to frustrate their efforts of exoneration for over thirty years. *See* Amended Complaint, ¶¶ 26-41. All of these facts support the loss of consortium, intentional infliction of emotional distress, and conspiracy claims, and their "gravamen" clearly cannot be malicious prosecution, as they were already incarcerated when they occurred.[30] Conversely, a concerted effort by law enforcement officers to frame two innocent men for murder, and the corresponding injury, would give rise to common law claims even before a prosecution was initiated, or if a prosecution were not ultimately initiated. *See Limone*, 271 F. Supp. 2d at 363-64.

It is clear that the loss of consortium, intentional infliction of emotional distress, and conspiracy claims brought by the Plaintiffs are not merely attempts to "end-run" the FTCA's limits on the waiver of sovereign immunity. Therefore, the Court should deny the Government's motion to dismiss these claims.

## CONCLUSION

Based upon the foregoing, the Plaintiffs respectfully request that this Honorable Court DENY the motion to dismiss, or in the alternative grant them leave to file the attached Second Amended Complaint.

---

[30] A claim for malicious prosecution under Massachusetts law requires "the institution of criminal proceedings against the plaintiff ...." Gutierrez v. MBTA, 437 Mass. 396, 405 (2002) (emphasis added).

19

Respectfully submitted,

**THE LIMONE, TAMELEO AND GRECO PLAINTIFFS,**
By their attorneys,

_/s/ Juliane Balliro_ (by RJS)
Juliane Balliro (BBO# 028010)
Ronald J. Snyder (BBO# 638188)
PERKINS, SMITH & COHEN, LLP
One Beacon Street
Boston, Massachusetts 02108
(617) 854-4000

_/s/ Michael Avery_ (by RJS)
Michael Avery (BBO# 024500)
Suffolk University Law School
120 Tremont Street
Boston, MA 02108
(617) 573-8551

_/s/ William T. Koski_ (by RJS)
William T. Koski (BBO# 277820)
KOSKI & KEARNS LLP
One Bowdoin Square, Suite 300
Boston, MA 02114
(617) 973-4525

Respectfully submitted,

**EDWARD GRECO,**
By his attorneys,

_/s/ Howard Friedman_ (by RJS)
Howard Friedman (BBO# 180080)
Law Offices of Howard Friedman
90 Canal Street
5th Floor
Boston, MA 02114-2022
(617) 742-4100

_/s/ Edwin Durham_ (by RJS)
Edwin Durham
Rachlis, Durham, Duff, Adler
542 South Dearborn Street
Suite 1310
Chicago, IL 60605
(312) 733-3950

DATED: January 6, 2004

## CERTIFICATE OF SERVICE

I, Ronald J. Snyder, hereby certify that on this 6th day of January 2004, I served the foregoing by mailing a copy first class, postage prepaid, to all counsel of record and to counsel for the United States by facsimile.

_/s/ Ronald J. Snyder_

20