UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                    )
PETER J. LIMONE, et al.,                  )
                                                    )
             Plaintiffs,                         )
                                                    )
        v.                                         )          CIVIL ACTION NO.
                                                    )          02-CV-10890-NG
UNITED STATES OF AMERICA,         )
                                                    )          **LEAVE TO FILE**
             Defendant.                        )          **GRANTED ON 8/29/2006**
_____)

## THIRD AMENDED COMPLAINT OF
## PLAINTIFFS PETER J. LIMONE, OLYMPIA LIMONE, PETER A. LIMONE, PAUL LIMONE, CAROLYN LIMONE ZENGA, JANINE LIMONE ARRIA, SAVERIO TAMELEO, ADMINISTRATOR OF THE ESTATE OF ENRICO (HENRY) TAMELEO, SAVERIO TAMELEO, ADMINISTRATOR OF THE ESTATE OF JEANNETE TAMELEO, and SAVERIO TAMELEO

### Introduction

1.      This action for money damages is brought pursuant to Title 28 U.S.C. §§ 2671, *et seq.* (hereinafter the "Federal Tort Claims Act") based upon various violations of the common law of the Commonwealth of Massachusetts.  Jurisdiction is based upon 28 U.S.C. §§ 1331, 1343, 1346(b).

2.      Plaintiffs allege that federal officials conspired with each other and with other unnamed individuals to bring about the wrongful conviction and imprisonment of Peter J. Limone (hereinafter, "Limone") and Enrico (Henry) Tameleo (hereinafter, "Tameleo") in Suffolk Superior Court in the Commonwealth of Massachusetts in 1965 and thereafter.

## **Parties**

3.    The following persons are the plaintiffs in this action:

    a.    Peter J. Limone at all times material to this complaint was and is a resident of Middlesex County, Massachusetts.  He is of full age.

    b.    Olympia Limone at all times material to this complaint was and is married to Peter J. Limone.  She is of full age.

    c.    Peter A. Limone, Paul Limone, Carolyn Limone Zenga and Janine Limone Arria at all times material to this complaint were and are the children of Peter J. Limone and Olympia Limone.  They are of full age.

    d.    Saverio Tameleo is the son of Enrico (Henry) Tameleo and Jeannete Tameleo.

    e.    Jeannete Tameleo was married to Enrico (Henry) Tameleo.

    f.    Enrico (Henry) Tameleo died in prison on August 18, 1985.

    g.    In his representative capacities, Saverio Tameleo is the Administrator of the Estate of Enrico (Henry) Tameleo and the Administrator of the Estate of Jeannete Tameleo.

    h.    The following entity is the defendant in this action:

    i.    The United States of America is the appropriate defendant under the Federal Tort Claims Act and was at all times material to this complaint the employer of H. Paul Rico (hereinafter "Rico"), Dennis Condon (hereinafter "Condon"), John Morris (hereinafter "Morris"), John Connolly (hereinafter "Connolly"), James L. Handley (hereinafter "Handley") and Edward F. Harrington (hereinafter "Harrington").  The

acts of these federal agents described in this Complaint were taken in their official capacities as employees of the United States.  The United States has filed the proper certificate with regard to Condon, Rico and Handley. *See* Docket No. 130, Order of Court dated 2/10/2003.

j.      Rico, Condon, Morris and Connolly were at all times material to this complaint special agents of the Federal Bureau of Investigation (hereinafter "FBI").

k.      Handley was the Special Agent in Charge of the Boston field office of the FBI from 1964 to 1969.

l.      Harrington worked for the United States Department of Justice at all times material to this complaint.

### Facts

4.      Limone and Tameleo were convicted in the Superior Court for Suffolk County, Massachusetts and were sentenced to death, which sentence was later vacated and Limone and Tameleo were sentenced to life imprisonment, for the March 12, 1965 murder of Edward "Teddy" Deegan (hereinafter, "Deegan").

5.      Deegan was in fact killed by Vincent James Flemmi (hereinafter "Flemmi") and Joseph Barboza, a/k/a Joseph Baron, (hereinafter "Barboza") and Roy French (hereinafter "French"), Joseph Romeo Martin (hereinafter "Martin") and Ronnie Cassesso (hereinafter "Cassesso").

6.      Limone and Tameleo were innocent of and were wrongfully convicted and incarcerated for this murder.  Their wrongful conviction and incarceration were

the proximate result of the acts and omissions of the defendant United States, through its agents and employees, alleged in the following paragraphs.

7.     Rico and Condon developed relationships with Flemmi and Barboza as informants and/or cooperating witnesses for the FBI.

8.     Due to their criminal records and criminal activities, including multiple murders, their unreliability, their mendacity, their lack of credibility, the danger they posed to public safety, and their intentions to continue to break the law, all of which were known to Rico and Condon, Flemmi and Barboza were not qualified, suitable or appropriate to serve either as cooperating witnesses or informants for the FBI.  Rico and Condon, and other FBI agents, and their superiors, including, but not limited to, Handley, failed to follow proper procedures and guidelines with respect to the selection of cooperating witnesses and informants, with respect to the selection and employment of Flemmi and Barboza.

9.     Rico and Condon, and other FBI agents, and their superiors, including, but not limited to, Handley, failed to follow proper procedures and guidelines with respect to monitoring and approving the activities of Flemmi and Barboza, with the result that as informants and/or cooperating witnesses, Flemmi and Barboza were allowed and/or encouraged to engage in actions that were illegal, including murder, conspiracy to murder, perjury and other crimes.  Such acts were neither suitable nor appropriate, nor legal, for FBI informants and/or cooperating witnesses.

10.     Rico and Condon and/or other FBI agents were informed as early as May 22, 1964 that Flemmi had stated that "all he wants to do now is to kill people," and in

October, 1964, that Flemmi's stated aspiration was to become the number one "hit man" in the area.  LIM010-0219.

11.  Rico and Condon and/or other FBI agents were also advised as early as March 3, 1965, that alleged organized crime boss Gennaro J. Angiulo (hereinafter, "Angiulo") was of the opinion and had communicated it to alleged organized crime boss Raymond Patriarca (hereinafter "Patriarca"), that Flemmi "did not use sufficient common sense when it came to killing people."  LIM011-2697.

12.  Deegan was murdered on March 12, 1965.  On or before March 10, 1965, Rico and Condon knew or should have known, based upon information received by other FBI agents working in concert with them, directly or indirectly from Flemmi, Patriarca and others, that: Flemmi had formed the intent to murder Deegan as early as October 19, 1964; that Flemmi and Barboza had sought an "OK" from Patriarca to kill Deegan (LIM011-0208); and that as early as October 23, 1964, Limone, contrary to harboring murderous impulses concerning Deegan, had warned Deegan that Flemmi was looking for him and that Flemmi was out to kill him.  LIM011-2686.

13.  Rico, Condon, Handley and other FBI agents failed to warn Deegan, failed to properly control the activities of their cooperating witnesses and/or informants Flemmi and Barboza and failed to take any steps to prevent the murder.

14.  Rico and/or Condon were informed directly or indirectly by Flemmi the day after the murder of Deegan that it had been committed by French, Cassesso, Martin, Barboza and Flemmi, and memorialized this information in a memorandum to Handley, the Special Agent in Charge of the Boston FBI office.

15.     Rico claimed in the said memorandum that FBI Agent Donald V. Shannon had
transmitted the information contained therein to Renfrew, then a captain in the
Chelsea Police Department.

16.     Limone and Tameleo were indicted for the murder of Deegan.  Limone was
arrested and incarcerated on November 1, 1967 and Tameleo was arrested and
incarcerated on October 25, 1967.  They were convicted of murder in the first
degree and conspiracy to murder.  Limone and Tameleo were sentenced to death
on or about July 31, 1968.  Specifically:  (i) Limone and Tameleo were convicted
and sentenced to death as accessories in the murder of Deegan; and (ii) Limone
and Tameleo were also convicted of conspiracy to murder Stathopoulos.  On or
about June 29, 1972 the United States Supreme Court vacated Limone's and
Tameleo's death sentences and they subsequently were resentenced to life
imprisonment.

17.     Tameleo remained incarcerated until his death on August 18, 1985.

18.     Limone remained incarcerated until January 5, 2001, when he was released on
bail.  His conviction was vacated and a new trial ordered on January 8, 2001.  On
January 30, 2001 the Suffolk County District Attorney's Office announced that it
would not prosecute the case further and Mr. Limone was discharged.  In a
written nolle prosequi filed with the Superior Court for Suffolk County, the
District Attorney's Office stated that evidence newly discovered as of December
19, 2000, consisting of FBI documents, had undermined the credibility of the
Commonwealth's principal witness Joseph Barboza at Limone's trial, and
undermined the Commonwealth's theory of Limone's role in the murder of

Deegan.  The nolle prosequi stated that the Commonwealth had conducted a thorough review of the facts and the alleged evidence against Limone and concluded "that it does not now have a good faith basis – legally or ethically – to proceed with any further prosecution of the defendant."  The criminal proceedings were terminated in Limone's favor.

19.    Criminal proceedings were also constructively terminated in favor of Tameleo inasmuch as the allegations and testimony against Tameleo were based upon the same evidence and witnesses as the case against Limone.  Had Tameleo not died while incarcerated, he would have joined in Limone's motion for a new trial described in paragraph 18 and his motion would have been granted and the criminal proceedings against him nolle prossed for the same reason that charges against Limone were nolle prossed.

20.    The conviction and incarceration of Limone and Tameleo was a direct and proximate result of the wrongful acts and omissions of the defendant alleged herein.

21.    FBI agents including, but not limited to, Rico, Condon, Morris, Connolly and Handley, initiated, procured and continued the prosecution of Limone and Tameleo by actively participating in the said prosecution in numerous ways including, but not limited to, the following:

   a.    FBI agents, including, but not limited to, Rico and Condon, met with Barboza during the spring of 1967 and induced or coerced him into becoming a cooperating witness with the state prosecution of the Deegan

homicide and thereafter assisted state prosecutors in developing Barboza as a witness.

b.  Before the grand jury appearance of Barboza that led to the indictment and during the prosecution of the Deegan homicide, Rico, Condon and other Federal agents knowingly suborned from and assisted the principal Commonwealth witness Barboza in committing perjury in testimony against Limone and Tameleo.

c.  Rico, Condon and other agents of the FBI provided material support and assistance to Barboza in exchange for his participation as a cooperating witness in the state prosecution of the Deegan homicide.

d.  Rico, Condon and other agents of the FBI encouraged state prosecutors to prosecute Limone and Tameleo for the murder of Deegan, although they knew that the said persons were innocent of the crime.  The said agents encouraged the prosecution of innocent parties in order to cover up and keep secret the involvement of the FBI informant Flemmi in the murder.

22.  Rico, Condon, Morris, Connolly and Handley and other Federal agents actively participated in the continuation of the prosecution of Limone and Tameleo and the post conviction defense of the judgment in that case in numerous ways including, but not limited to, those alleged below in paragraphs 23-79.

23.  Participation of the FBI agents in the state prosecution of the Deegan murder was crucially important to the case, as reflected in a July 31, 1968 FBI memo after the convictions that stated, "Garrett H. Byrne, District Attorney, Suffolk County, stated that prosecution was a direct result of FBI investigation and particularly

noted development of principal government witness, Joseph Baron, aka Barboza, and Robert Glavin.  Byrne was extremely praiseworthy of cooperation between FBI and his office.  SAS H. Paul Rico and Dennis M. Condon were instrumental in development of Baron and Glavin."

24.    Rico, Condon, Handley, and other agents of the FBI, failed to disclose information exculpatory to Limone and Tameleo in their possession to the attorneys prosecuting the Deegan murder case and representing the government in post-conviction proceedings.  Agents and employees of the United States Department of Justice and the FBI did not disclose the said exculpatory information until on or about December 19, 2000.

25.    On diverse dates between the murder of Deegan and the present, Rico, Condon, Morris, Connolly, Harrington and other agents and employees of the Department of Justice and the FBI engaged in numerous acts to keep secret information and evidence exculpatory to Limone and Tameleo and to cover up the identity of the true killers of Deegan.

26.    In or about 1970 Barboza recanted his trial testimony against Limone and Tameleo in statements to James Southwood, William Geraway, Attorney F. Lee Bailey and Attorney Gerald Alch in which he stated that such testimony had not been true.  On August 28, 1970, Harrington, acting outside any role as a prosecutor in judicial proceedings, visited Barboza in prison and forced and/or persuaded and/or induced him to withdraw his recantation and affirm his earlier perjured trial testimony.  Said acts by Harrington constituted interference with the administration of justice.

27.     In 1971 Barboza was living in California as a participant in the witness protection

program, under the name Joseph Bentley.  At that time he shot and killed Clayton

Wilson and subsequently was prosecuted for the capital crime of first-degree

murder.

28.     In 1972 Barboza wrote to Condon and Harrington, seeking their assistance with

the charge pending against him.

29.     Harrington, Rico and Condon traveled to Santa Rosa, California to intercede on

Barboza's behalf with local authorities responsible for his prosecution.  As a

result of their efforts, Barboza was permitted to plead guilty to second-degree

murder and was sentenced to five years imprisonment.

30.     Harrington subsequently appeared on Barboza's behalf in connection with parole

proceedings, with the result that Barboza was released from prison after serving

less than three years of his sentence.

31.     The actions taken by Harrington, Rico and Condon on behalf of Barboza in

connection with the Wilson murder were for the purpose of continuing to

purchase his silence in connection with his false testimony in the Deegan murder

trial and in order to keep Limone and Tameleo wrongfully incarcerated for

Deegan's murder.

32.     Following Barboza's recantation of his trial testimony, Attorney F. Lee Bailey

sought to have him examined by a polygraph expert for assistance in determining

whether his trial testimony or his recantation was true.  One or more Federal

Agents urged the responsible officials to refuse permission for the polygraph test,

for the improper purpose of covering up Barboza's perjury at trial and keeping Limone and Tameleo in prison, despite their innocence.

33. Following Barboza's recantation statements to Southwood, Southwood reported the statements to Suffolk District Attorney Garret Byrne, who repeated the information to Jack Zalkind, an assistant district attorney responsible for the case. Zalkind, acting in an investigatory capacity, then spoke with Southwood, who repeated Barboza's intention to recant his testimony to Zalkind. Shortly thereafter, Barboza telephoned Southwood and stated he would deny having made the recantation statements to him.

34. In 1982, with the support of the Deegan family, who believed in his innocence, Peter Limone filed a petition for commutation with Massachusetts authorities. Federal agents continued to withhold information from their files that would have established that Limone was innocent.

35. Morris and Connolly attempted to discourage members of the Massachusetts Advisory Board of Pardons ("Board") from recommending commutation for Limone by various means including, but not limited to, communicating directly with members of the Board and providing, directly and/or through then United States Attorney William Weld, false information concerning Limone to members of the Board and other Massachusetts officials.

36. On August 1, 1983, the Advisory Board of Pardons voted 5 votes to 2 to recommend commutation of Limone's sentence. FBI agents including, but not limited to, Morris and Connolly attempted to discourage then-Governor Michael Dukakis from granting commutation for Limone by various means including, but

not limited to, providing false information concerning Limone to the office of the Governor.  On September 20, 1983, Governor Dukakis denied the petition for commutation.

37.    FBI agents including, but not limited to, Morris and Connolly, caused state law enforcement officials and agents to investigate members of the Advisory Board of Pardons who had voted in favor of commutation to determine if they had relationships with "organized crime," with the intent to discourage members of the Board from supporting any future petitions for commutation by Limone. There was no basis in fact for such investigations.

38.    On December 21, 1987, the Massachusetts Advisory Board of Pardons unanimously denied a hearing on a subsequent petition for commutation by Limone.  FBI agents had caused false information concerning Limone to be transmitted to the Board through then United States Attorney Frank McNamara, Assistant United States Attorney Jeremiah O'Sullivan, Suffolk County District Attorney Newman Flanagan, Massachusetts Attorney General James Shannon and the Massachusetts Director of Public Safety William McCabe.

39.    In February 2002, Harrington testified before the House Government Reform Committee.  Despite the earlier disclosure of FBI memoranda described in paragraphs 10, 11, 12, 14 and 15 herein, Harrington suggested that Barboza had testified truthfully in the Deegan murder trial.  Harrington further suggested in his testimony that Limone and Tameleo were involved in the Deegan murder. Harrington gave said testimony for the purpose of continuing to cover up the

wrongdoing of federal agents and employees in conspiring to wrongfully convict Limone and Tameleo of the Deegan murder.

40. At all times material to this Complaint, FBI supervisors and special agents were required to act in accordance with mandatory, internal directives and operating procedures. Said directives and procedures were contained in the following Bureau manuals: (i) the Manual of Rules and Regulations ("MRR"); (ii) the Manual of Administrative Operations and Procedures ("MAOP"); (iii) the Manual of Instructions ("MOI"); and (iv) the Manual of Investigative Operations and Guidelines ("MIOG"). The MRR was replaced by the MAOP in 1978. The MOI was replaced by the MIOG in 1977.

41. The conduct of the individual FBI agents, as described herein, violated federal laws and Bureau directives and operating procedures.

42. The United States and FBI supervisors knew, or reasonably should have known, that the FBI agents were engaged in conduct that violated federal law and Bureau directives and operating procedures.

43. Despite the FBI agents' violations of federal law and Bureau directives and operating procedures, the United States and FBI supervisors failed to discipline and/or terminate the FBI agents. At best, the FBI agents were not disciplined, and at worst, they were rewarded, by the United States and FBI supervisors for their misconduct. (*See* House Committee on Government Reform, Everything Secret Degenerates:  The FBI's Use of Murderers as Informants ("Committee Report"), pp.5, 24, 25, 39, and 40 (Nov. 20, 2003).

44. As early as 1973, and continuing for all times material hereto, FBI supervisors were required to take "appropriate disciplinary action including possible dismissal" against employees who failed to "[c]onduct themselves in a manner that creates and maintains respect for the Department of Justice and the U.S. Government . . .," or took "any action which might [have] result[ed] in, or create[d] the appearance of . . . (c) Impeding Government efficiency or economy[,] (d) Losing complete independence or impartiality . . . [or] (f) Affecting adversely the confidence of the public in the integrity of the Government." MRR, Part I, § 1. LIM007-1476 and LIM007-1617.

45. As early as 1963, and continuing for all times material hereto, it was mandatory that FBI supervisors "report immediately any improper conduct of employees in their territory." MRR, Part I, § 1(A)(1). LIM007-1501.

46. As early as 1963, and continuing for all times material hereto, FBI supervisors were required to "report immediately neglect of duty or any conduct prejudicial to the best interests of the Bureau, or any matter which may result in embarrassment to the Bureau." MRR, Part I, § 1(A)(2). LIM007-1501.

47. As early as 1973, and continuing thereafter for all times material hereto, it was mandatory FBI policy that "employees will obey not only the letter of the law but the spirit of the law as well whether they be engaged in activities of a personal or official nature." MRR, Part I, § 1(A)(3). LIM007-1478. *See also* MAOP, Part I, § 1-4(1). LIM007-1648.

48. As early as 1973, and continuing thereafter for all times material hereto, it was mandatory FBI policy that "employees must at all times zealously guard and

defend the rights and liberties guaranteed to all individuals by the Constitution." MRR, Part I, § 1(A)(3).  LIM007-1478.  *See also* MAOP, Part I, § 1-4(2). LIM007-1648.[1]

49.    As early as 1963, and continuing for all times material hereto, FBI supervisors were required to take "drastic disciplinary action including possible dismissal" against employees who became "involved in personal misconduct which would reflect unfavorably upon the Bureau."  MRR, Part I, § 1(B)(3).  LIM007-1501.

50.    As early as 1966, and continuing thereafter for all times material hereto, it was mandatory FBI policy that employees "conduct themselves in a manner that creates and maintains respect for the Department of Justice and the U.S. Government."  MRR, Part I, § 1(D)(17)(a)(1).  LIM007-1520.

51.    As early as 1966, and continuing thereafter for all times material hereto, it was mandatory FBI policy that "no employee shall engage in criminal, infamous, dishonest, immoral, or notoriously disgraceful conduct or other conduct prejudicial to the Government."  MRR, Part I, § 1(D)(18).  LIM007-1521.  *See also* MAOP, Part I, § 1-2.  LIM007-1656.[2]

---

[1] This directive was continued in the MAOP, Part I, § 1-4(2), when it was first published in 1978, and was later revised to read as follows:

> . . . under no circumstances shall employees of the FBI engage in any conduct which may result in defaming the character, reputation, integrity, or dignity of any citizen or organization of citizens of the United States.

(*See* MAOP revision dated 05/15/80.  This directive was continued in the MAOP at least through February 10, 1998.

[2] On March 27, 1973, this directive was moved and revised to read, as follows:

> § I(1)(A)(1):   Employees . . . must not, at any time, engage in criminal, dishonest, immoral or disgraceful conduct or other conduct

52.     As early as 1969, and continuing thereafter for all times material hereto, it was

mandatory FBI policy that "any information pertaining to allegations of

misconduct or improper performance of duty coming to the attention of any

Bureau employee be promptly and fully reported to the Bureau, and it is the

continuing responsibility of Bureau Officials to see to it that the employees under

their supervision are properly indoctrinated regarding this requirement so that

they not only will fully understand it but will comply with it."  MRR, Part I, §

(9)(A).  LIM007-1553.  *See also* MAOP, Part I, § 13-1.  LIM008-0146.

53.     As early as 1969, and continuing thereafter for all times material hereto, it was

mandatory FBI policy that there "be no delay in notifying the Bureau concerning

any allegations of either misconduct or improper performance of duty on the part

of Bureau personnel."  MRR, Part I, § (9)(B).  LIM007-1553.

54.     As early as 1969, and continuing for all times material hereto, FBI supervisors

were required to conduct "[i]nterviews of employees involved in allegations of

misconduct or improper performance of duty . . . at the earliest logical time and in

a forthright manner."  MRR, Part I, § (9)(D).  LIM007-1553.

55.     As early as 1977, and continuing for all times material hereto, FBI supervisors

were required to impose the following disciplinary sanctions on employees who

committed the listed offenses:

> "3.  Work deficiencies and/or inattention to duty.
>
> First Offense:  Oral reprimand to removal

---

prejudicial to the Government…
LIM007-1574.

This directive was continued in the MAOP, Part I, § 1-2, when it was first published in
1978.

> Second Offense:  5-day suspension to removal
> Third Offense:  15-day suspension to removal"

"9.  Criminal, dishonest, immoral, infamous or notoriously
     disgraceful conduct."

> "First Offense:  Oral reprimand to removal
> Second Offense:  5-day suspension to removal
> Third Offense:  30-day suspension to removal"

MAOP, Part I, § 13-12.  LIM008-0154 - LIM008-0155.

56.   As early as 1989, and continuing thereafter for all times material hereto, it was

mandatory FBI policy that "employees shall endeavor to avoid any actions

creating the appearance that they are violating the law or the ethical standards

promulgated pursuant to this order."  MAOP, Part I, § 1(5)(n).

57.   As early as 1977, and continuing to at least 1989, it was mandatory FBI policy

that "while it is proper for the FBI to use informants in appropriate investigations,

it is imperative that special care be taken not only to minimize their use but also to

ensure that individual rights are not infringed and that the government itself does

not become a violator of the law."  MOI, § 108(IV).  LIM007-1256.[3]

58.   As early as 1977, and continuing thereafter for all times material hereto, it was

mandatory FBI policy that "[u]nder no circumstances shall the FBI take any

---

[3] This directive was added to the MOI in a revision dated January 12, 1977.  It is unclear
whether the directive was included in the MIOG when it was published in 1977,
however, the directive is found in the MIOG as early as January 12, 1981 at § 137-
17(A)(1).  It was moved to § 137-16 (A)(1) in a revision dated March 28, 1984, where
it remained as late as May 26, 1989.

action to conceal a crime by one of its informants."  MOI, § 108(IV)(C)(1).

LIM007-1257.  MIOG, § 137-13(1)(C)(1).  LIM001-0371.[4]

59.     As early as 1963, and continuing to at least 1976, it was mandatory FBI policy

that "Agents cannot promise any immunity or any reduction in sentence to a

criminal who furnishes information and they must not put themselves in a position

where they might subsequently be accused of having done so."  MOI, §

108(D)(4).  LIM007-1261.

60.     By virtue of the FBI's relationship to the public and the mandatory directives and

operating procedures set forth in paragraphs 40-59, the United States owed the

plaintiffs a duty of care to select, supervise and retain the FBI agents in

accordance with such directives and operating procedures.

61.     By failing to discipline and/or terminate the FBI agents for conduct which was

illegal and violated Bureau directives and operating procedures, the United States

and FBI supervisors violated the mandatory, internal FBI directives and operating

procedures set forth above in paragraphs 40-59, and breached the duty of care the

United States owed to the plaintiffs.

62.     The conduct of the FBI agents, as described herein, was reasonably foreseeable.

63.     The United States' and FBI supervisors' repeated and knowing failure to

discipline or otherwise dissuade in any way the FBI agents' unlawful and

violative conduct, their practice of rewarding the FBI agents for such conduct, and

---

[4] In the MIOG, the successor to the MOI, this directive was moved over the years, but was never deleted or revised in any material way.  In a revision to the MIOG dated January 12, 1981, the directive was moved to § 137-17(G)(5).  On November 20, 1990, the directive was moved to § 137-4(5).  On March 10, 1994, it was moved to § 137-5.2(3), and the word "FBI" was changed to "field office."

their failure to act in accordance with the mandatory directives and operating procedures set forth in paragraphs 40-59 directly and proximately caused the plaintiffs substantial harm.

64.     Despite the United States' and FBI supervisors' real or constructive knowledge of said conduct of the FBI agents, the FBI agents were permitted to engage in said conduct with impunity.

65.     The repeated and knowing failure of the United States and FBI supervisors to discipline or otherwise dissuade in any way the FBI agents' unlawful and violative conduct, and the practice of the United States and FBI supervisors to reward the FBI agents for such conduct, created and fostered an agency culture in which FBI agents routinely violated federal laws and Bureau directives and operating procedures for the sake of cultivating and protecting informants in the belief such acts would be condoned and justified by superiors.

66.     The United States' and FBI supervisors' conduct in this regard manifests a policy or custom of the United States, implemented by FBI supervisors, which breached the duty of care the United States owed to the plaintiffs.

67.     The actions of the United States and FBI supervisors, as described herein, were taken pursuant to said policy or custom of the United States.

68.     The existence of the policy or custom described in Paragraph 66 was known to policy-making officers and officials of the United States and the FBI  for a substantial period of time.

69.     Despite their knowledge of said policy or custom, the policy-making officers and officials of the United States and FBI failed to take steps to terminate said

practices, failed to discipline or otherwise properly supervise the FBI agents who engaged in said conduct, and instead tolerated and sanctioned the policy or custom described in Paragraph 66, directly and proximately causing the plaintiffs substantial harm.

70.    The aforesaid acts and omissions of the defendant and its agents were motivated, in part, by the intention of the defendant to discriminate against Limone and Tameleo because of their national origin, Italian-American.

71.    As a direct and proximate result of the intentional, reckless and/or negligent actions and omissions of the defendant as set forth above, the plaintiffs Peter J. Limone and plaintiffs' decedent Enrico (Henry) Tameleo were deprived of their liberty, deprived of their right to freedom of speech and to petition the government for redress of grievances, denied their rights to equal protection of the law, deprived of their liberty without procedural and substantive due process of law, denied a fair trial, subjected to cruel and unusual punishment, forced to endure emotional and physical suffering, and required to expend funds for legal defense.

72.    As a direct and proximate result of the intentional, reckless and/or negligent actions and omissions of the defendant as set forth above, plaintiffs Peter J. Limone, Olympia Limone, Peter A. Limone, Paul Limone, Carolyn Limone Zenga, Janine Limone Arria, plaintiff's decedents Jeannete Tameleo and Enrico (Henry) Tameleo and plaintiff Saverio Tameleo were deprived of the income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice of their spouses and/or fathers.

73.     As a direct and proximate result of the actions and omissions of Rico, Condon, Morris, Connolly, Handley and Harrington, as set forth above, plaintiffs were deprived of the income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel and advice of their spouses and/or fathers.

74.     As a direct and proximate result of the acts and omissions of Rico, Condon, Morris, Connolly, Handley and Harrington, plaintiffs Peter J. Limone, Olympia Limone and plaintiffs decedents Jeannete Tameleo and Enrico (Henry) Tameleo suffered the loss of the companionship, affection and sexual enjoyment of their spouse.

75.     Plaintiffs Peter A. Limone, Paul Limone, Carolyn Limone Zenga and Janine Limone Arria were all minors at the time of their father's incarceration and during his imprisonment and they were dependant upon their father.

76.     The defendant is liable to the plaintiffs for injuries and damages resulting from the fact that Rico, Condon, Morris, Connolly, Handley and Harrington by their acts and omissions alleged herein caused the plaintiffs to suffer loss of consortium.

77.     The defendant is liable to the plaintiffs for injuries and damages resulting from Rico's, Condon's, Morris', Connolly's, Handley's and Harrington's institution and maintenance of criminal proceedings against Limone and Tameleo with malice and without probable cause.  Said proceedings terminated in favor of Limone and constructively in favor of Tameleo.

78. The defendant is liable to the plaintiffs for injuries and damages resulting from the fact that Rico, Condon, Morris, Connolly, Handley and Harrington combined and conspired together, and with others unnamed, to employ illegal means for an illegal purpose, namely to wrongfully imprison, convict and maintain incarcerated Limone and Tameleo, and to cover up and keep secret their wrongful acts.

79. The defendant is liable to the plaintiffs for injuries and damages resulting from the fact that Rico, Condon, Morris, Connolly, Handley and Harrington by their acts and omissions alleged herein intentionally inflicted emotional distress upon the plaintiffs.

### Cause of Action Against the United States
### Under the Federal Torts Claims Act

80. Paragraphs 1 through 79 are incorporated herein by reference as though fully set forth.

81. At all times material to this complaint, Rico, Condon, Morris, Connolly, Handley, Harrington and the other agents and employees of the Department of Justice and the FBI referred to herein, were acting within the scope of their employment.

82. The defendant is liable to the plaintiffs for injuries and damages resulting from the acts and omissions of its agents and employees, including Rico, Condon, Morris, Connolly, Handley and Harrington and other unnamed agents and employees.

83. The United States, if a private person, would be liable to the plaintiffs for the acts and omissions of its employees and agents described herein under the law of the place where said acts and omissions occurred, to wit, under common law tort claims for: 1) malicious prosecution; 2) intentional infliction of emotional

distress; 3) negligent selection, supervision and retention of agents and employees, including informants; 4) common law conspiracy; and 5) loss of consortium.

84.     The plaintiffs submitted an Administrative Claim to the Federal Bureau of Investigation and to the United States Department of Justice on or about July 24, 2001.

85.     The said agencies have failed to make a final disposition of the claims within six months after they were filed and the claimants have elected to deem them denied.

86.     Following the filing of the proper certificate, the Court substituted the United States as the proper defendant in this matter with regard to Condon, Rico and Handley.  *See* Docket No. 130, Order of Court dated 2/10/2003.


[CONTINUED ON NEXT PAGE]

**WHEREFORE**, plaintiffs request that this Court:

1)      Award compensatory damages to plaintiffs against the defendant;

2)      Award costs and attorney's fees to plaintiffs;

3)      Award such other and further relief as this court may deem appropriate.


Respectfully submitted,

**PETER J. LIMONE, OLYMPIA LIMONE, PETER A. LIMONE, PAUL LIMONE, CAROLYN LIMONE ZENGA, JANINE LIMONE ARRIA, SAVERIO TAMELEO individually and as the ADMINISTRATOR OF THE ESTATE OF ENRICO (HENRY) TAMELEO and as the ADMINISTRATOR OF THE ESTATE OF JEANNETE TAMELEO,**
By their attorneys,

 /s/ Christine M. Griffin
Juliane Balliro (BBO # 028010)
Christine M. Griffin (BBO # 651401)
Wolf, Block, Schorr and Solis-Cohen LLP
One Boston Place
Boston, MA 02108
617-226-4000

William T. Koski (BBO # 277820)
KOSKI & KEARNS LLP
One Bowdoin Square, Suite 300
Boston, MA 02114
617-973-4525

Michael Avery (BBO # 024500)
Suffolk University Law School
120 Tremont Street
Boston, MA 02108
617-573-8551

Dated: August 29, 2006

## <u>CERTIFICATE OF SERVICE</u>

I, Christine M. Griffin, hereby certify that it is my understanding that the foregoing document will be served on all counsel of record via email through the Court's ECF filing system upon the electronic filing of this document with the Court on this the 29th day of August, 2006.

/s/ Christine M. Griffin_____
Christine M. Griffin
