# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PETER J. LIMONE, et al.,       ) | |
|     Plaintiffs,           ) | |
|                  ) | |
|    v.                ) | Civil Action No. 02cv10890-NG |
|                  ) | |
| UNITED STATES OF AMERICA, et al., ) | |
|     Defendants.       ) | |

GERTNER, D.J.

## TABLE OF CONTENTS

**MEMORANDUM AND ORDER RE: PLAINTIFFS' MOTION FOR
RECOVERY OF REASONABLE COSTS AND FEES
August 12, 2011**

**I.  STATUTORY FRAMEWORK** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **-6-**
      **A.  The EAJA and the FTCA** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **-6-**
      **B.  Relationship Between the EAJA and Sanctions under the Federal
           Rules** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **-8-**
      **C.  Relationship Between § 2678 and § 2412** . . . . . . . . . . . . . . . . . . . . **-10-**

**II.  APPLICATION TO THE FACTS AT BAR** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **-11-**
      **A.  The Discovery Record** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **-11-**
           **1.  2004-2005** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **-12-**
           **2.  2006** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **-13-**
           **3.  Trial Counsel Had No Access to the Unredacted
              Documents** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **-19-**

**III.  ATTORNEYS' FEES COMPUTATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **-22-**
      **A.  Lodestar** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **-23-**
      **B.  Costs** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **-23-**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **PETER J. LIMONE, et al.,** ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 02cv10890-NG** |
| ) | |
| **UNITED STATES OF AMERICA, et al.,** ) | |
| **Defendants.** ) | |

**GERTNER, D.J.**

**MEMORANDUM AND ORDER RE: PLAINTIFFS' MOTION FOR**
**RECOVERY OF REASONABLE COSTS AND FEES**
August 12, 2011

This is the last motion that I must resolve in connection with this Federal Tort Claims Act

("FTCA") case against the United States Government. In this lawsuit, Peter Limone

("Limone"), Enrico "Henry" Tameleo ("Tameleo"), Louis Greco ("Greco"), and Joseph Salvati

("Salvati"), claimed that thirty-nine years ago they were convicted of a crime which they did not

commit -- the murder of Edward "Teddy" Deegan ("Deegan"). Limone, Tameleo, and Greco

were sentenced to die in the electric chair, a sentence reduced to life imprisonment when the

Massachusetts death penalty was vacated. Salvati was also sentenced to life imprisonment.

They accused the United States, specifically, the Federal Bureau of Investigation ("FBI"), of

framing them for Deegan's murder by failing to disclose exculpatory documents and information,

and then, by covering up FBI misconduct, ensuring their imprisonment over the next three

decades. They brought this lawsuit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §

2671, et seq., on a number of grounds.

A lengthy memorandum and order was issued in July of 2007 awarding the plaintiffs

judgment in the amount of $101,750,000.00, which the government appealed. <u>Limone v. United</u>

<u>States</u>, 497 F. Supp. 2d 143 (D. Mass. 2007). The First Circuit affirmed, in part. <u>Limone v. United States</u>, 579 F.3d 79 (1st Cir. 2009).

Within the appropriate period under the rules, Plaintiffs filed a motion seeking attorneys' fees and expenses pursuant to 28 U.S.C. § 2412(b) deriving from their contention that the United States acted in bad faith in the conduct of this litigation. The government opposed, arguing that there was no bad faith and, in any event, if the Court so found, it should award only fees and costs traceable to that conduct.

I find that there was bad faith conduct, but not with respect to the government's conduct in toto. While I emphatically rejected the government's substantive positions -- certain of the defenses it interposed I labeled "absurd" -- in the light of the First Circuit's decision, I cannot find them to have been asserted in bad faith. After all, while the First Circuit Court affirmed this Court's finding of intentional infliction of emotional distress, and the damage award, it agreed with the government with respect to plaintiffs' claim of malicious prosecution. It concluded that the FBI was not responsible for the state murder prosecution that victimized these plaintiffs; that prosecution was attributable to decisions of the state authorities.[1]

---

[1] On the subject of the relationship between the FBI and the state Deegan murder trial, I found:

> The FBI, and not the state, developed Barboza as a witness, knowing that his false testimony would be used to prosecute the plaintiffs for a crime they did not commit. They, and not the state, kept their conduct from being discovered by failing to disclose exculpatory evidence, before, during, and after the trial. They, and not the state, vouched for Barboza to law enforcement and to the very jury hearing the murder case, even when all the information they had flatly contradicted his account.

<u>Limone v. United States</u>, 497 F. Supp. 2d at 154.

And later:

> The state investigation of the Deegan case had stalled. Without Barboza there was no case. Without the FBI there was no Barboza. While the state authorities

Nevertheless, there was a pattern of bad faith conduct that the First Circuit has not addressed, with which this Court was intimately familiar -- that is, the government's conduct in connection with discovery.

This was a document case from start to finish; many of the witnesses were dead or ailing. The plaintiffs' case had to be painstakingly pieced together through materials that were not publicly available. Indeed, secrecy -- and secrecy gone awry -- was central to the litigation. Documents concerning the "Top Echelon Criminal Informant Program" and the abuses committed in its name, including those that were the subject of this lawsuit, had been purposefully withheld, not only from state law enforcement, but from other divisions within the FBI. The program did not become known to the Department of Justice until 1995, during

---

> could corroborate information about the murder -- how it happened, where and when -- Barboza's testimony was the only link to the plaintiffs. And his testimony about the plaintiffs could not be corroborated because it was false. Only the FBI had the means to prove Barboza's falsity, and they were not talking. Even when Barboza testified that 'the FBI never promised [him] anything,' they stood mute.
>
> The FBI's role at trial went far beyond the failure to share evidence in their files. They were a formidable presence through the trial both directly and indirectly. They cultivated, debriefed and prepared Barboza. They corrected his testimony only when it was inconsistent with reports the defense was likely to have or when it made him vulnerable on cross-examination. Condon even testified on Barboza's behalf attesting to the "purity" of Barboza's false testimony. They conferred with and controlled major prosecution witnesses before they testified (Anthony Stathopoulos and John Fitzgerald). They advised Suffolk County Assistant District Attorney ("ADA") Jack Zalkind ("Zalkind") and his staff behind the scenes.

Limone v. United States, 497 F. Supp. 2d at 158-59.

Indeed, the FBI in its public statements admitted responsibility for the state prosecution. The "successful prosecution" of the local murder case was a "direct result" of their "noteworthy development of a pertinent witness." Limone v. United States, 497 F. Supp. 2d at 206.

True, as the First Circuit found, the FBI did not focus on the Deegan murder, and did not suggest to Barboza whom he should frame. But that hardly relieved the FBI of responsibility. Their informants were among Deegan's murderers. Limone, 497 F. Supp. 2d at 163. The reason for their silence was that they did not want the truth to become known and wreck their investigation.

extraordinary proceedings before Judge Mark Wolf in <u>United States v. Salemme</u>. <u>United States v. Salemme</u>, 91 F. Supp. 2d 141 (D. Mass. 1999); <u>Limone v. United States</u>, 497 F. Supp. 2d at 153. The record revealed FBI agents "hiding the ball," not disclosing critical exculpatory information in the Deegan murder case for nearly forty years, information that would have exonerated the plaintiffs. As I noted in my decision:

> ...[T]hat policy [the nondisclosure policy] continued to the present, and affected the very trial of this case. The attorneys representing the government were not permitted access to unredacted documents even though they were obliged to certify that all relevant information had been turned over under Rule 26, Fed. R. Civ. Pro. That charade ended when I ordered that lawyers with an appearance in this case had to have access to all of the information in unredacted form.

<u>Limone v. United States</u>, 497 F. Supp. 2d at 161.

The problem with the government's conduct went beyond mere delay. The government blocked access to the relevant documents -- hiding behind specious procedural arguments, baseless motions to stay and "emergency" motions to defer production, culminating in a frivolous interlocutory appeal. While the government may have had a legitimate concern about protecting informant identities -- what they insisted was their core concern -- that protection was hardly absolute and unreviewable. <u>Roviaro v. United States</u>, 353 U.S. 53 (1957) the seminal case on the disclosure of informant identities contemplates a balance between the public interest in protecting the flow of information on the one hand, and an individual's right to prepare his or her case, on the other, a balance which a judicial officer is to strike based on the facts before her. Until pushed by myriad orders of the Court, the defendants prevented the Court from making a considered decision. They would not disclose -- even in camera -- until ordered to do so, why, for example, a deceased informant's forty year old information deserved protection. They

constantly refused to disclose the facts on which these claims of privilege were based. They would have this Court, the parties, the lawyers, the public, simply trust that they had previewed the documents in good faith, and redacted information they simply *had* to protect.

When, at long last, the Court was on the verge of awarding sanctions against the defendants, there was an extraordinary admission. The lawyers representing the government, who had signed the pleadings during the two years of discovery, who were familiar with the plaintiffs' allegations, and who were subject to the discipline of this court, including the disciplinary provisions of Rule 11 and Rule 26(g) Fed. R. Civ. Pro. -- had not been given access to the discovery in its unredacted form at all. <u>See</u> Order to Show Cause, December 12, 2006 (document #494). While Rule 26(g), Fed. R. Civ. Pro., requires that every disclosure be signed by "at least one attorney of record" who is supposed to make a "reasonable inquiry" that the "disclosure is complete and correct as of the time it is made," trial counsel was in no position to make these representations. Only the general counsel of the FBI was able to decide what should or should not be redacted because only she (and presumably her agents at the FBI) was authorized to see them. But the FBI's general counsel refused to enter an appearance in the case. She would not come to court to justify the redaction decisions that had been made, in effect to demonstrate her good faith. Put simply, the lawyer in front of me lacked the authority to see the unredacted documents, and the lawyer who had that authority was not in front of me!

On December 12, 2006, over two years from the first discovery motion, I ordered that the matter be brought to the personal attention of the Director of the FBI, to "answer the Court's concern that counsel be given the tools they need to defend these charges, namely access, as

officers of the Court, to the documents relevant to the case at bar." <u>See</u> Order to Show Cause. And with that Order, the logjam was broken.

Notwithstanding my findings of bad faith, however, I was not able to order an amount of attorneys fees on the initial attorneys' fees record in front of me.  The records that the plaintiffs provided, while complete and voluminous, did not lend themselves to easily identifying which conduct was attributable to the bad faith discovery abuses that I found.  Accordingly, I issued this opinion in draft form, and ordered supplemental briefing on the question of which fees were attributable to the bad faith abuses.[2]  That briefing is now complete.  This memorandum first describes the statutory framework that applies to the claims and its application to the case at bar, then the facts and the remedy.

## I.      STATUTORY FRAMEWORK

### A.      The EAJA and the FTCA

Congress passed the Equal Access to Justice Act ("EAJA") to make certain that "private parties will not be deterred from seeking review of, or defending against, unjustified governmental action because of the expense involved in securing vindication of their rights.". <u>Maritime Mgmt., Inc. v. United States</u>, 242 F.3d 1326, 1331 (11th Cir. 2001) (<i>quoting</i> H.R. Rep. No. 99-0120, at 4 (1985)).  The statute allows a court to award attorneys' fees to parties that prevail in civil litigation against the government when either 1) the common law or 2) a statute authorizes such fees.  28 U.S.C. § 2412(b).  Courts have recognized certain common law exceptions to the "American Rule," the rule that each party bears his own fees: the exceptions are "common fund," "common benefit," "willful disobedience of a court order," and "bad faith."

---

[2] The Government requested an opportunity to supplement their briefing to determine "whether plaintiffs' submissions are attributable to any bad faith conduct," should the Court find bad faith, as I have.

Chambers v. NASCO, Inc., 501 U.S. 32, 45 (1991); Maritime, 242 F.3d at 1331; Lucarelli v. United States, 943 F. Supp. 157, 158 (D.P.R. 1996).  Specifically, the EAJA, 28 U.S.C. § 2412(b)  provides:

> Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys, in addition to the costs, which may be awarded pursuant to subsection (a), to the prevailing party in any civil action brought by or against the United States, or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. *The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award.*

(Italics supplied.)

The EAJA has two attorneys' fees provisions: § 2412(d), under which an award of attorneys' fees is mandatory in certain cases when the government's position was not "substantially justified;" and § 2412(b), under which an award of attorneys fees is permitted  when authorized by another statute or by the common law.

Since the former, § 2412(d), expressly excludes "cases sounding in tort,"[3] plaintiffs rely on § 2412(b) and allege bad faith.  In Chambers, the Court noted that fees may be awarded when the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  501 U.S. at 33.  A finding of subjective bad faith is not necessary so long as the moving party can demonstrate that the losing party's actions were in fact objectively "frivolous, unreasonable, or without foundation," Local 285, Serv. Emp. Int'l Union, AFL-CIO v. Nonotuck, 64 F.3d 735, 737 (1st Cir. 1995) (quoting Washington Hosp. Ctr. v. Serv. Emp. Int'l Union, 746 F.2d 1503,

---

[3] The plaintiffs' claim that § 2412(d)'s preclusion of fees in cases "sounding in tort" does not apply to *constitutional* torts  is irrelevant here.  A suit under the FTCA is clearly not a constitutional tort.

1510 (D.C. Cir. 1984)).  While the First Circuit broadly noted that this power should be used

"sparingly" and should be reserved for "egregious circumstances" Jones v. Winnepesaukee

Realty, 990 F.2d 1, 4 (1st Cir. 1993),[4] that characterization is misleading.  In the same case, the

Court held that egregious conduct could include  a "litigants' repeated efforts to stall a case,

harass other participants, and frustrate the operation of the justice system."  Jones, 990 F.2d at 5.

Thus, bad faith conduct, so defined, includes a wide variety of actions that led to the lawsuit as

well as actions during litigation.  Roadway Express, Inc. v. Piper, 447 U.S. 752, 765-66 (1980).

And as to all such actions, the plaintiffs bear the burden of showing bad faith.  United States v.

Ford, 797 F.2d 1506, 1509 (1984).

### B.  Relationship Between the EAJA and Sanctions under the Federal Rules

A court also has the inherent power to award fees for bad faith despite the fact that the

conduct identified -- like discovery abuse -- might also have warranted sanctions under some

other provision of the law.  In Chambers for example the Supreme Court concluded:

> There is, therefore, nothing in the other sanction mechanisms or
> prior cases interpreting them that warrants a conclusion that a
> federal court may not, as a matter of law, resort to its inherent
> power to impose attorney's fees as a sanction for bad-faith conduct.
> This is plainly the case where the conduct at issue is not covered
> by one of the other sanctioning provisions. But neither is a federal
> court forbidden to sanction bad-faith conduct by means of the
> inherent power simply because that conduct could also be
> sanctioned under the statute or the Rules.

501 U.S. at 50. See also, United States v. Horn, 29 F.3d 754, 760 (1st Cir. 1994)(". . . even

though a particular abuse is covered by a specific statute or rule, a court may still invoke its

---

[4] As the government notes, the Second Circuit applies a more restrictive test for bad faith: the litigant's claim or defense must be *both* "(1) meritless; and (2) brought for improper purposes such as harassment or delay." Kerin v. United States Postal Serv., 218 F.3d 185, 190 (2d Cir. 2000).  The First Circuit law, as described above,  is otherwise.

supervisory power to address the abuse if the existing remedial provision is inadequate to the task.").

To be sure, as the Court noted in <u>Chambers</u>, where the bad faith conduct can be adequately sanctioned under the rules, that is the preferable course. 501 U.S. at 50. But where, as here, the conduct is beyond the reach of the rules and is "intertwined within conduct that only the inherent power could address," <u>Id.</u> at 51, I may use the fee shifting provision of the EAJA to address it. As described below, the civil rules were not adequate here to sanction the government. The government represented that dire consequences would attend the disclosure of forty year-old information and -- until ordered to do so -- would not explain why. While the Court used every procedural device in its arsenal, the government still stalled this case for years, up until the very eve of trial.

The principle sanctioning tool that the Court had, Rule 11, and even Rule 26(g) (which is addressed to discovery abuses) was inadequate. Trial counsel for the FBI was not given the authority to look at the unredacted documents; they were, in effect, classified not only as to the plaintiffs but also *to the entire government trial team*. Only her client, the FBI, had access. Trial counsel's representations to this Court, implying that everything had been turned over that was appropriate for disclosure, that redactions had been made in good faith, were without basis. She was simply parroting the representations of the FBI -- a defendant in this case, who - ironically -- were being sued for withholding exculpatory information. Crucial decisions in the litigation -- what to produce or not produce, what to redact or not redact -- were made by the very party whose failure to turn over critical, exculpatory, documents over forty years ago led to this lawsuit. The charade finally ended on December 12, 2006, during the trial when the Court

entered an Order to Show Cause to insure that the issue of access be brought to the personal attention of the Director of the FBI.  See Order To Show Cause.

### C.    Relationship Between § 2678 and § 2412

The FTCA's provision for attorneys' fees, 28 U.S.C. § 2678, provides that "[n]o attorney shall charge, demand, receive, or collect for services rendered, fees in excess of 25 percentum" of any FTCA judgment.  The government argues that this provision precludes a separate fee award, apart from a 25% contingency agreement,  "under almost all circumstances." Additionally, the government points to that provision of the EAJA providing for mandatory attorney's fees when the government's position is not "substantially justified," and argues that it specifically excludes tort cases, like the case at bar.  28 U.S.C. § 2412(d)(1)(A).  As a result, the government argues, Congress must have intended that the government generally not be held liable for attorney's fees over and above their 25% share of the recovery.

In Lucarelli, the district court rejected this position, explaining that the 25 % provision was meant to protect clients, not the government.  943 F. Supp. at 157.  Nor does the tort exception to mandatory fees under § 2412(d) apply to permissive fees under § 2412(b):

> The FTCA does not provide for awarding attorney's fees to a
> prevailing party. Section 2678 merely limits the amount an
> attorney may charge a client to 25 percent of a court settlement or
> judgment.. . .
>
> EAJA contains two provisions for awarding attorney's fees, §
> 2412(b) and § 2412(d)(1)(A).  Section 2412(b) is permissive . . . .
> Section 2412(d)(1)(A), on the other hand, is mandatory . . . .
> Although some courts, without discussing 2412(b), have denied
> attorney's fees based on the reasoning that 2412(d)(1)(A) precludes
> such an award in tort cases, see In re Turner, 14 F.3d 637, 640
> (D.C. Cir. 1994); Campbell [v. United States], 835 F.2d [193,] 196
> [(9th Cir. 1987)], we agree with the Eastern District of
> Pennsylvania that by the terms of § 2412, the tort exception applies

only to the mandatory award of attorney's fees. <u>Keller v. Dalton</u>,
No. CIV. A. 95- CV-712, 1995 WL 552978 at *2 (E.D. Pa. Sept.
18, 1995). Section 2412(b), in contrast, contains no such
exception. Consequently, this case falls under 2412(b) . . . .
[U]nder 2412(b), the United States may be held liable for
attorney's fees to the same extent that private parties would be
under the common law or the terms of a statute providing for such
fees.

<u>Lucarelli</u>, 943 F. Supp. at 158; <u>see also</u> <u>Bergman v. United States</u>, 844 F.2d 353, 355 (2d Cir.

1988) (reaching the same conclusion); <u>Havrum v. United States</u>, 204 F.3d 815, 819 (8th Cir.

2000) ("We have held that where the government has acted in bad faith it may be required to pay

attorney's fees under § 2412(b), and we assume, without deciding, that such awards are available

in FTCA actions." (citations omitted)).

I agree with the reasoning in <u>Lucarelli</u>.  I hold the FTCA's 25% provision does not limit

the award of attorneys' fees (apart from any contingency fee agreement) where those fees can be

traced to the parties' bad faith conduct.

## II.    APPLICATION TO THE FACTS AT BAR

### A.    The Discovery Record

The case law appropriately requires a detailed explanation of the bad faith conduct

supporting an award of attorney's fees, <u>Mullane v. Chambers</u>, 333 F.3d 322, 338 (1st Cir. 2003),

which follows here:

Document production was entirely controlled by the FBI.  The FBI denied plaintiffs

access to the unredacted versions of the documents, notwithstanding the myriad orders of this

Court.  Discovery abuses included the repeated defiance of court orders to produce, the repeated

filing of meritless motions to stay or reconsider discovery orders and last, but not least,  the

redaction of discovery materials without a review by the attorney who signed the pleadings, the attorney who had entered an appearance in the case.

### 1.    2004-2005

In 2004, plaintiffs moved for the production of documents that were plainly relevant to the case. The government's response initially was entirely appropriate. Pls.' Mot. (document #235). It sought a protective order because the material involved sensitive information on confidential informants and third parties not involved in the litigation. Pls.' Mem. in Supp. of Mot. (document #236 at 2). In November 2004, the Court immediately granted the Government's motion insofar as it set up a procedure for claiming privilege, for objecting to the claim of privilege and for enabling the parties to litigate the issue before the Court. The problem was that the government never followed its own order.

Following the November 2004 order, the government sent the plaintiffs carton loads of documents. The documents were effectively incomprehensible. They were heavily redacted. Some had nothing more than a heading; sometimes the same document was reproduced elsewhere with different redactions. It was accompanied by a barely readily log which identified the category to which the redaction belonged -- informant privilege, etc. -- *but not the facts on which the redaction was based.*

The plaintiffs moved to compel production of the unredacted material, the first of many such motions.[5] The government opposed on entirely procedural grounds -- the plaintiffs had not

---

[5] The plaintiffs indicated their concern about whether the Government was acting in good faith:

> The plaintiffs contend that, in many instances, the United States is using its claims of privilege as a shield against appropriate discovery, rather than to protect material that is actually privileged. First, the United States has failed to specifically or properly assert the privileges on which it purportedly relies.

followed the rules, did not confer in advance, filed the request late, etc. They did not address the merits of the request at all. See e.g., Defs.' Opp'n to Pls.' Joint Mot. to Compel Prod. of Doc. (document #284); Defs.' Opp'n to Pls.' Second Joint Mot. to Compel Prod. of Doc. (document #293); Defs.' Opp'n to Pls.' Third Joint Mot. to Compel Prod. of Doc. (document #324).

To be sure, the Government had a right to rely on the procedural rules, to complain about the failure to confer, or about untimely objections to their submissions – as any party was entitled to do. But they were hardly without fault. They had turned over 40,000 documents in a form that, from the perspective of the parties, was impossible to understand and, from the perspective of the Court, impossible to use for the purpose of coming to reasoned judgments about what should or should not be protected. As described below, they continued to certify that the documents redacted or withheld were privileged (informant's privilege) without doing what parties in discovery are supposed to do – provide the Court with information as to how those privileges applied to the materials that were provided. It was no surprise that it took months for the plaintiffs to unscramble the documents they had been sent – to the extent they were able to do so. (Nor was it any surprise that the plaintiffs required numbers of lawyers and paralegals to staff the case – as their application for attorneys' fees reflects.)

The government claims in its opposition to plaintiffs' motion for fees, that it was entitled to withhold documents that were based on the informant's information. After all, it suggest this Court ultimately upheld the privilege.

---

Second, and moreover, almost all of the privileges claimed by the United States are privileges that require the Court to balance the plaintiffs' need for the redacted information against the government's claim of harm with regard to the disclosure of that information.

Mem. in Supp. of Pls.' Joint Motion to Compel Prod. of Doc. (document #278 at 4).

The claim is profoundly disingenuous. The government asserted the privilege with respect to large numbers of documents, redacted huge swatches of others. With each discovery wave and order of the Court, the documents as to which it claimed privilege were reduced -- but this was with substantial effort on the part of the Court and of counsel. It took countless hours to finally force the government to come to grips with its obligations. And, the government persisted in refusing to disclose the bases for its claim of privilege -- not the category, but the facts. It did not do so until 2006, years into the case. Nevertheless, with respect to this period, 2004-2006, I will give the government the benefit of the doubt. I will take responsibility for not being as clear about the government's disclosure obligations as I should have been. Accordingly, I will not find bad faith in connection with pre 2006 discovery.

### 2.    2006

Finally, on March 26, 2006, the Court specifically ordered the government to provide "not just the facts of the privilege, but the information on which it is based," if necessary in camera.   <u>See</u> March 26, 2006 (document #352).[6]  While the government produced some

---

[6] The Order consisted of the following:

> Electronic ORDER entered granting in part and denying in part 277, Motion to Compel, granting in part and denying in part 288, Motion to Compel, granting in part and denying in part 313,  Motion to Compel : In docket #277, plaintiffs move this Court to compel defendant to produce certain unredacted documents in connection with documents concerning the investigation of the murder of Edward Deegan, *or to provide sufficient information to enable the Court to determine if the redactions are legally required*. In docket #288, plaintiffs moves for similar relief in connection with 1) redactions to the manuals, instructional documents, and policy documents produced by the United States; 2) redactions to additional documents produced by the government regarding the investigation of the murder of Edward Deegan, and not addressed in Plaintiffs? earlier motion to compel; and 3) redactions to the documents produced by the government to the United States Congress at the Congressional Hearings relating to the events at issue in this matter. In the final motion to compel, docket #313, plaintiffs address documents not covered by the first two motions (accompanied by an attachment, filed under seal) specifying those documents. The government did not oppose #277 on the merits, but only in terms of whether the plaintiffs

documents, on April 27, 2006, it withheld many others, continuing to file motions to block their disclosure.  The docket reflects the numbers of hearings the Court was obliged to hold, and the successive discovery orders the Court was obliged to issue, each more and more detailed, and candidly, more and more strident.

First, the government argued that it should be required to produce only those documents which *it* deemed relevant to summary judgment with the rest of their production stayed.  Then they suggested that plaintiffs already had all the information they needed, according to the *government's* view of plaintiff's case -- that the government already knew that Jimmy Flemmi was not prosecuted for the Deegan murder, but was involved in it, and that the FBI failed to pass that information on to the state authorities.  The "name of the informant who provided the information is irrelevant to . . . these theories of liability," the government claimed.  Defs.' Resp. to Order (document #354 at 2).  At the same time, the government was insisting that the FBI's role -- as they characterized it -- was not sufficient to make it responsible for the state prosecution.  Reduced to its essentials was the claim that the plaintiffs did not need the

complied with the discovery rules. It filed more substantive oppositions to the remaining two motions. The Court resolves these three motions with three principles in mind: 1) *It is up to the Court to balance plaintiffs' need for information, and the government's claim of the harm that could be caused by the disclosure*; 2) *the information requested is at least 30 years old, in some cases, raising substantial questions concerning whether their disclosure would cause harm sufficient to warrant denying the motion to compel*, and 3) that the Court entered a protective order, precisely as the government had drafted it, which governs disclosure of any documents in connection with this case. Accordingly, 1) the parties are to confer about which documents remain in contention, 2) to the extent that the government continues to assert the privileges it has asserted thus far, it is ORDERED to supplement its responses to describe not just the fact of the privilege, but the information on which it is based; 3) to the extent that the responses disclose information that the government insists cannot be shared with plaintiffs -- even subject to its protective order -- it will file such information with the Court in camera. Supplemental responses are to be filed by April 27, 2006.

March 26, 2006, document #352 (Italics supplied).

-15-

information requested because the Court should simply adopt the government's defense as true –
that "all" the government did was to make Barboza available and nothing more. Defs.' Resp. to
Order at 7.

At other times the government insisted that the burden was on the plaintiffs to show *why*
they needed the unredacted materials. The position made no sense. The plaintiffs could not show
why they needed the documents until they knew what they were looking at. And, in any event,
in order to do an independent investigation, the plaintiffs needed to know who had provided the
information on which the FBI had relied, whether the informants were credible, whether the
informant gave inconsistent tips, or whether their information was contradicted by other
information the FBI had.

These positions necessitated another order (dated July 4, 2006):

> On March 26, 2006, in response to a plethora of discovery
> motions, I ordered inter alia, that the parties confer for the purpose
> of narrowing the documents in contention. Conferring, apparently,
> did not work very well. On April 27, 2006, the United States sent
> to the Court unredacted copies of an initial set of documents that
> the parties agreed were still in contention, together with a chart
> describing the document, and the position of the respective parties.
> Subsequent correspondence between the parties suggest[ed] that
> considerably more than that 'initial' set remain in contention. . . .
> [P]laintiffs are correct that the operative standard here is not
> whether documents are 'relevant for summary judgment purposes,'
> as the government suggests. The relevant standard is under Rule
> 26, Fed. R. Civ. Pro., whether the material 'appears reasonably
> calculated to lead to the discovery of admissible evidence.' Some
> information relevant under Rule 26 – because it addresses
> credibility issues, impeachment of material witnesses, etc. – may
> in fact relate more to trial presentations than to summary judgment
> presentations.
>
> [W]ith respect to informants' names and file numbers, and insofar
> as they concern the specific documents described below, I agree
> with the plaintiffs. The malicious prosecution allegations in this

case include inter alia the failure of the government to disclose exculpatory information, as well as its efforts to suborn perjury and fabricate evidence in connection with the prosecutions of the plaintiffs for the murder of Edward Deegan. The requested information bears on the question of whether the FBI had reason to rely on and credit certain information it had received about the Deegan murder, whether it should have passed that information on to state authorities, etc. The government argues that this information is not relevant because the government did nothing more than transmit the information it had received about the Deegan murder to the state authorities. *Whether or not that account should be accepted depends upon the facts*, see Memorandum and Order Re: Motion to Dismiss, July 17, 2003, p. 25 et seq., facts which the plaintiffs are entitled to probe. *Moreover, since the information is over forty years old, since a considerable amount has already been disclosed in litigation in the District of Massachusetts and in Congress, I do not see how the informants named in these documents will be harmed. Finally, the case on which the government relies,* Roviaro v. United States*, 353 U.S. 52 (1959) provides a balancing test, not a blank check for informant secrecy no matter what the context.* In this case -- with respect to the documents described below -- that balance shifts in favor of disclosure of informant names and file numbers. [Listing of the specific documents and findings with respect to each].

(Italics supplied).

The government's response was to file yet another "Emergency Motion to Stay Order Compelling Names Pending Resolution of United States' Summary Judgment Motion." Def.'s Mot. (document #375).

Over the next several months, as the trial date loomed, although more documents were produced, the government persisted in claiming that it was entitled to simply announce the privileges it was asserting, without meaningful explanation of the facts relating to each claim (a position, sadly, it insists on in its briefing on fees to this day). After the Court denied summary judgment, and set a trial date, the Court's impatience with the government's position was palpable. On October 15, 2006, the Court entered the following order:

> [W]ith respect to documents that were ordered produced on July 4,
> 2006. I originally ordered certain documents produced on that
> date, but stayed the order to consider the Declaration of Robert A.
> Enriquez, Sr., Special Agent of the FBI. This affidavit does not
> affect my ruling on that date. I indicated that <u>Roviaro v. United
> States</u>, 353 U.S. 52 (1959) outlines a balancing test, "not a blank
> check for informant secrecy no matter what the context." *The
> Declaration does not meet that test. It is nothing more than a
> generalized recitation of the need for informant secrecy, without
> regard to the context of this case.* The government is ordered to
> produce these documents unredacted forthwith. [SPECIFYING
> THE DOCUMENTS BY BATES NUMBER AND CATEGORY
> WITH A DEADLINE FOR THEIR PRODUCTION]

(Italics supplied).

The government moved for an emergency stay to "assess its appellate options," a position

which this Court once again found to be disingenuous.  Defs.' Mot. (document #438).  My order,

on October 17, 2006 denying the stay, makes clear the facts why:

> FIRST: The government seeks a stay in order to determine whether
> or not it will appeal the Court's most recent order. Their position is
> disingenuous. The most recent order should not have come as a
> surprise. The government should have been addressing its
> appellate options long before today. Indeed, in an order dated July
> 4, 2006, this Court indicated that the usual balance suggested by
> the <u>Roviaro</u> decision --against the disclosure of informant
> identities - points in a different direction in the case at bar . . .
> requiring the *defendants* to come forward with concrete reasons for
> the non disclosure of particular informants. In response, the Court
> received a 'declaration' from an agent which did little more than
> recite the defendants' concerns in the most conclusory terms.
> While such a declaration may be sufficient in the usual case, it is
> not remotely sufficient here. Likewise, in open court on September
> 14, and by an endorsed order on September 15, the Court urged the
> defendants to demonstrate in camera -- who the informants are and
> why they remain vulnerable. SECOND: This Court well
> understands the importance of protecting informants' identities.
> One only has to read Judge Lindsay's decision in the McIntyre case
> (where the Court found the defendants responsible for the release
> of information which led to the death of an informant) to fully
> appreciate the risks. Likewise, the Court understands the plaintiffs'

claims that the requested discovery goes to the core of the case. This case is ABOUT whether the government had information suggesting that the plaintiffs did not commit the Deegan murder and that others did, information that obviously includes informant information. Moreover, a good deal of information about informant identity has already been disclosed to these plaintiffs and significantly, to Congress in connection with its report on informant abuse which focused directly on this case, namely, the 2004 Report of the House Committee on Government Reform, Everything Secret Degenerates: The FBI's Use of Murderers as Informants. The information is historical, forty years old. Some of the informants are long deceased. THIRD, given the allegations in this case, and their age, not to mention the age of the plaintiffs who are seeking redress for their decades-long imprisonment, the burden is on the government to justify non disclosure. The Court will give the defendants one more opportunity -- not to garner more time to discuss appellate options it should have considered long ago, not to provide the Court with unredacted documents without explanation. But rather, to provide the Court with the specific, concrete reasons for nondisclosure-- who the informant is that they wish to protect, why he or she needs protection for information provided forty years ago. ORDER: The defendants have until the close of business Monday, October 23 to provide this information to the Court. Moreover, the defendants shall, in addition, provide this Court with a statement as to what basis if any exists for appellate jurisdiction. The trial date will not be continued.

The Government filed another Emergency Motion for a Stay of Disclosure Orders Pending Appellate Review both with respect to 1) the specific documents that had been the subject of this Court's earlier orders and the informants' identities that disclosure involved, and 2) the remaining documents that had been produced in redacted form (some 7,000 pages). Defs.' Mot. (document #452).

By October 30, 2006, the plaintiffs moved for evidentiary sanctions, representing that the FBI had refused to identify the informants whose names were contained in certain specified

documents.  Pls.' Mot. for Sanctions (document #455). On November 2, 2006, the Court declined

to stay the orders one moment more:

> [T]he Order will not be stayed. The Court has requested that the
> Government identify to the Court in camera, who the informants
> are, why continued protection is necessary, etc. (See my earlier
> orders.) The Government has refused to do so. *With respect to
> 2)[the remaining documents in contention], the parties are
> directed to point out to me in this voluminous record, whether the
> Government has ever done what civil litigants are obliged to do --
> namely to identify document by document, why it believes the
> document is not relevant, and which particular privilege is
> implicated or rather, the Government persists in its blunderbuss
> approach -- e.g. 'somewhere in this mass of documents are
> privileged documents but we won't tell you where or why.'* The
> parties are to reply by November 3, 2006.

(Italics supplied.)

The government filed a petition for mandamus which was shortly denied.

Finally, on November 13, 2006, the Government filed a notice of production of

unredacted documents for in camera review, months after they had been ordered to do so.  Defs.'

Notice of Pro. of Unredacted Doc. (document #467).  Trial began on November 16, 2006, even

though some of the discovery issues remained unresolved.

The government's behavior from March 2006 to December 2006 was unquestionably in

bad faith.  The issue is not what ultimately happened – when the government finally met its

obligation to disclose ex parte the basis for its claims of privilege, when it finally narrowed its

objections to a finite set of documents.  The issue is how long it took them to get to that point

and how much effort Plaintiffs' counsel had to expend.  That effort should not go

uncompensated.

### 3.	Trial Counsel Had No Access to the Unredacted Documents

On November 20, 2006, during a hearing on one disputed exhibit, trial counsel for the defendants, who had been involved in the discovery disputes for two years, confirmed that she *had never seen* the unredacted documents that were supposed to be produced. Only the FBI had that access -- the very entity charged with failing to turn over exculpatory evidence forty years before. Small wonder that trial counsel could not respond on the merits to the myriad discovery motions. She had no idea what was *in* the unredacted material.

The Court ordered the Government to provide certification that an attorney with an appearance in this case had reviewed the discovery materials for their compliance with Rule 26. By December 12, 2006, the Court was compelled to file an Order to Show Cause:

> As I indicated in open court, there is a serious problem in the defense of the above entitled cases.
>
> On the one hand, the lawyers representing the government, who sign the pleadings, who are familiar with the plaintiffs' allegations, and who are subject to the discipline of this Court, including the disciplinary provisions of Rule 11 and Rule 26(g) Fed. R. Civ. Pro. – have not had access to the discovery at least in its unredacted form. In a striking admission, they have represented to the Court that they, attorneys and officers of this Court, are somehow not authorized by their client, the Federal Bureau of Investigation, to see the material until the FBI – or its general counsel, apparently – redacts it. Indeed, Ms. Lipscomb went so far as to compare her diminished status to that of someone in a national security case who does not have a security clearance. The analogy was, in a word, absurd.
>
> On the other hand, the lawyers representing the FBI, the FBI's general counsel, who ostensibly reviewed the documents, determined what should or should not be redacted, have not entered an appearance in the case, and according to a recent submission are not even permitted to do so. As such, they are not subject to the discipline of this Court, including the disciplinary provisions of Rule 11 and Rule 26(g). Nor can I have great confidence that are familiar with the plaintiffs' allegations in any great detail. . . .

True, the FBI and all law enforcement agencies should take all lawful steps to protect the identity of informants who have cooperated with the government. But the rule of protection is not absolute. The <u>Roviaro</u> decision contemplates a balance between the public interest in protecting the flow of information against the individual's right to prepare his or her case. . . . True too, that under Rule 26(g) every disclosure is to be signed by "at least one attorney of record" who is supposed to make a "reasonable inquiry" that "the disclosure is complete and correct as of the time it is made."

. . . [T]he position the FBI is taking is chilling. Time and again during the course of the litigation, a question will be posed about a document produced in discovery and government counsel will have no idea how to answer because they have not been privy to all of the information, because they have not participated in the screening decisions – and the answer is delayed. Time and again it appears that the lawyers representing the Government have simply not been given the authority that they need to understand the big picture, trying this case, if you will, with one hand tied behind their back. This Court is not remotely satisfied. Plaintiffs' have moved for monetary contempt sanctions for the government's failure to properly comply with Rule 26(g), which will be taken under advisement. In order to make that decision, the Court ORDERS that this matter be brought to the personal attention of the Director of the FBI, to answer the Court's concern that counsel be given the tools they need to fairly and properly defend these charges, namely access, as officers of the Court, to the documents relevant to the case at bar. Counsel IS ORDERED [to] report to this Court no later than Monday, December 18, 2006.[7]

Within a week, the government agreed to comply. Less redacted versions were sent to the plaintiffs. At the same time, the Government moved for permission to separately file sealed material to the Court. The Court reviewed the material and issued additional orders requiring production under the protective order that had been drafted and signed years before. To be sure, the Court sustained the Government's objections to disclosure but only with respect to a very,

---

[7] Monetary sanctions were never awarded.

very small number of documents and surely not the voluminous materials as to which the claim was initially made.

To this day, the government insists that "DOJ trial counsel were entitled to rely upon the FBI's expertise as to the assertion of the informant's privilege." Defs.' Resp. (document #688 at 1). Relying on the FBI's expertise is one thing. Ceding all control of discovery to one's client, without informing the court, is quite another.

All told, discovery motions consumed two years, multiple court orders, motions for sanctions, five motions to stay, four court orders. And it continued even into the trial as the Court noted:

> At the close of the bench trial, I ruled that the parties would be allowed to reopen the evidence with respect to a narrow set of issues – namely allow the Plaintiffs to introduce less- redacted versions of trial exhibits, as well as new exhibits, the relevance of which only became apparent in light of other lifted redactions, which had become the subject of a long standing discovery dispute."

Limone, 497 F. Supp. 2d at 173 n. 69.[8]

### III.    ATTORNEYS' FEES COMPUTATION

There is no doubt that there was bad faith in connection with the government's conduct during discovery. The government played a shell game – dumping vast numbers of documents that were so redacted as to be incomprehensible, interposing procedural objections to delay taking any substantive position, repeatedly filing specious objections to discovery, and then specious motions for a stay, culminating in the disclosure that trial counsel had no access to the unredacted documents. To be sure, I do not find that trial counsel made misrepresentations to

---

[8] Indeed, the trial record could not be close because the government discovery was still outstanding. See docket entries March 7, 2007, and March 8, 2007.

the Court. In reviewing all of the submissions, and all of the orders, it is clear that trial counsel never once affirmatively stated that they had personally reviewed the unredacted versions of the discovery. Nor did they say the opposite.

Nevertheless, it was reasonable for the Court to infer that the lawyers who had entered an appearance in the case were fully informed about whether the government had fulfilled its discovery obligations. I appreciate the position trial counsel found itself in, caught between the proverbial rock and a hard place, a client unwilling to cooperate with them, and a court pressing them for information. But the finding of bad faith accrues to the government's – here, the client's – conduct and is fully supported on this record.

As the plaintiffs argue, some courts have held that if a district court makes a bad faith finding under the EAJA, it may award fees and expenses for the entire litigation. See Gray Panthers Project Fund v. Thompson, 304 F. Supp. 2d 36, 42 (D.D.C. 2004); see also Comm'r, Immigration and Naturalization Serv. v. Jean, 496 U.S. 154, 161-62 (1990) (explaining that awards for the entire litigation are appropriate under a related provision of the EAJA governing mandatory awards, § 2412(d), which does not apply here). The government notes that other courts have concluded that fees awarded for bad faith should be traceable to the bad faith conduct. See Rodriguez v. United States, 542 F.3d 704, 713 (9th Cir. 2008); Brown v. Sullivan, 916 F.2d 492, 497 (9th Cir. 1990). I agree with the Government and ordered that the plaintiffs identify that portion of their fees attributable to the bad faith discovery practices of the Government. They have done so. I will award fees in connection with bad faith discovery practices from March 2006 to December 2006.

**A.      Lodestar**

In evaluating the fees, I am to use the lodestar approach to identify unreasonable, duplicative, or excessive time spent on the case.  See Guckenberger v. Boston Univ., 8 F. Supp. 2d 91, 99-100 (D. Mass. 1998).  The plaintiffs' memo sets forth the reasonableness of the hours, the steps taken to avoid duplicative tasks, reasons to include fees for unsuccessful claims, justifications for plaintiffs' chosen hourly rates, and a request for inclusion of time spent preparing the motion for fees, and I so find.  Pls.' Mem. (document #581 at 31-39).  While the government objects to payments for multiple lawyers at hearings representing a single client, the Court can attest to the extraordinary complexity of the case and the need for backup.  Indeed, the trial presentation was remarkably well organized with each set of plaintiffs allocated a certain time and set of issues.

I find that the plaintiffs' hourly rate to be reasonable and the work of counsel was not duplicative.

**B.    Costs**

Plaintiffs request costs regardless of whether there is a finding of bad faith.  See 28 U.S.C. 2412(a) ("Except as otherwise specifically provided by statute, a judgment for costs, as enumerated in section 1920 of this title, but not including the fees and expenses of attorneys, may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. A judgment for costs when taxed against the United States shall, in an amount established by statute, court rule, or order, be limited to reimbursing in whole or in part the prevailing party for the costs incurred by such party in the litigation.").  The government opposes certain costs, such as travel, meals, accommodations, and consulting

services, as unreasonable and excessive.  Def.'s Opp'n (document #595 at 44-46); see also Pls.'

Reply (document #601 at 13-18).  I adopt the Government's position on costs and have

recomputed the figures accordingly.

I hereby award the following:

| Attorney Name | Amount Requested | Amount Granted |
|---|---|---|
| Juliane Balliro | $676,541.76 (fees)<br>$176,619.00 (cost)<br>$867,910.67 (total) | $532,954.00 (fees)<br>$87,707.80 (cost)<br>$620,662.00 (total) |
| Michael Avery | $34,735.00 | $9,225.00 |
| William T. Koski | N/A[9] | $23,430.00 |
| Joseph B. Burns | $70,791.50 | $22,248.00 |
| Victor Garo | $11,070.00 | $7,640.00 |
| Richard Bickleman | $37,258.71 | $19,334.74 |
| Daniel R. Deutsch | $32,877.35 | $14,206.65 |

This award was calculated based on the time sheets submitted by Plaintiff's counsel.  All

redactions and objections were taken into account.  In Plaintiff's "Supplemented Motion on

Behalf of the Salvati Plaintiffs For Recovery of Reasonable Fees and Costs," paralegal TCS was

listed at an hourly rate of $100, however in the submitted time sheet, TCS was billed at an hourly

rate of $120.  Pls.' Mem. (document #686-1 at 3); Pls.' Mem (document #686-2 at 2 ).  I have

calculated the hourly rate of TCS at $100.  Included in the award for Balliro, Bickleman,

Deutsch and Avery is an additional $14, 750, $2,538.87, $2,650 and $3,375 respectively in

_____

[9] In "Supplemented Motion on Behalf of Limone and Tameleo Plaintiffs For Recovery of Reasonable Fees and Costs" (document #685-3), Koski did not include a requested amount.  The amount granted was calculated by computing the cost of service during the stipulated time period as provided by the submitted time sheets.

response to my June 20, 2011 order, which represents the amount of time spent to prepare the fees petition.

I have awarded $87,707.80 to Juliane Balliro in costs.[10]  The remaining Plaintiffs attorneys did not submit any documents regarding cost and therefore I will not grant costs on their behalf.

**SO ORDERED.**

**Date:  August 12, 2011**          _/s / Nancy Gertner_
                                 **NANCY GERTNER, U.S.D.J.**

---

[10] While I make this award to Ms. Balliro, I note that Ms. Balliro started the litigation at one firm, and concluded it at another. I take no position as to which firm is share in the costs awarded to Ms. Balliro.